IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICHARD SIMON, JANELLE SIMON,
ERIC CURTIS, and JOSE VEGA,

       Plaintiffs,

vs.                                                                      No. CIV 12-0096 JB/WPL

HEATH TAYLOR, JERRY WINDHAM,
PAT WINDHAM, MARTY L. COPE,
ARNOLD J. REAL, B. RAY WILLIS, THOMAS
FOWLER, LARRY DELGADO, and THE NEW
MEXICO RACING COMMISSION,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Defendants Marty L. Cope, Arnold J.

Real, B. Ray Willis, Thomas Fowler, Larry Delgado, and the New Mexico Racing Commission's

Motion to Dismiss under Rule 12(b)(6) and Memorandum in Support, filed November 20, 2012

(Doc. 22)("Motion to Dismiss").  The Court held a hearing on September 26, 2013.  The primary

issues are: (i) whether the Rooker-Feldman doctrine[2] deprives the Court of jurisdiction to hear

the Plaintiffs Richard Simon, Janelle Simon, Eric Curtis, and Jose Vega's claims against

Defendants Marty L. Cope, Arnold J. Real, B. Ray Willis, Thomas Fowler, Larry Delgado, and

---

[1] The Court entered an Order, filed September 30, 2013 (Doc. 34), granting the Motion to Dismiss in part and denying it in part, stating: "The Court will . . . issue an opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

[2] The Rooker-Feldman doctrine derives from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).  The Tenth Circuit has recognized that the "Rooker-Feldman doctrine prohibits federal suits that amount to appeals of state-court judgments."  Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1142-43 (10th Cir. 2006)(citations omitted).

the New Mexico Racing Commission (collectively, "the State Defendants"); (ii) whether the New Mexico Racing Commissioners are entitled to absolute immunity from suit regarding the decision that the Plaintiffs challenge; (iii) whether the Plaintiffs have stated a claim that the State Defendants violated their due process rights; and (iv) whether the law entitles the Plaintiffs to injunctive relief against the Racing Commission. The Court concludes that: (i) the <u>Rooker-Feldman</u> doctrine applies, but it bars the Court from considering only matters that the New Mexico courts decided, not matters that only the Racing Commission decided; (ii) the Racing Commissioners are entitled to absolute immunity from suit, because they acted in a quasi-judicial capacity when they issued the decision which the Plaintiffs challenge; (iii) the Plaintiffs have not stated a claim that the State Defendants violated their due process rights, because the Plaintiffs lack a constitutionally protected property interest; and (iv) given the Court's dismissal of the Plaintiffs' claims against the Racing Commission, the Racing Commission's argument that the Plaintiffs are not entitled to injunctive relief is moot. The Court will, therefore, grant the motion in part and deny it in part.

## **FACTUAL BACKGROUND**

The Court takes the following facts from the Plaintiffs' Original Complaint, filed January 31, 2012 (Doc. 1)("Complaint"), as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6). This dispute arises out of a horse race, the All American Futurity Run, at Ruidoso Downs Race Track in Ruidoso Downs, New Mexico on September 1, 2008. <u>See</u> Complaint ¶ 1, at 2. The All American Futurity is widely recognized in the quarter horse racing world as the major quarter horse event. <u>See</u> Complaint ¶ 3, at 3. The winning horse in the event receives a purse of approximately one million dollars. <u>See</u> Complaint ¶ 3, at 3. The winner also receives publicity, and earns for its owners tremendous stud and

breeding fees.  See Complaint ¶¶ 3-4, at 3.

Stolis Winner, a horse that the Windhams owned and Taylor trained, just barely crossed the finish line ahead of Jet Black Patriot, a horse that the Simons owned, Curtis trained, and Vega rode.  See Complaint ¶¶ 2, 9-11, at 2-3.  Jet Black Patriot finished the race approximately "a neck" behind Stolis Winner.  Id.  ¶ 12, at 4.  Jet Black Patriot was recorded as winning second place.  See Complaint ¶ 8, at 3.

A licensed veterinarian collected test samples for banned substances for each of the horses that competed in the race and divided the test samples for each horse into two containers. See Complaint ¶¶ 13-14, at 4.  Both of the samples taken from Stolis Winner tested positive for caffeine.  See Complaint ¶¶ 16, 21, at 4-5.  The rules and regulations promulgated by the Racing Commission list caffeine as a level 2 drug.  See Complaint ¶ 17, at 5.  The substance is banned pursuant to the Racing Commission's no-tolerance policy for level 2 drugs.  See Complaint ¶ 18, at 5-6.  New Mexico officials released the race purse to the Defendants before they received all of the test results, but after the staff had received a suspicious test.  See Complaint ¶ 23, at 5.

The Racing Commission scheduled a hearing of the stewards[3] to consider disciplinary action against "some or all of the Defendants."  See Complaint ¶¶ 22, 24, at 5.  The Plaintiffs were not permitted to bring their own administrative complaint against Windham and Taylor for violating the Racing Commission's rules, because the facts underlying the violations were concealed until after the deadline to file a complaint.  See Complaint ¶ 25, at 6.

---

[3] Section 60-1A-2 of the Horse Racing Act defines "steward" as "an employee of the commission who supervises horse races and oversees a race meet while in progress, including holding hearings regarding licensees and enforcing the rules of the commission and the horse racetrack."  NMSA 1978 § 60-1A-2(GG).  One of the stewards' duties is conducting hearings on complaints brought on the stewards' motion, or on receipt of a complaint from an official or third party.  See 15.2.1.9(B)(2)(a) NMAC.

After conducting a hearing on January 8, 2009, the stewards disqualified Stolis Winner and declared Jet Black Patriot the winner.  See Complaint ¶ 24, at 5.  The stewards entered two orders.  See Complaint ¶ 24, at 5.  The first order issued penalties against Taylor, Stolis Winner's trainer, and the second order altered the winners of the race, placing the Plaintiffs' horse first.  See Complaint ¶ 24, at 5.  Taylor appealed the decision and requested a de novo review.  See Complaint ¶ 26, at 6.  For the first time in New Mexico racing history, the Racing Commission appointed a three-judge administrative panel.  See Complaint ¶ 26, at 6.

The Plaintiffs attempted to participate in the appeal by filing a motion to appear at the administrative panel's hearing.  See Complaint ¶ 27, at 6.  The panel recommended that the Racing Commission deny the motion to appear.  See Complaint ¶ 28, at 6.  Although the Plaintiffs demonstrated that they "ha[d] an effected [sic] interest sufficient to create standing in the case," which is the test set forth in New Mexico Administrative Code § 15.2.1.9(C)(1)(d) for an interested party to intervene, they were prohibited from participating in the review process.  See Complaint ¶ 29, at 6.  In an effort to obtain a final ruling regarding the administrative panel's recommendation to exclude them, the Plaintiffs filed a petition for writ of certiorari to the First Judicial District Court, State of New Mexico.  See Complaint ¶ 33, at 7.

The New Mexico Assistant Attorney General prosecuting the administrative case requested that Taylor be required to post a bond in the amount of the purse that was prematurely released, and the Racing Commission scheduled a hearing on October 29, 2009, to consider this request.  See Complaint ¶ 34, at 7.  The Plaintiffs' counsel attended the hearing in an attempt to have the Plaintiffs' arguments heard.  See Complaint ¶ 36, at 8.  No representative from the Attorney General's Office appeared to argue on behalf of the motion to require a bond.  See Complaint ¶ 37, at 8.  Taylor's counsel appeared and vigorously argued against posting a bond.

See Complaint ¶ 38, at 8.  The Plaintiffs' counsel asked to present argument, but the Racing Commission denied the request.  See Complaint ¶¶ 39, 40, at 8.

On November 3, 2009, the First Judicial District Court held a hearing on the Plaintiffs' petition for writ of certiorari.  See Complaint ¶ 41, at 8.  The court ruled that it lacked jurisdiction, because the Racing Commission had not entered a final order regarding whether to adopt the administrative panel's recommendation to exclude the Plaintiffs from the review process.  See Complaint ¶ 41, at 8.

On November 19, 2009, the Racing Commission conducted a hearing to determine whether to permit the Plaintiffs to participate in the administrative review hearing.  See Complaint ¶ 43, at 9.  "Plaintiffs argued state law as well as federal constitutional protections of due process."  Complaint ¶ 43, at 9.  The Racing Commission adopted the administrative panel's recommendation to exclude the Plaintiffs from the hearing before the panel.  See Complaint ¶ 43, at 9.

Thereafter, the Plaintiffs filed a second petition for writ of certiorari with the First Judicial District Court and requested an emergency hearing.  See Complaint ¶ 44, at 9-10.  The state court again denied the Plaintiffs the right to participate in the administrative proceeding. See Complaint ¶ 44, at 9-10.  The state court "stated during argument that it relied upon state case law that found administrative actions of this nature were quasi-criminal actions and private litigants were not permitted to participate."  Complaint ¶ 45, at 9-10.

On May 11, 2010, the administrative panel conducted an evidentiary hearing in support of Taylor's request for a de novo review of the stewards' decision.  See Complaint ¶ 45, at 10. The Plaintiffs' counsel appeared at the hearing, but the panel denied the Plaintiffs the right to participate.  See Complaint ¶ 46, at 10.  At the hearing's conclusion, the administrative panel

found in Taylor's favor.  See Complaint ¶ 46, at 10.  For the "first known time in history, the Racing Commission was recommended to turn a blind eye to proven doping."  Complaint ¶ 46, at 10.  The Racing Commission "blindly adopted" the administrative panel's decision without evidence or serious inquiry.  Complaint ¶ 47, at 10.  "The Commission determined Plaintiffs were not entitled to the race purse even though . . . the race rules dictated that Stolis Winner be disqualified."  Complaint ¶ 98, at 18.

The evidentiary hearing was "fatally defective in numerous respects."  Complaint ¶ 48, at 10.  First, a few weeks before the evidentiary hearing, the "longtime Assistant Attorney General assigned to prosecute cases involving the New Mexico Racing Commission was removed from the case for alleged unknown health concerns," and "[a] new Assistant Attorney General, with no experience prosecuting Racing Commission cases, was assigned to the matter."  Complaint ¶¶ 49, 50, at 10-11.  Second, the "new Assistant Attorney General, entered into stipulations with Heath Taylor's counsel as to various facts," and "[a]t least one of those stipulations was blatantly false."  Complaint ¶ 51, at 11.  Specifically, the State stipulated that there was no theophylline, a caffeine metabolite,[4] in the horse's blood at the time of the test, when the under-oath testimony from the laboratory personnel who performed the test was that theophylline was likely present.  See Complaint ¶ 51, at 11.  The presence of theophylline is important, because it proves that Stolis Winner metabolized[5] the caffeine.  See Complaint ¶ 51,

---

[4] A metabolite is "[a]ny product or substrate (e.g., foodstuff, intermediate, waste product) of metabolism, especially of catabolism."  Stedman's Medical Dictionary 1192 (28th ed. 2006).

[5] Metabolism is "[t]he sum of the chemical and physical changes in tissue, consisting of anabolism (those reactions that convert small molecules into large), and catabolism (those reactions that convert large molecules into small), including both endogenous large molecules as well as a biodegradation of xenobiotics."  Stedman's Medical Dictionary, supra at 1192.  A xenobiotic is "[a] pharmacologically, endrocrinologically, or toxicologically active substance not endogenously produced and therefore foreign to an organism."  Id. at 2158.  "Endogenous"

at 11.  Third, none of the sworn depositions were offered as evidence, including the testimony from the laboratory personnel that theophylline was likely present, or from other laboratory personnel, test barn staff, Racing Commission staff, and race track staff.  See Comp. ¶¶ 51-53, at 11.  Fourth, the State made virtually no objections to Taylor's evidence, which was both irrelevant and not scientific, conducted no significant cross-examination of Taylor's witnesses, see Complaint ¶¶ 58, 59, 61, at 12-13, and failed to present evidence of Taylor's "substantial history of doping violations by racing authorities around the nation," Complaint ¶ 62, at 13.  Fifth, Taylor's lawyers argued, without evidence, that there was a "possibility" of contamination of the horse during the race or in the test barn, and the State failed to challenge this evidence or present contrary deposition testimony indicating that there was no contamination.  See Complaint ¶¶ 63, 69, 70, at 13-14.

Sixth, the Racing Commission has "never (a) imposed any other penalty other than loss of purse for a positive caffeine test, and (b) released a purse of this size without first obtaining clean drug tests."  Complaint ¶ 73, at 14.  "[T]he New Mexico Racing Commission could face liability for the negligent release of purse funds should Plaintiffs pursue a lawsuit in New Mexico state or federal court," Complaint ¶ 74, at 14, and "could avoid liability if the administrative process 'blesses' their behavior in this case." Complaint ¶ 77, at 15.  Thus, the Racing "Commission benefitted by not aggressively pursuing Defendant Taylor insofar as it [wa]s a way to cover for [its] serious error in releasing the race purse prematurely."  Complaint ¶ 78, at 15.

Winning the All American Futurity entitled the owners of the first place horse to a one-

means "[o]riginating or produced within the organism or one of its parts."  Id. at 640.  Stedman's Medical Dictionary does not define "endrocrinologically," but it does define "endocrinology" as "[t]he science and medical specialty concerned with the internal or hormonal secretions and their physiologic and pathologic relations."  Id. at 639.

million-dollar purse.  See Complaint ¶ 92, at 17.  The second place horse owners were entitled to a purse of $285,000.00.  See Complaint ¶ 92, at 17.  Because of the significance of the All American Futurity within the racing community, first place horses are valuable for marketing, stud fees, and other benefits to the horse owner, trainer, and jockey.  See Complaint ¶¶ 93, 94, at 17.  A horse recorded as placing second in the race is substantially less valuable than the horse placing first.  See Complaint ¶ 94, at 17.  "Plaintiffs to this day have not had an opportunity to present their case to any tribunal much less a fair and impartial tribunal."  Complaint ¶ 99, at 18.

The Plaintiffs filed a complaint in the United States District Court for the Western District of Texas on November 11, 2008, seeking nearly the same relief as the relief requested in the Complaint in this case.  See Simon v. Taylor, No. CIV 08-0827 LY (W.D. Tex., filed Nov. 11, 2008)("Texas Complaint"); Complaint ¶ 82, at 15-16.  In the Texas Complaint, however, the Plaintiffs did not name the State Defendants, but rather named only Taylor and the Windhams. On November 4, 2010, the Honorable Lee Yeakel, United States District Judge for the Western District of Texas, entered an order dismissing the Texas Complaint for failure to state a claim upon which relief can be granted.  See Simon v. Taylor, No. CIV 08-0827 LY, Order at 6, filed Nov. 5, 2010 (Doc. 1-1)("W.D. Tex. Order").  Judge Yeakel's order was based, in part, on the Racing Commission's decision that no violation of the rules of racing had occurred and that Stolis Winner was the first place finisher of the race.  See W.D. Tex. Order at 5.  The Plaintiffs appealed to the United States Court of Appeals for the Fifth Circuit.  See Simon v. Taylor, No. 10-51148, Appeal (5th Cir., filed Apr. 29, 2011)(Doc. 1-2).  On December 22, 2011, the Fifth Circuit vacated the district court opinion and ordered the case dismissed for lack of diversity jurisdiction.  See Simon v. Taylor, No. 10-51148, Order (5th Cir., filed Dec. 22, 2011)(Doc. 1-3)("5th Cir. Order"); Complaint, ¶ 88, at 16.  This dismissal was without prejudice.  See 5th Cir.

Order at 3; Complaint ¶ 88, at 16.

## PROCEDURAL BACKGROUND

On January 31, 2012, the Plaintiffs filed their Complaint in the District of New Mexico, alleging that the Court has federal-question jurisdiction over this case pursuant to 28 U.S.C. § 1331 and diversity jurisdiction over it pursuant to 28 U.S.C. § 1332(a).  The Complaint involves the same allegations and claims for relief against Heath Taylor, Jerry Windham and Pat Windham (collectively, "the Private Defendants") as the Texas Complaint, but adds additional claims against the State Defendants.   Specifically, the Plaintiffs allege that the Racing Commission violated the due-process clause of the Fourteenth Amendment in both its procedural and substantive aspects.  See Complaint ¶¶ 153-67, at 167; ¶¶ 168-173, at 27-29.  The Plaintiffs further contend they are entitled to declaratory relief: they ask the Court to declare that Jet Black Patriot won the race, and that he "is due all the benefits and emoluments that are due" the first-place winner.  Complaint ¶¶116-17, at 21.  The Plaintiffs also ask the Court to issue injunctive relief: (i) an Order requiring the Racing Commission to release all relevant test results, see Complaint ¶¶ 120-123, at 22; (ii) if the Court finds the law does not entitle them to the adjudication before it, an Order requiring the Racing Commission to adjudicate their claims in a manner that honors their rights under federal law, see Complaint ¶¶ 123, at 22; (iii) regardless of whether the Court issues an Order granting the relief in (ii), the Plaintiffs ask the Court to adjudicate their claims with respect to stud fees, marketing fees, and other benefits that the Plaintiffs would have received had the Racing Commission declared Jet Black Patriot the winner, because the Racing Commission could not adjudicate their private claims.  See Complaint ¶¶ 124-25 at 21-23.  If the Court awards the Plaintiffs relief from the Racing Commission, the Plaintiffs also ask for attorneys' fees.  See Complaint ¶ 126, at 23.

To support their procedural due-process claim, the Plaintiffs contend that they had a property interest in the purse, and that the Racing Commission's individual members deprived them of that property interest without due process in two ways: (i) the Racing Commissioners excluded them from the appeal process, which determined whether the Plaintiffs would keep their winnings; and (ii) the Racing Commissioners adopted the panel's decision overturning the Plaintiffs' first-place win.  See Complaint ¶¶ 153-161, at 26-28.  According to the Plaintiffs, the due-process clause mandates that they participate and offer evidence at a hearing before an unbiased panel, and the Racing Commissioners deprived them of that right; therefore, the Plaintiffs contend, they may seek damages from the Racing Commissioners.  See Complaint ¶¶ 162-67, at 28.  The Plaintiffs also assert a substantive due-process claim: in their view, the Racing Commissioners' adoption of the non-Racing Commission panel's decision was arbitrary and conscience-shocking, and, therefore, the Racing Commissioners violated a property interest the substantive due-process doctrine protects.  See Complaint ¶¶ 168-172, at 29.  In their view, that doctrine entitles the Plaintiffs to recover damages from the Racing Commissioners.  See Complaint ¶¶ 173, at 29.

The Plaintiffs request one of two alternative forms of relief.  They first ask the Court to enter judgment

(a) Order[ing] the New Mexico Racing Commission to release all those blood and urine samples taken from any horse on the day of the subject race so that they can be tested for the presence of caffeine to determine if any contamination is possible[;]

(b) Prohibiting Defendants from stating, advertising or declaring that Stolis Winner was the winner of the All American Futurity;

(c) Declaring Jet Black Patriot was in fact the winner of the All American Futurity;

(d) Requiring the Defendants to state a court has declared Jet Black Patriot the

winner of the 2008 All American Futurity when inquired;

(e) Awarding Plaintiffs the difference in purse between the First and Second Place finishers at the All American Futurity;

(f) Awarding Plaintiffs the difference in value of Jet Black Winner had he been declared the winner of the All American Futurity without court intervention;

(g) Awarding Plaintiffs reasonable stud fees and other income Jet Black Winner would have earned but for the wrongful conduct of Defendants[.]

Complaint ¶ 175, at 30-31.  They also propose a second form of relief:

(h) In the alternative to an award of the race purse and a declaration of the race order, Order the New Mexico [R]acing Commission to conduct a new hearing, carried out by the member [sic] personally, that fully permits Plaintiffs to present evidence and argument in their favor and permit Plaintiffs a reasonable appeal therefrom, if necessary.

(i) Awarding the Plaintiffs their reasonable and necessary attorney's fees and costs incurred in prosecuting this suit; and

(j) Awarding the Plaintiffs such other and further relief to which they may be justly entitled at law or in equity.

Complaint ¶ 175, at 31.

The State Defendants raise four principal arguments in their Motion to Dismiss.  First, they argue that the Rooker-Feldman doctrine bars the Plaintiff's claims.  See Motion to Dismiss at 6-11.  According to the State Defendants, the "Plaintiffs seek review and reversal of a state administrative proceeding order which was affirmed by the State District Court.  Plaintiffs also seek review and reversal of the Commission's final decision and order.  Plaintiffs appealed this decision to the State District Court," which dismissed the matter for lack of activity.  Motion to Dismiss at 6.  In the State Defendants' view, therefore, the Rooker-Feldman doctrine bars the Court from considering this case.  See Motion to Dismiss at 6.

The State Defendants argue that the Court should dismiss this case for a second reason: absolute judicial immunity.  In their view, the Racing Commissioners were acting in a quasi-

judicial capacity, because their actions satisfy the three-part test that the United States Court of

Appeals for the Tenth Circuit set out in Horwitz v. State Bd. of Med. Exam'rs, 822 F.2d 1508

(10th Cir. 1987)("Horwitz"):

> The *Butz* decision granted absolute immunity to administrative officials
> performing functions analogous to those of judges and prosecutors if the
> following formula is satisfied: (a) the officials' functions must be similar to those
> involved in the judicial process, (b) the officials' actions must be likely to result
> in damages lawsuits by disappointed parties, and (c) there must exist sufficient
> safeguards in the regulatory framework to control unconstitutional conduct.

Horwitz, 822 F.2d at 1512-13 (citing Butz v. Economou, 438 U.S. 478 (1978)).  In the State

Defendants' view, "the Commissioners had jurisdiction over the subject matter, were well within

their legal authority and are therefore entitled to absolute immunity."  Motion to Dismiss at 10.

The State Defendants argue that the Racing Commissioners satisfied the Horwitz test's judicial-

function prong "by appointing a panel of hearing officers to conduct the hearing, issuing

subpoenas, reviewing all portions of the record and issuing a final decision."  Motion to Dismiss

at 10.  The State Defendants state, without elaboration, that the Racing Commissioners satisfy

the second prong.  See Motion to Dismiss at 10.  With respect to the third prong, the State

Defendants contend that "safeguards to prevent unconstitutional action against a party include

the regulatory allowance of a request for rehearing and the ability of disappointed parties to

appeal the decision to State District Court."  Motion to Dismiss at 10.  The State Defendants

further contend that the exception to judicial immunity for "actions, though judicial in nature,

taken in the complete absence of all jurisdiction," Mireles v. Waco, 502 U.S. 9, 11-12 (1991),

does not apply; in their view, even if "the Commissioners did not have jurisdiction, it could not

be said that they acted in clear absence of jurisdiction," as Moss v. Kopp, 559 F.3d 1155 (10th

Cir. 2009), requires.  Motion to Dismiss at 9-10.  The State Defendants further argue that,

because 42 U.S.C. § 1983 does not affect absolute judicial immunity, the Racing Commissioners

are entitled to absolute immunity.  See Motion to Dismiss at 10.

    The State Defendants also argue that the Plaintiffs received all the process the Fourteenth Amendment requires.  See Motion to Dismiss at 11.  In their view, the Plaintiffs fail to state a claim on which the Court may grant relief, because the Plaintiffs have alleged only that the Racing Commissioners violated a state statute and not any federal constitutional right: in the State Defendants' view, the "Plaintiffs had no recognized property right that would have entitled them to intervene and participate in the disciplinary hearing against Trainer Taylor's License." Motion to Dismiss at 11-12.  The State Defendants argue that the Plaintiffs have conceded three points: first, that the hearing's purpose was limited to disciplinary action against Taylor; second, that the Racing Commission lacked the authority to give the Plaintiffs the full relief they requested; and third, that "both the Commission and the State District Court denied their motion to intervene with the State District Court ordering that Plaintiffs had no entitlement to intervene as 'private litigants were not permitted to participate' in the administrative process."  Motion to Dismiss at 12.  The State Defendants argue that, because the Plaintiffs were not parties to the administrative action, the due-process clause does not entitle them to due-process rights and protections; rather, the due-process clause entitles only Taylor to these protections.  See Motion to Dismiss at 12.  The State Defendants argue that New Mexico statutes give the Racing Commission authority only in a limited area -- licensing and protecting racing participants and patrons from wrongful or unfair practices -- and that the Racing Commissioners acted within this limited authority.  See Motion to Dismiss at 13.  The State Defendants point out that the Plaintiffs appealed to state district court the Racing Commission's denial of their motion to intervene and argue that that appeal satisfied the due-process clause's dictates.  See Motion to Dismiss at 14.

- 13 -

The State Defendants also argue that the Plaintiffs waived process to which the law entitled them.  They first point to the Plaintiffs' decision not to appeal the state district court's decision affirming the Racing Commission's decision.  <u>See</u> Motion to Dismiss at 15.  They also argue that, "[a]ssuming *arguendo* that Plaintiffs had standing and were entitled to the constitutional safeguards afforded parties, they failed to pursue" their rights under the Horse Racing Act, NMSA 1978, § 60-1A-1-30, and related regulations.  <u>See</u> Motion to Dismiss at 15. According to the State Defendants, those provisions allow "a party adversely affected by [an] order to file a petition for rehearing" under certain circumstances, and they could have appealed a final order in state court.  <u>See</u> Motion to Dismiss at 15.  The State Defendants also point to a second Petition for Writ of Certiorari that the Plaintiffs filed in state court, and the resulting Writ, which said the Plaintiffs "may be entitled to the relief sought in the petition."  Motion to Dismiss at 15.  The Plaintiffs, however, failed to take action on the Writ in the subsequent six months, and a state district judge issued an Order of Administrative Closure due to "lack of activity within the previous six months."  Motion to Dismiss at 15.  The Order permitted the Plaintiffs to reinstate the matter upon good cause within thirty days, but the Plaintiffs again took no action. <u>See</u> Motion to Dismiss at 15.  According to the State Defendants, the Plaintiffs thereby "waived the right to challenge the adequacy of certain procedural rights 'by knowingly failing to take advantage of those procedures.'"  Motion to Dismiss at 15 (citing <u>Pitts v. Bd. of Educ.</u>, 869 F.2d 555 (10th Cir. 1998)).

The State Defendants also dispute the significance of the Plaintiffs' criticism of the prosecutor.  <u>See</u> Motion to Dismiss at 16.  According to the State Defendants, the Racing Commission is required to consider, in reaching its decision, only the evidence that the parties present at the hearing.  <u>See</u> Motion to Dismiss at 16.  In the State Defendants' view, the Racing

Commission is not responsible for any of the prosecutor's failings.  See Motion to Dismiss at 16-

17.  They further argue that no evidence supports the Plaintiffs' suggestion that, because both the

prosecutor and the Racing Commission's lawyer were Assistant Attorneys General, bias,

collusion, and conflicts of interest infected the process.  See Motion to Dismiss at 17.  The State

Defendants argue that, even if there were such evidence, "the Commissioners should not be held

liable for any claimed inadequacies of either their legal counsel or the administrative

prosecutor."  Motion to Dismiss at 17-18.

The State Defendants also defend the Racing Commission against the Plaintiffs' charge

that the Racing Commission was unfair and partial.  See Motion to Dismiss at 18.  In the State

Defendants' view, this language from the Tenth Circuit's decision in Guttman v. Khalsa, 446

F.3d 1027 (10th Cir. 2006),[6] forecloses this argument:

> The Supreme Court has established that an accusation of a conflict of interest
> does not trump a claim of absolute immunity.  "[J]udicial immunity is not
> overcome by allegations of bad faith or malice. . . . " Mireles, 502 U.S. at 12 . . . .
> Only accusations that a judge was not acting in his judicial capacity or that he
> acted in the complete absence of all jurisdiction can overcome absolute immunity.

Motion to Dismiss at 18 (quoting Guttman v. Khalsa, 446 F.3d at 1033-34).  In the State

---

[6] Guttman v. Khalsa has a tangled history -- so tangled that, in the Tenth Circuit's most
recent case, it adopted the following convention for its previous decisions:

> Guttman v. Khalsa, 320 F.Supp.2d 1164 (D.N.M. 2003)(Guttman I); Guttman v.
> Khalsa, 401 F.3d 1170 (10th Cir. 2005)(Guttman II); Guttman v. Khalsa, 446 F.3d
> 1027 (10th Cir. 2006)(Guttman III); Guttman v. New Mexico, 325 Fed. Appx.
> 687 (10th Cir. 2009)(Guttman IV).

Guttman v. Khalsa, 669 F.3d 1101, 1106 (10th Cir. 2012).  Among other reasons, the Tenth
Circuit did so because the Supreme Court granted, vacated, and remanded "Guttman II" for
reconsideration in light of Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 282
(2005).  See Guttman v. Khalsa, 546 U.S. 801 (2005).  The Court relies solely on the Tenth
Circuit's subsequent decision in "Guttman III."  Because Guttman v. Khalsa's procedural history
is irrelevant in the present case, the Court will refer to "Guttman III" by its formal citation
throughout the remainder of this memorandum opinion.

Defendants' view, because the Complaint does not allege that the Racing Commissioners acted either outside of their judicial capacities or in the absence of all jurisdiction, the Racing Commissioners are entitled to absolute immunity from the Plaintiffs' claims for damages. Motion to Dismiss at 19.  Further, the State Defendants again point out that the Plaintiffs had alternative avenues for review of the Racing Commission's decision, and "that the Racing Commission accepted the Hearing Panel's proposal for decision does not establish lack of fairness or lack of impartiality."  Motion to Dismiss at 18.  In sum, according to the State Defendants, "[t]he Commissioners complied with [the Racing Commission's] statutory and regulatory obligations and should be dismissed with prejudice from this lawsuit."  Motion to Dismiss at 19

        In their fourth and final principal argument, the State Defendants argue that the law does not entitle the Plaintiffs to an injunction ordering the Racing Commission to conduct a new hearing.  See Motion to Dismiss at 19.  Conceding that judicial immunity would not bar the Plaintiffs' claim for prospective relief, the State Defendants nonetheless argue that New Mexico law's injunction standard does not entitle the Plaintiffs to an injunction.  See Motion to Dismiss at 19-20.  First, the State Defendants argue, the Plaintiffs have demonstrated neither that they would suffer irreparable harm in the absence of injunctive relief nor the absence of an adequate remedy at law.  See Motion to Dismiss at 20.  In the State Defendants' view, the "Plaintiffs had legal remedies they chose not to pursue" -- i.e., state appellate remedies -- and, having abandoned those remedies, they cannot now claim irreparable harm and the absence of an adequate remedy at law.  Motion to Dismiss at 20.  The State Defendants also argue that any injury which the Plaintiffs might suffer does not outweigh the damage that the injunction would inflict on the Racing Commission, i.e., the time, effort, and cost of appointing a new hearing

panel, holding a new, longer hearing, and deciding the issue again, with perhaps an identical result.  See Motion to Dismiss at 21.  The State Defendants further argue that an injunction would not serve the public interest, substantially because, in their view, the Racing Commission's previous actions served the public interest.  See Motion to Dismiss at 21.  Finally, the State Defendants argue, in light of their other objections to the Plaintiffs' claims, that the Plaintiffs do not have a substantial likelihood of prevailing on the merits.  See Motion to Dismiss at 21-22.

The Plaintiffs respond to these claims in Plaintiffs' Response to Defendants Marty L. Cope, Arnold J. Real, B. Ray Willis, Thomas Fowler, Larry Delgado, and the New Mexico Racing Commission's Motion to Dismiss Under Rule 12(b)(6) and Memorandum in Support, filed December 21, 2012 (Doc. 25)("Response").  The Plaintiffs first argue that Rooker-Feldman does not bar their claims, because the Racing Commission's decision to exclude the Plaintiffs from the hearing is not a "final judgment equivalent to the facts of the Rooker and Feldman cases."  Response at 5-6.  They contend that the state district court's decision on appeal does not change this outcome, because the Order of Administrative Closure the state district court issued was for failure to prosecute, and "had nothing to do with the merit of the appeal."  Response at 6. The Plaintiffs also contend that the Racing Commission's construction of the system is "unworkable," because if the Plaintiffs must exhaust their state remedies and may not seek federal court review after state court review commences, they will be deprived of "meaningful federal court review."  Response at 6.  The Plaintiffs continue:

> Plaintiffs are claiming a subdivision of the State of New Mexico deprived them of their constitutional rights to a fair hearing.  Under the Commission's reading of the Rooker-Feldman doctrine, federal courts could never be invoked to protect the constitutional rights of a citizen against the state.  This outcome is exactly why the Supreme Court has invoked the doctrine so sparingly.

- 17 -

Response at 6.

The Plaintiffs contend that absolute immunity does not insulate the Racing Commissioners from liability, because they cannot satisfy any of the <u>Horwitz</u> test's prongs. Regarding the first prong -- that the officials' functions must be similar to those involved in the judicial process -- the Plaintiffs argue that the Racing Commission did not demonstrate the key characteristics of a fair tribunal, because: (i) it excluded interested and affected parties -- <u>i.e.</u>, the Plaintiffs -- from the proceedings; (ii) "the 'prosecutors' had an interest in the proceeding insofar as they hoped to avoid liability for their own acts[;]" (iii) "[t]here was no meaningful discovery and available, relevant sworn depositions were . . . excluded from the record;" and (iv) "[t]he state criminal investigator who always (or nearly always) testifies in these hearing [sic] was not called because her testimony would have been damaging to the state."  Response at 7-8.

Regarding the <u>Horwitz</u> test's second prong -- that the officials' actions are likely to cause civil lawsuits by disappointed litigants -- the Plaintiffs contend that this case is highly unusual, because the Racing Commission departed from its usual adversarial procedures, and because the Racing Commission will only rarely "conduct[] an adjudication where their own error and the consequences therefore hang in the balance."  Response at 8.  Further, the Plaintiffs argue, because the All American Futurity is unusually prestigious and victory is unusually lucrative, few litigants will be as motivated to litigate as the Plaintiffs are.  <u>See</u> Response at 8.

Regarding the <u>Horwitz</u> test's third prong -- that the regulatory framework must contain sufficient safeguards to control unconstitutional conduct -- the Plaintiffs assert that, because they were the only parties the Private Defendants truly injured, the Plaintiffs' stake in the outcome uniquely positioned them to challenge the Private Defendants' actions.  <u>See</u> Response at 8. Further, the Plaintiffs contend that the Racing Commission stood to benefit if it concluded that

Taylor had not violated its doping rules and that Stolis Winner rightfully won the race, because the Racing Commission "would not be liable for negligently paying out a purse."  Response at 8. In the Plaintiffs' view, the Racing Commission's interest in the outcome motivated it to "simply stage[] a review process they controlled from the beginning."  Response at 9.  The Plaintiffs argue that no meaningful standards or procedures govern Racing Commission hearings, and that the Racing Commission's ruling that the harmless error standard governs doping test results departs from its own precedent and introduces instability into its own jurisprudence.  See Response at 9.

The Plaintiffs also maintain that, given the Assistant Attorney General's conduct at the hearing and failure to appeal the decision, and the fact that the Racing Commission excluded the Plaintiffs from the hearing, "there were clearly insufficient safeguards in the administrative framework to control unconstitutional conduct and justify giving the Commission Defendants absolute immunity."  Response at 9.  The Plaintiffs also argue that, if the Court concludes that absolute immunity protects the Racing Commissioners from suit for damages, the Court should not dismiss the Plaintiffs' claims against them in their official capacities, because, citing cases from the United States Courts of Appeals for the Fifth and Sixth Circuits, absolute immunity does not protect the Racing Commissioners from such claims.  See Response at 10-11.

The Plaintiffs next defend their procedural and substantive due-process claims.  With regard to their procedural due-process claim, the Plaintiffs describe their property interest differently than the State Defendants do: in the Plaintiffs' view, they acquired a property interest in first-place standing and its benefits, including the purse and accompanying stud and breeding fees, as soon as Stolis Winner tested positive for caffeine and the Stewards declared Jet Black Patriot the winner.  See Response at 11-12.  The Plaintiffs contend that the Racing Commission

deprived them of that property interest by preventing them from presenting evidence at the Panel hearing to overturn their win.  <u>See</u> Response at 12.  In response to the State Defendants' argument that the Plaintiffs enjoyed all the process they were due, the Plaintiffs submit two arguments.  First, they contend that the Racing Commission did not comply with its own rules permitting affected parties to intervene.  <u>See</u> Response at 12.  Second, the Plaintiffs argue that the Racing Commission's decision to prevent them from intervening is separate from the argument about their property interest: that is, "[t]he hearing should not have been focused on whether the Plaintiffs had a right to be heard, but whether the taking of the Plaintiffs' property interest was just and fair."  Response at 12.  In their view, because they could not take part in the hearing, they did not receive due process, and dismissing the case "would exclude any federal court review of compliance by the state of [sic] constitutional rights."  Response at 12.

To the State Defendants' waiver argument, the Plaintiffs respond that any continued attempt to convince the Racing Commission to allow them to participate would have been futile in light of the Racing Commission's decisions.  <u>See</u> Response at 13.  In the Plaintiffs' view, their cause of action accrued after two conditions occurred: the Racing Commission took away their rights, and the Plaintiffs lacked an avenue to dispute or appeal that adverse decision.  <u>See</u> Response at 13.  The Plaintiffs argue that, even if they had "filed another Wirt [sic] of Certiorari, a right technically available only to parties of the lower proceeding, there was no evidentiary record to review except the one-sided fiction put on by the State and Taylor."  Response at 13. Therefore, in the Plaintiffs' view, their unsuccessful attempts to intervene in the proceedings and to appeal adverse decisions preserved their due-process claim from waiver.  <u>See</u> Response at 13.

The Plaintiffs further argue that the due-process clause entitles them to a neutral decision maker, and that, "[w]ith Taylor affirmatively seeking to overturn the Board of Stewards'

[d]ecision and the Assistant Attorney General failing to present nearly any of the evidence to defend the decision, there was little chance for a fair, unbiased hearing to take place." Response at 13-14. The Plaintiffs suggest that, because the Assistant Attorney General represented the Racing Commission, he could not adequately represent the Plaintiffs' position as well, given that the Racing Commission would benefit vis-à-vis civil liability if it overturned the Stewards' decision. See Response at 14. In sum, the Plaintiffs argue that, because the Plaintiffs could not present their argument, and because the Assistant Attorney General could not adequately represent the Plaintiffs' interests, the State Defendants deprived them of their due-process rights. See Response at 14.

The Plaintiffs respond to the State Defendants' injunction argument by first recasting the appropriate legal standard. See Response at 15. In their view, "[i]f a plaintiff shows irreparable harm, balance of hardships and effect on public interest, the plaintiff does not need to show a likelihood of success, but must show rather there are serious questions about merits that are ripe and deserve to be litigated." Response at 15 (citing Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234 (10th Cir. 2001)). The Plaintiffs argue that, because the Racing Commission deprived them of a property interest without due process, they suffered irreparable harm, and once the Racing Commission determined they could not intervene, they were unable to seek an adequate remedy at law. See Response at 15. Further, the Plaintiffs argue that their injury outweighs the damage an injunction would inflict on the State Defendants, because their due-process rights outweigh the compliance costs the State Defendants would incur. See Response at 16. With respect to the public-interest prong, the Plaintiffs argue that requiring the Racing Commission to release accurate test information and hold another hearing would serve the public's interest in fair horse racing. The Plaintiffs argue they satisfy the serious-merits-

questions prong, that their claims are ripe, and that "they deserve their day in court."  Response at 16.

Finally, if the Court agrees with any of the State Defendants' arguments, the Plaintiffs request leave to amend.  See Response at 17.

The State Defendants reply to each claim in turn.  See Defendants Marty L. Cope, Arnold J. Real, B. Ray Willis, Thomas Fowler, Larry Delgado, and the New Mexico Racing Commission's Reply in Suport [sic] of Motion to Dismiss under Rule 12(b)(6), filed January 18, 2013 (Doc. 26)("Reply").  With respect to the Plaintiffs' Rooker-Feldman argument, the State Defendants reply that, when the Plaintiffs failed to appeal the state district court's decision affirming the Racing Commission, that decision became final for purposes of Rooker-Feldman. See Reply at 1-2.  The State Defendants renew their failure-to-exhaust argument that "when Plaintiffs voluntarily dismiss their appeal of the Commission Order they have waived their right to object to the Commission's order by not exhausting an administrative remedy that they sought and received authority to pursue."  Reply at 2-3.  In their view, because the Plaintiffs did not reinstate their appeal, they voluntarily allowed dismissal, and the Order then became a final decision.  See Reply at 3.  Further, the State Defendants argue that Rooker-Feldman bars this case, because the relief which the Plaintiffs seek "is a direct attack on the Commission's final decision and amounts to appellate review of that final decision."  Response at 3.  According to the State Defendants, this case is similar to the Court's decision in Braverman v. New Mexico, No. CIV 11-0829, 2011 WL 6013587 (D.N.M. Oct. 19, 2012)(Browning, J.); in their view, here, as there, Rooker-Feldman bars the Plaintiffs' claims because the harm they allege would not have occurred but for the state court's judgment.  See Reply at 4 (quoting Braverman v. New Mexico, 2011 WL 6013587, at *31).

The State Defendants also assert that the Racing Commissioners are entitled to absolute immunity from the Plaintiffs' claims against them in both their individual and individual capacities.  See Reply at 4.  The State Defendants argue that the Plaintiffs have effectively conceded that the State Defendants have satisfied the Horwitz test's first, judicial process prong, because the Plaintiffs' arguments that the tribunal was not "fair" does not diminish their concession that the Racing Commission adjudication was similar to the judicial process.  See Reply at 4.  With respect to the second, litigation causation prong, the State Defendants contend that the Plaintiffs' response itself demonstrates that the Racing Commissioners' actions were likely to spawn litigation: if the Racing Commission had affirmed the Board of Steward's decision, the Plaintiffs would have sued for the purse's value -- and further, Stolis Winner's owners would have sued the Racing Commission as well.  See Reply at 4.  The State Defendants also contend that the Horse Racing Act's scheme for enacting and enforcing regulations provides sufficient safeguards against unconstitutional conduct.  See Reply at 4-5.

The State Defendants also contest the Plaintiffs' conclusion that absolute immunity does not bar their official-capacity claims.  In their view, insofar as the Plaintiffs seek both monetary and injunctive relief from the Racing Commission, the Eleventh Amendment bars their claims.  See Reply at 6.  Therefore, according to the State Defendants, the Plaintiffs must overcome not only absolute immunity, but also sovereign immunity, and they must do the latter by proving that the Racing Commission is a municipality and that it had a custom and policy to discriminate under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  See Reply at 6-7.  This, in the State Defendants' view, the Plaintiffs failed to do.  See Reply at 7.

The State Defendants then return to the Plaintiffs' due-process claims and argue that the Plaintiffs' claims rest on the central fallacy that they had a property interest that the Constitution

- 23 -

protects.  See Reply at 7.   In the State Defendants' telling, "[o]nly if the Commission had affirmed the Board would Plaintiffs have had a property right and interest in the first place winner's purse."  Reply at 7.  In their view, this reality disposes of the Plaintiffs' claim that the due-process clause entitled them to a hearing before a neutral arbiter, because "[h]aving no protected property interest, plaintiffs were not entitled to more due process than they received." Reply at 9.  The State Defendants also dispute the Plaintiffs' characterization of the statutory scheme governing the Racing Commission, under which "[t]he hearing is not meant to ensure that Plaintiffs receive the monetary winnings they seek," but to, using the Racing Commission's licensing power, ensure fairness and protect horse racing participants and patrons from illegality. See Reply at 8.

The State Defendants also renew their waiver arguments.  First, they argue that the Plaintiffs' decision not to request a rehearing was misguided, because that process provided a direct avenue for relief.  See Reply at 8.  Second, the State Defendants again point to the Plaintiffs' decision not to pursue the appeal avenue that the state court permitted them to pursue as evidence that "they failed to allow the Court to hear the matter on its merits and thereby waived any claim that the procedure failed to afford them the process they were due."  Reply at 8-9.  They also dispute, without further argument, the Plaintiffs' contention that the Racing Commission benefited from overturning the Board's decision.  See Reply at 9.  Finally, the State Defendants reiterate their view that, whatever the prosecutor's shortcomings, the Racing Commission had to base its decision on the evidence the prosecutor presented and that the Court should not hold the Racing Commission liable for prosecutorial failings.  See Reply at 9.

The State Defendants also restate that the Plaintiffs still have not proved the law entitles them to injunctive relief.  See Reply at 10.  First, they argue that the Plaintiffs' claims ultimately

reduce to claims for money damages and that, even if those damages are difficult to calculate, the existence of a monetary remedy precludes injunctive relief.  See Reply at 10.  The State Defendants also renew their argument that an injunction would not serve the public interest, because endless and costly litigation would follow if race losers could sue the Racing Commission in like circumstances, and because the Plaintiffs' quest for compensation for themselves does not serve the public interest where the Racing Commission has followed the Horse Racing Act.  See Reply at 10.

The State Defendants also argue that the Court should deny the Plaintiffs' request for leave to amend.  In their view, the Plaintiffs have waited too long to make this request, and allowing them to add new legal theories "is unduly prejudicial to Commission Defendants, will cause undue delay and is in bad faith."  Reply at 11.  According to the State Defendants, the Court should, therefore, deny the Plaintiffs' request that, rather than granting the Motion to Dismiss, the Court should allow them to amend their complaint.

The Court held a hearing on September 26, 2013.  See Transcript of Hearing, taken September 26, 2013 ("Tr.").[7]  At the hearing, the Court asked the Plaintiffs what relief they seek; the Plaintiffs stated that the Court should adjudicate the issue, because a two-fold problem prevents a fair administrative hearing: first, the record was incomplete, because the State concealed the Racing Commission's wrongdoing; and second, the Racing Commission cannot conduct a truly impartial hearing, because the Racing Commission may itself be liable for improper acts.  Tr. at 6:2-7:25.  (Court, Dunn).

---

[7] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

The Plaintiffs argued that Rooker-Feldman does not preclude their claims, because there is no "judgment" from a state court.  Tr. at 8:1-25 (Dunn).  The Plaintiffs cited the Supreme Court of the United States' decision in Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635 (2002), for the proposition that Rooker-Feldman "has no application to judicial review of executive action, including determinations made by a state administrative agency," Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. at 644 n.3, and argue that, if the state provides for judicial review of an administrative proceeding and there is no such review in a particular case, Rooker-Feldman does not bar the claim, see Tr. at 9:6-23 (Dunn, Court).  Further, according to the Plaintiffs, the Racing Commission violated their due-process rights by simultaneously barring them from both the Racing Commission proceedings and meaningful review by New Mexico state courts.  See Tr. at 10:4-13 (Dunn).  The Plaintiffs argue that The Federalist No. 82 and the Supreme Court both recognized that state courts can adjudicate federal rights; in the Plaintiffs' view, Rooker-Feldman secures state-court jurisdiction over federal claims, including, for example, a hypothetical claim by the Plaintiffs that New Mexico's procedures violate the due-process clause.  See 10:14-11:6 (Dunn).  The Plaintiffs insist that -- despite their failure to appeal the decision against them -- the law entitles them to a federal forum for this claim, because the state courts, agreeing with the State and affirming the Racing Commission, excluded them from the Racing Commission proceeding.  See 11:7-12:13 (Court, Dunn).

After the Court indicated that Rooker-Feldman may well bar this claim, the Plaintiffs retreated to their fallback position that Rooker-Feldman "preclusion" covers only what the state court actually decided, and that, therefore, Rooker-Feldman only bars reconsideration of the state court's decision that state law did not entitle the Plaintiffs to intervene.  See Tr. at 12:20-13:7

- 26 -

(Dunn).  The Plaintiffs maintain that, because they did not present their due-process theory to the state court, <u>Rooker-Feldman</u> does not bar the Court from considering it.  <u>See</u> Tr. at 13:15-14:2 (Dunn).  The Court expressed its view that <u>Rooker-Feldman</u> and judicial immunity might block all of the claims, and again prompted the Plaintiffs to present a particularized list of the relief they seek; the Plaintiffs did not.  <u>See</u> Tr. at 15:3-17:10 (Court, Dunn).

The State Defendants asserted three points: that there was a final decision from the state court; that the Plaintiffs clearly set out the relief they seek in their Complaint; and that <u>Rooker-Feldman</u> bars the Court from hearing the claim.  <u>See</u> Tr. at 16:14-20 (Galanter).  With respect to the first point, the State Defendants contended that the Racing Commissioners' decision was final within the meaning of state law, because, as a practical matter, it resolved all issues arising from the dispute; in the State Defendants' view, the Plaintiffs abandoned their appeal after they predicted that the state court would not permit them to intervene.  <u>See</u> Tr. at 19:6-20:10 (Galanter).  Further, the State Defendants maintain that, under the Tenth Circuit's decision in <u>Guttman v. Khalsa</u>, a judgment is considered final if the state-court action has reached a point where neither party seeks further action; in this case, the State Defendants argue, when the time to file a notice of appeal expired without the Plaintiffs seeking further action, the Racing Commission's decision became final.  <u>See</u> Tr. at 20:15-24 (Galanter).  While conceding that the state court's decision was not a hearing of the case's merits, the State Defendants nonetheless insist that the Plaintiffs abandoned their appeal.  <u>See</u> Tr. at 21:25-26:4 (Galanter).

The State Defendants then turned to the Plaintiffs' relief.  In the Defendants' telling, the Plaintiffs ask the Court to declare Jet Black Patriot the winner, to bar the State Defendants from stating that Stolis Winner was the winner, and to require them to convey the Court's declaration that Jet Black Patriot won.  <u>See</u> Tr. at 21:5-22:14 (Galanter, Court).  In the State Defendants'

view, the Court could grant that relief only by overturning the Racing Commission's decision. See Tr. at 21:5-22:14 (Galanter, Court).  Further, the State Defendants argued that state law permitted the Racing Commission to appoint the hearing panel, and that the decision becomes final once a person entitled to appeal it -- here, Taylor -- does so.  See Tr. at 22:15-24:3 (Galanter).

The State Defendants then argued that Rooker-Feldman bars the claim.  Citing Tenth Circuit case law, the State Defendants contend that Rooker-Feldman protects state court judgments from impermissible appellate review by the lower federal courts by excluding from federal court review claims that were inextricably intertwined with the state court judgment.  See Tr. at 24:13-25:8 (Galanter, Court).  The Court suggested that Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 282 (2005), called the Tenth Circuit's inextricably-intertwined analysis into question; the State Defendants argued that Exxon Mobil Corp. v. Saudi Basic Industries Corp. stands for the principle that Rooker-Feldman applies only if the state case is final before the state court loser initiates federal-court proceedings.  See Tr. at 24:9-25:23 (Galanter, Court).  The State Defendants argued that Verizon Maryland v. Public Service Commission of Maryland should not apply and repeated their waiver argument in support of that conclusion.  See Tr. at 16:24-17:25 (Court, Galanter).  In response to the Plaintiffs' argument about the scope of Rooker-Feldman "preclusion," the State Defendants argued that only the second writ was limited to the question of intervention and suggested that a third writ covered other matters; the State Defendants did not clearly identify this third writ's topics, but instead argued that the administrative process governed only the Racing Commission's relationship to licensees and not private parties' rights.  See Tr. at 28:1-29:5 (Court, Galanter).  The State Defendants also cited the Court's decision in Braverman v. New Mexico for the principle that

Rooker-Feldman bars a plaintiff's claims if the harm alleged would not have occurred but-for the state court judgment and argued that the only way that the Court could give the Plaintiffs the relief they seek is by overturning the state Racing Commission's decision, which the state district court's decision, in their view, made final. See 29:14-30:1 (Galanter).

The Plaintiffs also argued that, in the alternative to the purse and declaratory relief, their Complaint asked the Court to order the Racing Commission to conduct a new hearing at which they could present evidence to the members personally. See Tr. at 30:19-31:12 (Dunn). The Plaintiffs also emphasized their belief that they will not receive a fair hearing before the Racing Commission. See Tr. at 30:13-19 (Dunn). The Court returned the Plaintiffs to Rooker-Feldman, asking if, by doing what they ask, the Court would be overturning the New Mexico agency or court. See Tr. at 31:20-32:1 (Court). The Plaintiffs conceded that the Court would be doing that, but argued that it would be entirely within its power to do so, because of the due-process flaws which the Plaintiffs identified. See Tr. at 32:2-10 (Dunn). The Court suggested that Rooker-Feldman barred merits consideration of the due-process claims; the Plaintiffs argued that Exxon Mobil Corp. v. Saudi Basic Industries Corp. altered this understanding, and, further, that Exxon Mobil Corp. v. Saudi Basic Industries Corp. involved parallel proceedings over identical subjects, while the state court judgment in this case decided only the intervention issue. See Tr. at 32:11-34:4 (Court, Dunn). With respect to exhaustion, the Plaintiffs argued that, even had they appealed the state court judgment, the state courts still would not have entered a final judgment on the due-process issues which they presented to the Court. See Tr. at 35:5-12 (Dunn).

The Plaintiffs then turned to judicial immunity and relied principally on the Horwitz test's third prong -- whether the regulatory scheme included sufficient safeguards to avoid

unconstitutional conduct.  See Tr. at 35:16-36:3 (Dunn).  In the Plaintiffs' view, this issue is a fact one, and there were not sufficient safeguards, for essentially the reasons they offer in their brief.  See Tr. at 36:3-16 (Dunn).  The Plaintiffs also argued that they are not seeking damages against the Racing Commissioners individually, and would agree to dismiss without prejudice any such claims.  See 36:17-38:8 (Dunn, Court).  After an extended discussion about the implications of sovereign immunity for the Plaintiffs' claims against the State Defendants, the Plaintiffs suggested that they would consider abating their claims against the State Defendants, because their claims against the Private Defendants might make them whole.  See Tr. at 38:9-41:7 (Court, Dunn).

The State Defendants did not agree to abating, stating that they preferred a ruling on the Motion to Dismiss.  See Tr. at 41:12-42:5 (Court, Galanter).  Citing Exxon Mobil Corp. v. Saudi Basic Industries Corp., the State Defendants reiterated their argument that the Plaintiffs presented the substance of their claims, including arguments drawn from federal and state constitutional law, to the state tribunals, and that the tribunals rejected those claims.  See Tr. at 42:6-43:13 (Galanter).  The Court asked whether Rooker-Feldman would bar the Plaintiffs' procedural due-process claim as well; the State Defendants answered that it would, because they still seek to undo a final state-court decision.  See Tr. at 44:14-45:1 (Court, Galanter).

The Court indicated it was inclined to find that Rooker-Feldman precludes the declaratory- and injunctive-relief claims, but that it does not preclude their due-process claims, because those claims do not require the Court to overturn a state tribunal's decision.  See Tr. at 46:2-21 (Court).  The Private Defendants tentatively suggested that Rooker-Feldman might preclude the due-process claim as well, for the reasons that underlie the State Defendants' waiver argument.  See Tr. at 47:12-50:11 (Lindenberger, Court).

Before the State Defendants turned to their judicial-immunity argument, the Court suggested that it would dismiss under the Eleventh Amendment any official-capacity claims against the Racing Commissioners and the Racing Commission for damages.  <u>See</u> Tr. at 51:17-52:8 (Galanter, Court).  The State Defendants argued that, at bottom, the Plaintiffs' argument is simply a disagreement with the Racing Commission's decision, and, for substantially the reasons in their brief, the Racing Commissioners are entitled to judicial immunity.  <u>See</u> Tr. at 52:13-57:9 (Court, Galanter).

The Plaintiffs asserted that, for judicial immunity to shield them from suit, the State Defendants must prove that there are sufficient safeguards in the regulations to avoid unconstitutional conduct and that the State Defendants have not done so here.  <u>See</u> Tr. at 57:13-58:7 (Dunn, Court).  The Plaintiffs conceded that they are not complaining about the statutory and regulatory scheme itself, but only about the state tribunals' application of that scheme to their case; the Plaintiffs denied that they are bound to pursue this claim only through the state appellate court system to the Supreme Court of the United States, arguing that they are entitled to bring this claim in either forum.  <u>See</u> Tr. at 58:8-59:12 (Court, Dunn).  The Plaintiffs suggested that, if a party litigating in state court does not raise a constitutional argument to support a particular conclusion, the party may still bring the claim in federal court, for two reasons: first, the alternative would preclude federal-court review of federal claims, and, second, <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u> permits the claims.  <u>See</u> Tr. at 59:13-17 (Court, Dunn). The Court pointed out that the Supreme Court of the United States was available to consider claims appealed through the state-court system -- which the Plaintiffs conceded -- and that <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u> focused on the time at which a plaintiff filed a federal case, and not on the standards applied in parallel proceedings.  <u>See</u> Tr. at 60:2-25 (Court,

Dunn).  The Court indicated that it disagreed with the Plaintiffs' narrow construction of <u>Rooker-Feldman</u>, and that, while the due-process claims might survive, the injunctive claims probably would not.  <u>See</u> Tr. at 61:24-12 (Court).

The Court then turned to the judicial immunity issue, asking whether the Plaintiffs would agree that the Racing Commissioners' authority and capacity to review the hearing panel's report and issue a final order resulted from their statutory and regulatory responsibilities; the Plaintiffs disagreed, because, they argued, the Court should not condone the state tribunals' actions here as being a judicial function.  <u>See</u> Tr. at 62:19-63:7 (Court, Dunn).  In the Plaintiffs' view, for the Court to abstain from review of the state tribunals' action would undermine centuries of due-process jurisprudence and the rights that jurisprudence secures.  <u>See</u> Tr. at 63:7-17 (Dunn).  The Plaintiffs argued that the sufficient safeguards prong exists -- and exists as a fact issue -- to prevent this result.  <u>See</u> Tr. at 63:17-21 (Dunn).  The Court suggested that they must be implicitly arguing that the statutory structure is unconstitutional; the Plaintiffs argued that they did not have notice of the statutory structure until the state court found they did not have a right to intervene, at which point the Court could consider the constitutional issue.  <u>See</u> Tr. at 63:22-64:10 (Court, Dunn).  The Court suggested that the Plaintiffs needed to assert that claim at the time; the Plaintiffs suggested they did so, within the statute of limitations, by filing the Texas case.  <u>See</u> Tr. at 63:11-25 (Court, Dunn).

Returning to judicial immunity, the Court asked the Plaintiffs to identify anything the Racing Commissioners did that was purely administrative.  <u>See</u> Tr. at 67:5-17 (Court, Dunn). The Plaintiffs argued that excluding them and appointing the panel, without the opportunity for meaningful review, satisfied this prong; the Court suggested that this was a judicial function. <u>See</u> Tr. at 67:18-68:8 (Court, Dunn).  The Plaintiffs then reiterated their dissatisfaction with the

way the prosecutor presented the case.  See Tr. at 68:13-24 (Dunn).  The Court suggested that the sufficient safeguards prong went to the regulations as written and not as they function; the Plaintiffs disagreed, but moved on without elaboration.  See Tr. at 69:6-23 (Court, Dunn).

The Plaintiffs urged that, even if the Court finds that judicial immunity bars their claims for damages, the Court still may enjoin the State Defendants and require them to re-hold the hearing under the conditions the Plaintiff has identified.  See Tr. at 69:24-5 (Dunn).  The Plaintiffs argued that the contrary cases which the State Defendants cited involved a neutral decision maker and that this case involved a self-interested decision maker.  See Tr. at 70:6-21 (Dunn).  The Plaintiffs reiterated that the State Defendants' view of the law would preclude federal judicial review of such claims.  See Tr. at 70:22-2 (Dunn).

The Plaintiffs briefly argued that, even if the state courts had permitted them to participate, judicial review would have been limited to the incomplete record before the Racing Commission.  See Tr. at 73:6-16 (Dunn).  The Plaintiffs then argued two concluding points about judicial immunity: first, judicial immunity functions as it does because federal courts can usually issue injunctive relief ordering a fair tribunal to adjudicate plaintiffs' claims, and that damages are unnecessary.  See Tr. at 72:17-73:4 (Dunn).  Ordering such injunctive relief, in their view, would not help their cause, because the Racing Commission is an unfair tribunal.  See Tr. at 73:4-10 (Dunn).  Second, the Plaintiffs argued that, if the Court was inclined to dismiss all damages claims against the State Defendants, leaving only the claims for injunctive relief, they may consider dropping their claims against the State.  See Tr. at 74:11-14 (Dunn).

On rebuttal, the State Defendants first pointed out that the Plaintiffs have been pursuing this claim for many years and that the Court should notice the Plaintiffs' frequently shifting positions on many issues before it.  See Tr. at 74:18-75:7 (Galanter).  With respect to judicial

immunity, the State Defendants contended that the Plaintiffs concede the judicial process prong in their Response, and that the Plaintiffs' Complaint proves the litigation causation prong, for the reasons the State Defendants outline in their brief.  See Tr. at 75:8-22 (Galanter).  They further contended that the regulatory framework includes sufficient safeguards against unconstitutional conduct, for substantially the reasons set out in their brief.  See Tr. at 75:23-76:6 (Galanter). Further, the State Defendants argued that that judicial immunity operates even when judicial officers do judicial acts maliciously or corruptly.  See Tr. at 77:20-25 (Galanter).  With respect to Rooker-Feldman, the State Defendants argued that appointing the panel was within the Racing Commission's statutory powers.  See Tr. at 77:1-17 (Galanter).  Further, the State Defendants pointed to the Plaintiffs' past admission that they abandoned their appeal because they anticipated the state system would disagree with them; in their view, the Plaintiffs did not have the right to forego appeal for that reason, but they must "allow the district court to hear it on the merits, and . . . make that decision."  Tr. at 79:8-20 (Galanter).  On the Court's prompting, the State Defendants conceded that judicial immunity protects only the Racing Commissioners against damages.  See Tr. at 79:22-80:7 (Court, Galanter).  The Court indicated that it was inclined to hold that judicial immunity bars the due-process claims for damages, leaving only the claim for injunctive relief.  See Tr. at 80:24-81:5 (Court).

The State Defendants then turned to the due-process theories.  They first argued that "[t]here is no constitutional[ly] protected property interest in prize money that could be deemed to equate to a civil rights claim and deprivation of due process."  See Tr. at 81:15-83:20 (Galanter).  Citing cases from the Supreme Court and the Tenth Circuit, the State Defendants argued that, because the Racing Commission exercises considerable discretion whether to award prize money, the Plaintiffs had no property interest in it.  See Tr. at 83:21-84:14 (Galanter).  The

State Defendants also contended that, to state a procedural due process-claim, the act alleged must have caused a violation of a clearly established procedural due-process right.  See Tr. at 84:15-19 (Galanter).  In their view, because Jet Black Patriot came in second, the Plaintiffs could have had a constitutionally protected interest only if the Racing Commission had ruled in their favor.  See Tr. at 84:25-85:5 (Galanter).  Further, the State Defendants maintain that the Plaintiffs must prove that they did not receive notice, an explanation of the evidence, or an opportunity to respond before an impartial tribunal.  See Tr. at 85:13-19 (Galanter).  According to the State Defendants, a plaintiff can satisfy the impartial tribunal prong by showing bias with respect to the factual issues to be decided at the hearing, and they point out that the Plaintiffs have alleged bias only by the Racing Commissioners and not by the hearing panel.  See Tr. at 85:19-56:1 (Galanter). In sum, the State Defendants "argue that the plaintiffs had no recognized constitutional property right that would have entitled them to intervene and participate in . . . a disciplinary hearing regarding the trainer's violation of his license."  Tr. at 87:2-6.  Further, the State Defendants contended that, even if the Plaintiffs were entitled to due process, the state-court proceedings provided the Plaintiffs notice and the opportunity to be heard.  See Tr. at 87:7-20.  With respect to the substantive due-process claim, the State Defendants argued that, because the Racing Commissioners followed the statute and reviewed the hearing panel's report, their actions did not lack a rational basis and thus were not arbitrary.  See Tr. at 88:4-18 (Galanter).  The State Defendants also maintained that the Racing Commissioners' conduct, when compared to cases in which federal courts have found conscience-shocking conduct, should not shock the Court's conscience.  See Tr. at 88:25-90:8 (Galanter).  The Plaintiffs agreed to stand on their brief on this point.  See Tr. at 91:16-19 (Dunn).

The Court indicated that it was inclined to find that the Plaintiffs had a constitutionally protected property right.  See Tr. at 91:20-25 (Court).  The Court further indicated that, because the Complaint did not include a full statement of the case's procedural history -- on which the procedural due-process claim necessarily turns -- it was inclined to allow the due-process claims to proceed.  See Tr. at 92:1-15.

The State Defendants then turned to the injunctive relief claim.  In their view, because the Plaintiffs are seeking only money damages, there is an adequate remedy at law, which precludes equity relief; the State Defendants argued that, even if the Court eliminated the damages claims against them, the Plaintiffs could seek damages against the Private Defendants.  See Tr. at 92:18-93:6 (Galanter, Court).  The Court indicated it did not share this understanding of the law of injunctive relief.  See Tr. at 93:7-94:2 (Court, Galanter).  The State Defendants also renewed their contention that the Plaintiffs have not suffered irreparable harm.  See Tr. at 94:5-10 (Galanter).  The Plaintiffs indicated they would not argue further on this point.  See Tr. at 94:18-20 (Court, Dunn).

At the hearing's close, in light of the Court's inclinations, the parties indicated they would not present further argument regarding their motion to amend.  See Tr. at 94:24-95:15 (Court, Galanter, Dunn).

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83,

104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its

existence."). Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction

over the subject matter" by motion. Fed. R. Civ. P. 12(b)(1). The Tenth Circuit has held that

motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a

facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or

(2) a challenge to the actual facts upon which subject matter jurisdiction is based." Ruiz v.

McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in
> opposing a rule 12(b)(6) motion: the court must consider the complaint's
> allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v.
> Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the
> jurisdictional facts themselves, a district court may not presume the truthfulness
> of those allegations. A court has wide discretion to allow affidavits, other
> documents, and a limited evidentiary hearing to resolve disputed jurisdictional
> facts under Rule 12(b)(1). In such instances, a court's reference to evidence
> outside the pleadings does not convert the motion to a Rule 56 [summary-
> judgment] motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133, 2011 WL 6013025, at *8 (D.N.M.

Sept. 30, 2011)(Browning, J.). As the United States Court of Appeals for the Fifth Circuit has

stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.
> 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction --
> its very power to hear the case -- there is substantial authority that the trial court is
> free to weigh the evidence and satisfy itself as to the existence of its power to hear
> the case. In short, no presumptive truthfulness attaches to plaintiff's allegations,
> and the existence of disputed material facts will not preclude the trial court from
> evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed.

Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the

complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on

affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged

facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) ("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007))(internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING AMENDMENT OF PLEADINGS

Rule 15(a)(2) provides: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., No. 05-0073, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.). The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. 178, 182 (1962).  Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001).  See also In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d

848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

An amendment is "futile" if the pleading "as amended, would be subject to dismissal."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v.

Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny

leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith

or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d

1357, 1365-66 (10th Cir. 1993)).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to
> deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452,
> 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893
> F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales,
> 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion
> has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462.
> Furthermore, "[w]here the party seeking amendment knows or should have
> known of the facts upon which the proposed amendment is based but fails to
> include them in the original complaint, the motion to amend is subject to denial."
> Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.  "The . . . Tenth Circuit has emphasized that '[t]he

purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be

decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub.

Schs., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. Mar. 12, 2007)(Browning, J.)(quoting

Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

Further, the local rules provide that, with respect to motions to amend a pleading, "A

proposed amendment to a pleading must accompany the motion to amend."  D.N.M.LR-Civ.

15.1.

## <u>LAW REGARDING THE NEW MEXICO RACING COMMISSION[8]</u>

Pursuant to NMSA, § 60-1A-3 (2007), the Racing Commission consists of five members, appointed by the Governor of New Mexico and confirmed by the New Mexico Senate, knowledgeable in horse racing.   The New Mexico Legislature has provided the Racing Commission with broad powers over licensees.   These powers include the ability to promulgate regulations, to investigate the operations of licensees, to compel discovery, to subpoena witnesses, to administer oaths, to appoint hearing officers to conduct required hearings, and to issue a final decision upon review of the hearing officer's recommendations.   The Legislature statutorily conferred on the Racing Commission broad powers and duties "to implement the Horse Racing Act, and to ensure that horse racing in New Mexico is conducted with fairness and that the participants and patrons are protected against illegal practices" on the racing grounds. NMSA 1978, § 60-1A-5(A) (2007).   The Racing Commission implemented these Legislative enactments through regulations, including 15.2.6.6 NMAC, which makes the Commission's objective "to protect the integrity of horse racing, to ensure the health and welfare of race horses and to safeguard the interests of the public and the participation in racing."

The regulations regulate many aspects of horse racing, including the substances that race horses may take.   The regulations include guidelines that place each drug in a "Class" and recommend penalties for certain violations.   15.2.6.9 NMAC.   The regulations provide, however, "that in the event a majority of the stewards determine [sic] that mitigating circumstances require imposition of a lesser penalty they may impose the lesser penalty."   15.2.6.9 NMAC.

---

[8] The Court takes its understanding of the then-extant Racing Commission regulations from the Plaintiffs' submission in response to a separate motion to dismiss.   <u>See</u> Plaintiffs', Richard Simon, Janelle Simon, Eric Curtis, and Jose Vega, Response to Defendants' Motion to Dismiss, filed May 23, 2010 (Doc. 11-2).   The regulations have since changed, but the changes do not alter the Court's conclusion.

The regulations authorize the Racing Commission to review a decision or action of the Board of Stewards, and to accept or overturn the decision or action after a hearing.  See NMSA 1978, § 60-1A-12 (2007).  Enacted regulations specify procedures for complaints that the Board of Stewards addresses and procedures for the Racing Commission's review of the Board of Stewards' decision.  See 15.2.1.9 NMAC.  A person aggrieved of the Board of Stewards' ruling has a right to appeal to the Commission.  See 15.2.1.9(B)(9) NMAC; 15.2.1.9(C)(7) NMAC. The Commission may appoint a presiding officer to conduct a hearing.  See 15.2.1.9(C)(7) NMAC.  The hearing officer shall prepare proposed "findings of fact, conclusions of law and recommendation for Commission action."   15.2.1.9(C)(15)(a) NMAC.   Parties may file exceptions to the proposal within a certain time.  15.2.1.9(C)(15)(c) NMAC.  Further,

> [a]fter the expiration of the time for filing exceptions and replies, the Commission shall consider the proposal for decision in open meeting.  The Commission may: adopt the proposal for decision, in whole or in part; decline to adopt the proposal for decision, in whole or part; remand the proceeding for further action by the same or a different presiding officer; or direct the presiding officer to give further consideration to the proceeding with or without reopening the hearing.

15.2.1.9(C)(15)(d) NMAC.  The regulations also govern the manner in which the Commission issues orders and administers penalties, the process to request rehearing of an adverse decision, and many other matters.  See 15.2.1.9 NMAC.

## THE ROOKER-FELDMAN DOCTRINE

The Rooker-Feldman doctrine embodies the principle that federal district courts may not serve as courts of appeal for state courts.  See Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning, J.).  Review of state court judgments is within the Supreme Court of the United States' exclusive jurisdiction.  See D.C. Ct. App. v. Feldman, 460 U.S. 462, 476 (1983); Bolden v. City of Topeka, 441 F.3d 1129, 1140 (10th Cir. 2006).  A district court has no jurisdiction over a matter in which:  "(i) a state-

court loser; (ii) is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) [the state court] judgment was rendered before the commencement of the federal proceeding." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *38 (citing Guttman v. Khalsa, 446 F.3d 1027, 1032 (10th Cir. 2006)).

Although Rooker-Feldman, with its four elements, appears to be a straight-forward principle, the application of the doctrine can be complex. For example, a challenge to a state court judgment is "barred even if the claim forming the basis of the challenge was not raised in the state proceedings," yet "Rooker-Feldman does not bar a federal-court suit raising a claim previously decided by a state court unless the federal suit actually seeks to overturn, as opposed to simply contradict, the state-court judgment." Bolden v. City of Topeka, 441 F.3d at 1141, 1144. The Tenth Circuit has reconciled these principles by concluding that the scope of Rooker-Feldman is "confined to the cases of the kind . . . brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Bolden v. City of Topeka, 441 F.3d at 1142-43 (citing Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 282 (2005)). Thus, an essential characteristic of a suit barred under Rooker-Feldman is that the "loser in state court invites [a] federal district court to overturn [a] state court judgment." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. at 287 n.2. Conversely, Rooker-Feldman would not bar a plaintiff whose "claims . . . do not rest on any allegation concerning the state court proceedings or judgment." Bolden v. City of Topeka, 441 F.3d at 1145.[9] Thus,

_____

[9] The Court has previously discussed the relation of Rooker-Feldman and Younger v. Harris, 401 U.S. 37 (1971). See F.D.I.C. v. Harger, 778 F. Supp. 2d 1123, 1135 n.6 (D.N.M. 2011)(Browning, J.). In brief, whereas Rooker-Feldman bars a federal district court from reviewing state court judgments which are final, Younger v. Harris "prevents the federal district

where a plaintiff does not put the state court judgment itself at issue, the plaintiff may bring a federal suit "regarding the same subject matter, or even the same claims, as those presented in the state-court action." Bolden v. City of Topeka, 441 F.3d at 1139.[10]

The Tenth Circuit's application of the Rooker-Feldman doctrine elucidates the opaque distinction between claims that Rooker-Feldman bars, and those claims that allege the same cause of action asserted in the state court, but are not barred. The Tenth Circuit provided an example of this distinction in a hypothetical child-custody case in Bolden v. City of Topeka. See 441 F.3d at 1129. The Tenth Circuit explained that a father, who lost custody of his child in a state court judgment, could not then bring suit in federal court alleging that the state court judgment was invalid. The father would be barred even if his claims in federal court were different from those in state court; were the father, perhaps, to argue that the state court judgment deprived him of due process or was contrary to federal law on other grounds, Rooker-Feldman would bar such an action. Rooker-Feldman would not, however, bar the father from seeking

_____

court from interfering in an ongoing state proceeding." F.D.I.C. v. Harger, 778 F. Supp. 2d at 1135, n.6. Taking the two doctrines together, a plaintiff may neither request a federal district court to interfere before a state court judgment is final nor pray for relief from a state court judgment once it becomes final. See Martinez v. Martinez, No. CIV 09-0281 JB/LFG, 2013 WL 3270488, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).

[10] The doctrine of res judicata may bar a complaint that Rooker-Feldman does not. Rooker-Feldman is related to the principle that federal courts possess only original jurisdiction. See Rooker v. Fidelity Trust Co., 263 U.S. at 416 ("Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the [state court] judgment. . . .  To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the [federal] District Courts is strictly original."); Bolden v. City of Topeka, 441 F.3d at 1145 (discussing that, where Rooker-Feldman is not a bar, "[a] myriad of doctrines, including res judicata, would almost certainly bar the suit" which was brought after a state court judgment adverse to the plaintiff). See also Campbell v. City of Spencer, 682 F.3d 1278, 1283 (10th Cir. 2012)("Rooker-Feldman does not . . . override or supplant preclusion doctrine." (citing Exxon Mobil v. Saudi Basic Indus. Corp., 544 U.S. at 282)).

custody of his child in federal court, so long as the father's complaint did not raise any allegations regarding the state court judgment specifically.  See 441 F.3d at 1145.

The Tenth Circuit in Bolden v. City of Topeka, ruled that a district court was wrong to bar a plaintiff's suit under Rooker-Feldman where the plaintiff "did not seek to overturn the state-court judgment."  441 F.3d at 1138.  The City of Topeka notified the plaintiff in Bolden v. City of Topeka that several properties he owned failed to meet housing code regulations and thus would be demolished.  See 441 F.3d at 1131-32.  The plaintiff initially sought to enjoin the destruction of his buildings in state court, and the state court denied his request.  The plaintiff then filed suit in federal district court, once again seeking to enjoin the destruction of his buildings.  His federal suit did not address the validity of the state court judgment or argue that federal court should override, on any grounds, the state court judgment denying his requested injunction.  See 441 F.3d at 1132.  The district court dismissed his request for an injunction under Rooker-Feldman, but the Tenth Circuit found that the district court misapplied the doctrine.  See 441 F.3d at 1132, 1138.   The Tenth Circuit focused on the plaintiff's claims in federal court being "identical to what they would have been had there been no state-court proceeding."  441 F.3d at 1138.  Because the plaintiff did not argue that the "judgment itself inflicted an injury," Rooker-Feldman did not bar the plaintiff's claims alleging violations against the city's action of destroying his buildings.  441 F.3d at 1138, 1145.  Rooker-Feldman did not apply, because the plaintiff's claims "would be identical even had there been no state court judgment."  441 F.3d at 1145.

Similarly, the Tenth Circuit has endorsed the logic of Nesses v. Shepard, 68 F.3d 1003 (7th Cir. 1995), wherein the United States Court of Appeals for the Seventh Circuit found that Rooker-Feldman does not apply to a party's claims that do not request relief from a state-court

judgment.  See Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001)(quoting Nesses v. Shepard,

68 F.3d at 1005).  In Nesses v. Shepard, the plaintiff suffered several losses in state court before

suing the lawyers and judges involved in those state court proceedings in federal court.  See 68

F.3d at 1004.  He "allege[d] a massive, tentacular conspiracy among the lawyers and the judges

to engineer [his] defeat" in the state court suits.  68 F.3d at 1004.  The federal district court

dismissed the federal case for want of jurisdiction on the basis of the Rooker-Feldman doctrine.

See 68 F.3d at 1004.  On appeal, the Seventh Circuit held that Rooker-Feldman did not apply.

The Honorable Richard Posner, Circuit Judge for the Seventh Circuit, explained:

> [The Rooker-Feldman doctrine] is not that broad. Were [a plaintiff] merely
> claiming that the decision of the state court was incorrect, even that it denied him
> some constitutional right, the doctrine would indeed bar his claim. But if he
> claims, as he does, that people involved in the decision violated some independent
> right of his, such as the right (if it is a right) to be judged by a tribunal that is
> uncontaminated by politics, then he can, without being blocked by the *Rooker
> Feldman* doctrine, sue to vindicate that right and show as part of his claim for
> damages that the violation caused the decision to be adverse to him and thus did
> him harm.  Otherwise there would be no federal remedy for a violation of federal
> rights whenever the violator so far succeeded in corrupting the state judicial
> process as to obtain a favorable judgment.

Nesses v. Shepard, 68 F.3d at 1005 (internal citation omitted).  Judge Posner distinguished the

case from one Rooker-Feldman bars by pointing out that, although the plaintiff "was in a sense

attacking the ruling by the state court," by asserting that he lost in state-court because the

"lawyers and the judges [engineered the plaintiff's] defeat," the plaintiff was not "seeking to

undo a remedial order of some sort."  68 F.3d at 1005.

    The Tenth Circuit has barred a plaintiff's due process claims against a city, under

Rooker-Feldman, where the alleged violations occurred because of a state court's order.  See

Campbell v. City of Spencer, 682 F.3d, 1278, 1284 (10th Cir. 2012).  In Campbell v. City of

Spencer, a plaintiff filed suit in federal court, alleging, among other claims, that the City of

Spencer violated her due-process and Eighth Amendment rights by seizing her horses and imposing an "excessive fine" pursuant to a state court order.  682 F.3d at 1280.  The federal court dismissed her due-process allegations, finding that <u>Rooker-Feldman</u> barred the claims.  682 F.3d at 1280.  The Tenth Circuit agreed.  Because the plaintiff's "deprivation of property . . . allegedly without just compensation or due process was the deprivation ordered by the state court . . . [her] claim [had] merit only if the state court forfeiture order was unlawful on the record before the court."  682 F.3d at 1284.  The plaintiff's suit was a "direct attack on the state court's judgment because an element of [her] claim [was] that the judgment was wrongful."  682 F.3d at 1284.  "The alleged constitutional wrong was the content of the judgment . . . not . . . some act by a defendant that led to the judgment."  682 F.3d at 1285.  Thus, <u>Rooker-Feldman</u> barred the plaintiff's claims, because the harm the plaintiff alleged would not have occurred but-for the state court judgment.  682 F.3d at 1285-86.

Moreover, the Supreme Court has held that the <u>Rooker-Feldman</u> doctrine "has no application to judicial review of executive action, including determinations made by a state administrative agency."  <u>Verizon Md., Inc. v. Public Servs.' Comm'n of Md.</u>, 535 U.S. at 644 n. 3.  The Tenth Circuit held that the <u>Rooker-Feldman</u> doctrine does not apply to determinations made by a property valuations protest board, whose authority was defined under New Mexico statute.  <u>See</u> <u>Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d 1202, 1206 (10th Cir. 2006).  In so holding, the Tenth Circuit reasoned that "<u>Rooker-Feldman</u> does not apply to judicial review of state agency decisions."  <u>Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d at 1207-08.

## LAW REGARDING JUDICIAL IMMUNITY

"[J]udges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly."  Stump v. Sparkman, 435 U.S. 349, 355-56 (1978).  That same immunity continues even if the judge's "exercise of authority is flawed by the commission of grave procedural errors."  Stump v. Sparkman, 435 U.S. at 359.

The Supreme Court has emphasized that a judge's immunity from § 1983 liability "is overcome in only two sets of circumstances.  First, a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity.  Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12 (1991)(citations omitted).  The Supreme Court has also held that absolute judicial immunity was not affected or abolished "by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights."  Pierson v. Ray, 386 U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).

The Tenth Circuit has also recognized that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion."  Guttman v. Khalsa, 446 F.3d at 1033 (citing Butz v. Economou, 438 U.S. at 514).  For an official at an administrative hearing to enjoy absolute immunity, "(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct."  Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examr's, 822 F.2d 1508, 1513 (10th Cir.

1987))(internal quotation marks omitted).

In Guttman v. Khalsa, a doctor who suffered from depression and post-traumatic stress disorder had appeared before the Impaired Physicians Committee of the New Mexico Board of Medical Examiners to respond to complaints about his professional conduct.  See 446 F.3d at 1030.  The Committee in Guttman v. Khalsa issued a "Notice of Contemplated Action and an Order of Summary Suspension" of the doctor's medical license based on alleged mental illness and lying to the Committee.  446 F.3d at 1030.  The New Mexico Board of Medical Examiners then held a hearing, during which one of the defendants acted as Administrative Prosecutor.  See Guttman v. Khalsa 446 F.3d at 1030.  The New Mexico Board of Medical Examiners in Guttman v. Khalsa revoked the doctor's medical license pursuant to its statutory authority to do so.  See 446 F.3d at 1030.

The doctor in Guttman v. Khalsa appealed the decision to the Seventh Judicial District of New Mexico.  See 446 F.3d at 1030.  The Seventh Judicial District of New Mexico denied the appeal, and the doctor then appealed to the Court of Appeals of New Mexico.  See 446 F.3d at 1030.   After the Court of Appeals of New Mexico affirmed, the doctor filed a petition for certiorari with the Supreme Court of New Mexico.  See Guttman v. Khalsa, 446 F.3d at 1030.  Before the Supreme Court of New Mexico could act on the petition, the doctor filed a lawsuit in federal court, alleging, among other things, violations of his constitutional rights.  See 446 F.3d at 1030.

The Tenth Circuit held that the Rooker–Feldman doctrine did not bar the doctor's federal lawsuit, because the state-court lawsuit was not final.  See 446 F.3d at 1032.  The Tenth Circuit found, however, that the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners enjoyed absolute

immunity.  See Guttman v. Khalsa, 446 F.3d at 1032.  The basis for the hearing officer's immunity in Guttman v. Khalsa was that he had served a quasi-judicial function.  See 446 F.3d at 1032.

The Tenth Circuit in Guttman v. Khalsa also relied on an earlier case: Horwitz, 822 F.2d 1508 (10th Cir. 1987).  In Horwitz, the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See 822 F.2d at 1510, 1515.  The Tenth Circuit reasoned that the defendant Board members were performing adjudicatory and prosecutorial functions.  See 822 F.2d at 1515.  The Tenth Circuit also noted:

> There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine.  Public policy requires that officials serving in such capacities be exempt from personal liability.

822 F.2d at 1515.  Finally, the Tenth Circuit pointed out the Board members' functions, observing that Board members

> serve in the prosecutorial role in that they, among other things, initiate complaints, start hearings, make investigations, take evidence, and issue subpoenas.  They also serve in the adjudicative role, as judges.  Thus, the Board duties are "functionally comparable" to a court of law.  And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station.

822 F.2d at 1515.

Although certain officers enjoy immunity from suit for acts taken in a quasi-judicial setting, the Supreme Court has held that court reporters do not enjoy such immunity.  Rejecting a

court reporter's claim of absolute immunity, the Supreme Court stated: "We are also unpersuaded by the contention that our functional approach to immunity . . . requires that absolute immunity be extended to court reporters because they are part of the judicial function." Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435 (1993).  Rather, in the Supreme Court's view:

> The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability.  Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights."   [Burns v. Reed,] 500 U.S. [478,] 500 [(1991)] (Scalia, J., concurring in judgment in part and dissenting in part).  When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges -- that is, because they, too, "exercise a discretionary judgment" as a part of their function.   Imbler v. Pachtman, 424 U.S. [409] at 423, n. 20 [(1976)].

Antoine v. Byers & Anderson, Inc., 508 U.S. at 435-36 (footnote omitted)(final two alterations in original).

In light of this understanding of judicial immunity, the Supreme Court found that the function that court reporters perform is not one that would lead to a grant of immunity.  See 508 U.S. at 436.  The Supreme Court reasoned that court reporters "are afforded no discretion" in carrying out their duty and that they are "not absolutely immune because their duties are ministerial, not discretionary in nature."  508 U.S. at 436 (citations omitted)(internal quotation marks omitted).

The Court has also drawn distinctions between when a person is acting in a judicial role, such that they are entitled to quasi-judicial immunity,[11] and when a person in a quasi-judicial

---

[11] Quasi-judicial immunity affords "non-judicial officers the same absolute immunity enjoyed by judges when a claim is based on duties performed in furtherance of the judicial process."  Henshaw v. Bliss, 421 F.App'x 870, 871 (10th Cir. 2011).

setting plays a merely ministerial role.  See Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1204 (D.N.M. 2009)(Browning, J.).  In Duprey v. Twelfth Judicial District Court, the Court found that the state defendant who acted as chairperson of the judicial grievance board was entitled to absolute immunity, because his function was similar to that of an administrative law judge in a quasi-judicial setting.  See 760 F. Supp. 2d at 1204.  The Court found that the director of human resources for the New Mexico Administrative Office of the Courts was not entitled to absolute immunity, because her role was ministerial and mechanical.  See 760 F. Supp. 2d at 1204.  In analyzing each defendant's function, the Court focused on participation in the deliberative process and the exercise of independent judgment.  See 760 F. Supp. 2d at 1205. The Court determined that, because the human resources director played a ministerial role and did not act at the direction of a judge, she was not entitled to judicial immunity.  See 760 F. Supp. 2d at 1208 ("An individual whose job at a judicial proceeding is to run a tape recorder is not one who needs to be able to act according to her own convictions.").  See also Braverman v. New Mexico, No. 11-0829, 2011 WL 6013587, at *20 (D.N.M. Oct. 19, 2011)(Browning, J.)(finding that judicial immunity probably protected a state judge and special master from suit when denying a motion for a temporary restraining order).

## LAW REGARDING PROCEDURAL DUE-PROCESS RIGHTS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).  "Under

either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).   The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights were violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  Camuglia v. The City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(internal quotations omitted).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment."  Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is 'created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.'"  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).  See Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577 ("Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); Farthing v. City of Shawnee, 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source

such as state law.'" (quoting <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577)); <u>Paul v. Davis</u>, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985)(citing <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542 (citing <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313 (1950)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." <u>Mathews v. Eldridge</u>, 424 U.S. at 334 (internal quotation marks and brackets omitted).   The Supreme Court has described

> "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."  This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination "hearing," though necessary, need not be elaborate.  We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings."  In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action.

<u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542, 545 (footnote omitted)(citations omitted).  The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens

> the Government would face in providing greater process."  Hamdi v. Rumsfeld,
> 542 U.S. 507, ----, 124 S. Ct. 2633, 2646 . . . (2004)(quoting Mathews v.
> Eldridge, 424 U.S. at 335 . . . ).  A court must carefully balance these competing
> concerns, analyzing "'the risk of an erroneous deprivation' of the private interest
> if the process were reduced and the 'probable value, if any, of additional or
> substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335 . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the

procedures already guaranteed, and whether additional procedural safeguards would prove

valuable; and (iii) the government's interest and the burdens that additional procedures might

impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act

quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d

at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of a child

from parents' custody requires predeprivation hearing "except for extraordinary situations

where some valid governmental interest is at stake that justifies postponing the hearing until after

the event." (internal quotation marks omitted)).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS RIGHTS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . .

deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend.

XIV, § 1.  "The touchstone of due process is protection of the individual against arbitrary action

of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in

the exercise of power without any reasonable justification in the service of a legitimate

governmental objective."  Graves v. Thomas, 450 F.3d 1215, 1220 (10th Cir. 2006)(quoting

Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  Because "only the most egregious

official conduct can be said to be 'arbitrary in the constitutional sense,'" Cnty. of Sacramento v.

Lewis, 523 U.S. at 846 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 129 (1992)),

- 56 -

the Supreme Court has been reluctant to expand the doctrine of substantive due process, and has

cautioned that "[o]nly fundamental rights and liberties which are 'deeply rooted in this Nation's

history and tradition' and 'implicit in the concept of ordered liberty' qualify for such protection."

Chavez v. Martinez, 538 U.S. 760, 775 (2003)(quoting Washington v. Glucksberg, 521 U.S. 702,

721 (1997)).  See Graves v. Thomas, 450 F.3d at 1220 ("Substantive due process claims are not

based on state law but are founded upon deeply rooted notions of fundamental personal interests

derived from the Constitution." (quoting Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th

Cir. 1998))).

The ultimate measure whether conduct by state actors violates due process is whether

"the challenged government action 'shocks the conscience' of federal judges."   Ruiz v.

McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002)(quoting Uhlrig v. Harder, 64 F.3d 567, 573

(10th Cir. 1995)).  The Tenth Circuit has explained:

> It is well settled that negligence is not sufficient to shock the conscience. In
> addition, a plaintiff must do more than show that the government actor
> intentionally or recklessly caused injury to the plaintiff by abusing or misusing
> government power.  Even knowingly permitting unreasonable risks to continue
> does not necessarily rise to the level of conscience shocking.

Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal citations and quotations

omitted).  Rather, to succeed on a substantive due-process claim, a "plaintiff must demonstrate a

degree of outrageousness and a magnitude of potential or actual harm that is truly conscience

shocking."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1223 (10th Cir. 2006)(quoting

Uhlrig v. Harder, 64 F.3d at 574).  Accord James v. Chavez, 830 F. Supp. 2d 1208, 1273-1277

(D.N.M. 2011)(Browning, J.).  More specifically, "a § 1983 violation based on substantive due

process 'must be predicated on a state action manifesting one of two traditional forms of

wrongful intent -- that is, either (1) an intent to harm; or (2) an intent to place a person

unreasonably at risk of harm." Ward v. Anderson, 494 F.3d 929, 938 (10th Cir. 2007)(quoting

Uhlrig v. Harder, 64 F.3d at 573).   In determining whether a defendant's actions shock the

conscience, three principles guide a court's analysis: (i) the need for restraint in defining the

scope of substantive due process; (ii) the recognition that 42 U.S.C. § 1983 should not be used to

replace state tort law; and (iii) the propriety of deferring  to local policymakers' decisions

regarding public safety.  See Ruiz v. McDonnell, 299 F.3d at 1184.

## ANALYSIS

The Rooker-Feldman doctrine bars some of the Plaintiffs' claims, but not the thrust of

this suit.  Judicial immunity and Eleventh Amendment immunity bar the claim for damages

against the State Defendants.  Finally, the Plaintiffs have not stated a due-process claim entitling

them to injunctive relief.   The Court will, therefore, dismiss the Plaintiffs' claims against the

State Defendants.

I.     **THE  ROOKER-FELDMAN  DOCTRINE  BARS  THE  COURT  FROM
       REVERSING THE STATE COURTS' DECISIONS, BUT IT DOES NOT BAR
       THE  COURT  FROM  REVERSING  THE  RACING  COMMISSION'S
       DECISIONS.**

Rooker-Feldman applies to this case, but only narrowly.   Interpreting the Supreme

Court's decision in Verizon Maryland, Inc. v. Public Service Commission of Maryland, the

Tenth Circuit has held that that the "does not apply to judicial review of state agency decisions."

Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1208 (10th Cir. 2006).  The Tenth

Circuit has more recently explained:

> [Where] the state court did not review the merits of the state agency decision, the
> Rooker/Feldman doctrine does not apply to the agency decision. "While the
> Rooker–Feldman doctrine recognizes that the federal district courts may not
> review decisions by a state's courts, it does not preclude federal district court
> review  of  executive  action,  including  determinations  made  by  a  state
> administrative agency." Mitchell v. Fishbein, 377 F.3d 157, 165 (2d Cir. 2004)
> (internal quotation marks omitted).  "If the decision of a state agency has been

> upheld by a state court, then the <u>Rooker–Feldman</u> doctrine applies, because a challenge to the agency's decision necessarily involves a challenge to the judgment of the state court." <u>Narey v. Dean</u>, 32 F.3d 1521, 1525 (11th Cir. 1994). However, the doctrine is inapplicable to state agency decisions that have not been reviewed by the state courts. <u>Id.</u> at 1525–26; <u>see also</u> <u>Van Harken v. City of Chicago</u>, 103 F.3d 1346, 1349 (7th Cir. 1997)("If the <u>Rooker–Feldman</u> doctrine is to be extended to administrative judgments, it will have to be done by the Court that created it.").

<u>Pretlow v. McPherson</u>, 497 F. App'x 846, 847 (10th Cir. 2012). <u>Accord</u> <u>Woodward v. Jefferson Cnty.</u>, 18 F. App'x 706, 717 (10th Cir. 2001)("The <u>Rooker-Feldman</u> doctrine applies only to judicial proceedings[,]" as distinguished from administrative proceedings). For that reason, <u>Rooker-Feldman</u> divests the Court of subject-matter jurisdiction over only the claims seeking to overturn the state courts' judgments and not over any claims seeking to reverse matters only the Racing Commission decided.

The trouble in this case is identifying what the state courts decided. State court decisions exist regarding each of the Plaintiffs' three state court petitions for writs of certiorari. Each of these decisions would inform the Court's <u>Rooker-Feldman</u> inquiry, but the parties did not provide all of them to the Court: the Defendants attached a copy of the state court's decision on only the second of these to the Motion to Dismiss, and the Plaintiffs did not attach any decisions to their Response. Conscious of its responsibility to police its jurisdictional boundaries, the Court obtained copies of the relevant documents from all three state court cases to construct an intelligible timeline.[12]   With the context that the state court record and the Plaintiffs' other

---

[12] One might object that, because the Defendants moved to dismiss under rule 12(b)(6), the Court should look only to the face of the Complaint and not consider the state court decisions. <u>Rooker-Feldman</u>, however, is jurisdictional, and a motion to dismiss based upon it is properly considered under rule 12(b)(1). <u>See</u> <u>Frederiksen v. City of Lockport</u>, 384 F.3d 437, 439 (7th Cir. 2004)(Easterbrook, J.)("We now hold that the right disposition, when the <u>Rooker-Feldman</u> doctrine applies, is an order under Fed. R. Civ. P. 12(b)(1) dismissing the suit for lack of subject-matter jurisdiction."). In considering such a motion, the Court may consider matters outside the four corners of the Complaint. <u>See</u> 5B C. Wright & A. Miller, <u>Fed. Prac. & Proc.</u>

submissions provide, the Court offers here what it understands to be the relevant facts.

After Stolis Winner tested positive for a banned substance, the race stewards held a disciplinary hearing on January 8, 2009, at which they disqualified Stolis Winner, declared Jet Black Patriot the winner, and penalized Taylor, Stolis Winner's trainer.  See Complaint ¶ 24, at 5.  Taylor appealed that decision to the Racing Commission, as was his right under the Racing Commission's rules.  See Complaint at 26, at 6; 15.2.1.9(B)(9) NMAC.  The Racing Commission appointed a three-member panel ("Hearing Panel") to hear the appeal and recommend a disposition.  See Complaint ¶ 26, at 6.  The Hearing Panel's members were attorney Robert B. Collins, attorney Robert P. McNeill, and the Honorable A. Joseph Alarid, retired Judge of the New Mexico Court of Appeals.  See Report of the Hearing Officer Panel at 1, executed July 14, 2010, filed May 23, 2012 (Doc. 11-19).[13]  The Plaintiffs applied to appear at that proceeding; on April 16, 2009, the Hearing Panel recommended that the Racing Commission deny that request.  See Order Denying Application to Appear as Parties and Motion for Continuance at 3-8, executed April 16, 2009, filed May 23, 2012 (Doc. 11-19)("Hearing Panel's Order Denying Intervention").

The Plaintiffs challenged the Hearing Panel's Order Denying Intervention in their Petition for Writ of Certiorari and Notice of Appeal, filed May 14, 2009 (No. D-101-CV-200901526)("First Petition").  In the First Petition, the Plaintiffs sought to challenge the Hearing

§ 1350, at 159-60 (3d ed. 2004)("When the movant's purpose is to challenge the substance of the jurisdictional allegations, he may use affidavits or other additional matter to support the motion. Conversely, the pleader may establish the actual existence of subject matter jurisdiction through extra-pleading material.").

[13] Mr. Collins, Mr. McNeill, and former Judge Alarid heard the appeal's substance.  See Report of the Hearing Officer Panel at 1.  At an earlier stage of the proceedings, the Hearing Panel consisted of Mr. McNeill, former Judge Alarid, and Luis Stelzner; Mr. Stelzner is also a lawyer.  See Certificate of Service at 1, executed March 25, 2009, filed May 23, 2012 (Doc. 11-19).

Panel's Order Denying Intervention.  See First Petition at 6-8.[14]  The state court issued the Writ of Certiorari, filed May 19, 2009 (No. D-101-CV-200901526), but, after copious briefing, the court ultimately quashed the Writ of Certiorari in an Order, filed November 17, 2009 (No. D-101-CV-20090152).  Although the reasoning does not appear on the Order's face, the Plaintiffs contend that the state court did so because, given that the Racing Commission had not issued a final order, it lacked subject-matter jurisdiction.  See Complaint ¶ 41, at 8.

Their first unsuccessful attempt to get the New Mexico courts' assistance behind them, the Plaintiffs returned to the Racing Commission.   On November 13, 2009, the Racing Commission held a hearing on the Plaintiffs' application to appear; the "Plaintiffs argued state law as well as federal constitutional protections of due process," but the Commission nonetheless adopted the Hearing Panel's Order Denying Intervention.  Complaint ¶ 43, at 9.

Having failed before the Commission, the Plaintiffs went back to state court.  In the second of these three petitions, the Plaintiffs' Petition for Writ of Certiorari and Notice of Appeal, filed November 23, 2009 (No. D-101-CV-200903851)("Second Petition"), the Plaintiffs sought review of the Racing Commission's Decision and Order denying their application to appear in the Hearing Panel's merits consideration of Taylor's appeal.  Second Petition ¶ 37-39, at 6-7.  The state court denied the Second Petition.  See Order, filed December 17, 2009 (No. D-101-CV-200903851).  According to the Plaintiffs, "[t]he Court stated during argument that it

---

[14] Although the First Petition imprecisely refers to rulings by the Racing Commission, see First Petition at 35, because the Racing Commission had not yet adopted the Hearing Panel's report, there was no such Racing Commission ruling.  Given the context provided by the Racing Commission's decisions, the briefing regarding the First Petition, and the subsequent history of this litigation, the Court understands the Plaintiffs to have substantially directed their First Petition towards either some facet of the Hearing Panel's Order Denying Intervention or the Commission's consideration of the Hearing Panel's Order Denying Intervention.  The distinction makes no difference to the Rooker-Feldman analysis, in light of the fact that, as discussed below, the state court apparently denied the First Petition for lack of subject-matter jurisdiction.

relied upon state case law that found administrative actions of this nature were quasi-criminal actions and private litigants were not permitted to participate."  Complaint ¶ 44, at 9.

The Hearing Panel held its evidentiary hearing on the merits of Taylor's appeal on May 11, 2010.  See Complaint ¶ 45, at 10.  The Plaintiffs' counsel tried to appear, but the Hearing Panel denied that request.  See Complaint ¶ 46, at 10.  On July 14, 2010, the Hearing Panel recommended that the Complaint dismiss the Board of Stewards' rulings.  See Report of the Hearing Officer Panel, executed July 14, 2010, filed May 23, 2012 (Doc. 11-19)("Hearing Panel's Recommendation of Dismissal")).  The Racing Commission adopted those findings on August 24, 2010.  See Decision and Order, executed August 24, 2010, filed May 23, 2013 (Doc. 11-19)("Racing Commission's Order Adopting the Hearing Panel's Recommendation of Dismissal")).

The Plaintiffs made one last plea for state court intervention in their Petition for Writ of Certiorari and Notice of Appeal, filed September 13, 2010 (No. D-101-CV-201003186)("Third Petition").   In the Third Petition, the Plaintiffs asked the state court to review the Racing Commission's Order Adopting the Hearing Panel's Recommendation of Dismissal.   Third Petition ¶ 47, at 8.  The state court issued the requested Writ of Certiorari, filed October 29, 2010 (No. D-101-CV-201003186), saying that "the petition makes a prima facie showing that the petitioners may be entitled to the relief sought by the petition."  Writ of Certiorari at 1.  The Plaintiffs filed two motions to extend the time in which to file their briefs, which the state court granted, but the Plaintiffs never filed such a brief.   The state court entered an Order of Administrative Closure, filed June 29, 2012 (No. D-101-CV-201003186), because of inactivity.  See Order of Administrative Closure at 1.  The Order of Administrative Closure gave the parties the opportunity to have the case reinstated upon good cause shown within thirty days, see Order

of Administrative Closure at 1, but the parties took no further action.

As the Court has explained, four characteristics mark those cases that Rooker-Feldman places beyond federal court review: "(i) a state-court loser; (ii) is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) [the state court] judgment was rendered before the commencement of the federal proceeding." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *38 (citing Guttman v. Khalsa, 446 F.3d at 1032). Put differently, Rooker-Feldman bars a suit if a "loser in state court invites [a] federal district court to overturn [a] state court judgment." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. at 287 n.2. Conversely, Rooker-Feldman would not bar a plaintiff whose "claims do not rest on any allegation concerning the state court proceedings or judgment." Bolden v. City of Topeka, 441 F.3d at 1139.

Two elements of the Valdez v. Metropolitan Property & Casualty Insurance Co. framework are satisfied in this case. The second element is satisfied: the Court is a federal court, and the Plaintiffs are asking the Court to do something. The fourth element is also satisfied: even the latest state court judgment was rendered before this federal case commenced. The remaining analysis focuses on two issues: first, whether the Plaintiffs are state-court losers, and, second, whether the Plaintiffs ask the court to review the correctness of a judgment that the New Mexico courts rendered.

The Order on the First Petition is not a candidate for Rooker-Feldman "preclusion." The Plaintiffs do not ask the Court to review and overturn the First Judicial District Court's decision that the First Judicial District Court lacked subject-matter jurisdiction. The Order on the First Petition does not, therefore, bar the Court from considering the Plaintiffs' claims.

The Order on the Third Petition also does not present a Rooker-Feldman problem. The

Plaintiffs do not ask the Court to reverse any decision the state court made in the Order on the Third Petition.  Indeed, the state court's first decision in that case -- granting the Writ of Certiorari -- was favorable to the Plaintiffs; the Plaintiffs do not ask the Court to review and reject that decision.  The unfavorable decision in that case was the Order of Administrative Closure, and the Plaintiffs also do not ask the Court to reverse that decision.  The Order on the Third Petition does not, therefore, bar the Plaintiffs' claims.

Although the Order on the Second Petition gives the Court some pause, the Court nonetheless believes it does not present a Rooker-Feldman bar to the bulk of the Plaintiffs' claims.  To the extent that the Plaintiffs ask the Court to revisit and reject the state court's conclusion that state law gave the Plaintiffs no right to intervene in the disciplinary proceeding, Rooker-Feldman, of course, bars such a claim.  Construing the Plaintiffs' claim most favorably to them, however, the Plaintiffs contend that, even if state law prevented the Plaintiffs from intervening in the disciplinary proceeding, the due-process clause requires the Racing Commissioners to give the Plaintiffs some other hearing that complies with due process before the Racing Commissioners could deprive the Plaintiffs of their purported property interest, and that the Racing Commissioners failed to give them such a hearing.  In other words, they seek some free-standing hearing under the Constitution.  On this view, the Plaintiffs do not ask the Court to revisit and reject the state court's conclusion; therefore, Rooker-Feldman does not bar the claim.

II.     **QUASI-JUDICIAL IMMUNITY BARS THE PLAINTIFFS' CLAIMS FOR DAMAGES AGAINST THE RACING COMMISSIONERS, AND ELEVENTH AMENDMENT IMMUNITY BARS THE PLAINTIFFS' CLAIMS FOR DAMAGES AGAINST THE RACING COMMISSION.**

Quasi-judicial immunity bars the Plaintiffs' claims for damages against the State Defendants.     Contrary to the Plaintiffs' assertion that this conclusion renders four centuries of

due-process jurisprudence a nullity, the doctrine exists for cases like this one: cases where a party who is aggrieved by a court's decision and dissatisfied with his options for appeal sues the judge.  The Racing Commissioners' functions are, at least as relevant in this case, similar to those of judges in the judicial process, the Racing Commissioners' decisions were likely to cause litigation, and the regulatory scheme contained sufficient safeguards to prevent unconstitutional conduct.  Quasi-judicial immunity, therefore, shields the Racing Commissioners from the Plaintiffs' claims for damages.

The Racing Commissioners satisfy each of Horwitz test's three prongs.  The Racing Commissioners' functions are, at least as relevant to this case, similar to those of judges in the judicial process.  They appointed the Hearing Panel -- all lawyers, one a former judge -- to recommend a disposition of a particular dispute; the Hearing Panel conducted a hearing based on evidence, even if, in the Plaintiffs' view, that evidence was incomplete, and the Hearing Panel provided a recommendation; and the Racing Commissioners reviewed the findings of the Hearing Panel and disposed of its recommendation.  In this sense, the Racing Commissioners are similar to the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners in Guttman v. Khalsa, to whom quasi-judicial immunity applied.  In response, the Plaintiffs point to alleged conflicts of interest and adversarial process defects and argue that these facts undermine the first prong.  This argument is misplaced.  As applied to this case, the first prong only compares the Racing Commissioners' functions with those involved in the judicial process; the Plaintiffs' dissatisfaction with the manner in which the Racing Commission carried out its role in this case cannot transform the Racing Commission's otherwise clearly judicial functions into non-judicial functions.  If the judicial process prong examined the way judges behaved in a particular case,

that would vitiate the core principle of judicial immunity: "[J]udges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, <u>even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly</u>." <u>Stump v. Sparkman</u>, 435 U.S. 349, 355-56 (1978)(emphasis added). <u>See</u> <u>Nesses v. Shepard</u>, 68 F.3d at 1006 (stating that, where the plaintiff alleged "a massive, tentacular conspiracy among the lawyers and the judges to engineer [the plaintiff's] defeat" in state court proceedings, 68 F.3d at 1004, "[t]he judicial defendants were of course entitled to have the suit dismissed against them on grounds of immunity."). The Court concludes that the Racing Commission's functions are similar to those in the judicial process.

With respect to the litigation causation prong, the Court shares the State Defendants' view that, because the Racing Commission has wide-ranging authority over the lucrative horse racing industry, its acts are likely to provoke lawsuits by disappointed parties-in-interest. This case is evidence of that conclusion: because any decision that the Racing Commission made would have substantial economic consequences for some players in the industry, its decision would give those players reason to sue. The Plaintiffs submit that the facts and procedural history of this case are unusual in some respects. For example, they allege that the purse for this race is unusually high, that the Racing Commission departed from some of its usual adversarial procedures, and that the Racing Commission had a conflict of interest. Those allegations do not undermine the Court's conclusion. That this case is an acute example of facts giving rise to litigation against the Racing Commission is not evidence that the Racing Commission's acts are unlikely to provoke litigation. The Court concludes that the Racing Commission satisfies the <u>Horwitz</u> test's second prong, because the Racing Commission's adverse decisions necessarily displease people with substantial financial interests in the outcome, thereby provoking those

aggrieved to bring damages lawsuits against the Racing Commission.

The Court also concludes that the regulatory framework satisfies the sufficient safeguards prong.  That prong asks whether the regulatory framework contains sufficient safeguards to control unconstitutional conduct.   The State Defendants have produced a litany of such safeguards; indeed, the regulations contain an entire section devoted to "Due Process and Disciplinary Action."   15.2.1.9 NMAC.   At the hearing, the Plaintiffs conceded they do not challenge the regulatory framework as unconstitutional, but rather how the Racing Commission applied it their case: the Plaintiffs again raise their conflict-of-interest and adversarial process objections to the Racing Commission's proceedings in this case, and argue that whatever safeguards existed did not control this conduct.  This argument, however, raises a different issue, and fails on the third prong for the same reason it failed on the first prong: the facts asserted do not respond to the test applied.   The test asks whether the regulatory framework contains sufficient safeguards to control unconstitutional conduct and not whether a particular administrative tribunal in a particular case engaged in allegedly unconstitutional conduct.  What is more, as explained below, there was no unconstitutional conduct in this case.  The Court concludes that the State has carried its burden to prove that the regulatory framework contains sufficient safeguards to control unconstitutional conduct.

Not only does this case satisfy the Horwitz test; the facts are similar to those in Horowitz in important ways.  In that case, the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See Horwitz, 822 F.2d at 1510, 1515.  The Tenth Circuit did so in large part because the defendant Board members were performing adjudicatory

and prosecutorial functions.  See Horwitz, 822 F.2d at 1515.  The Tenth Circuit also noted:

> There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine.  Public policy requires that officials serving in such capacities be exempt from personal liability.

Horwitz, 822 F.2d at 1515.  Finally, the Tenth Circuit pointed out the Board members' functions,

observing that Board members

> serve in the prosecutorial role in that they, among other things, initiate complaints, start hearings, make investigations, take evidence, and issue subpoenas.  They also serve in the adjudicative role, as judges.  Thus, the Board duties are "functionally comparable" to a court of law.  And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station.

822 F.2d at 1515.  The Court finds that similar reasoning leads to a similar result in this case.

The Racing Commissioners performed similarly adjudicatory and prosecutorial functions in

regulating horse racing; in that sense, the Racing Commission is "functionally comparable" to a

court of law.   It is important that the Racing Commissioners regulate horse racing without

harassment or intimidation by lawsuits; the alternative would undermine confidence in the

conclusions that the Racing Commission reaches.  New Mexico state law provides sufficient due

process safeguards to protect against unconstitutional conduct without reliance upon private

damages lawsuits; if litigants do not believe they are receiving due process, they can appeal an

adverse result to state court for injunctive relief.   Accordingly, public policy requires that the

Racing Commissioners be exempt from personal liability.

　　　Because the facts satisfy the Horwitz test, the Racing Commissioners are entitled to

quasi-judicial immunity unless an exception applies.  None does.  The Plaintiffs have not argued

that the State Defendants acted in the absence of all jurisdiction; therefore, only the ministerial-role exception could potentially apply.   At the hearing, when the Court asked the Plaintiffs to identify ministerial, administrative acts the Racing Commissioners committed, the Plaintiffs alleged that excluding them from the proceeding and appointing the hearing panel, without the opportunity for meaningful review, satisfied this prong.   As the Court indicated, these are core judicial acts: it is difficult to conceive of activities that more clearly display participation in the deliberative process and the exercise of independent judgment, as opposed to a mechanical, ministerial role.   Appointing special masters and excluding evidence are what judicial officers do.

The Court concludes that the Racing Commissioners are entitled to quasi-judicial immunity from the Plaintiffs' claims for damages.   Further, as the Court stated at the hearing, the Court finds that Eleventh Amendment immunity, bars the Plaintiffs' claims against the Commission for damages.   As the parties agreed at the hearing, quasi-judicial immunity does not shield the Racing Commissioners from injunctive relief.   The Court will, therefore, dismiss all claims against the Racing Commissioners for damages and consider the claims for injunctive relief separately.

## III.   THE PLAINTIFFS HAVE NOT STATED A CLAIM THAT THE DEFENDANTS VIOLATED THEIR DUE-PROCESS RIGHTS.

The Plaintiffs have not stated a claim that the State Defendants violated their due-process rights.   To do so, the Plaintiffs must demonstrate that they "possess[ed] a protected property interest to which due process protection was applicable[.]"   Camuglia v. City of Albuquerque, 448 F.3d at 1219.   They have not done so.   Further, the Plaintiffs have not alleged conduct that shocks the judicial conscience.   The Court will, therefore, dismiss their due-process claims.

A.   **THE PLAINTIFFS DO NOT HAVE A CONSTITUTIONALLY PROTECTED PROPERTY INTEREST IN THE BENEFITS OF VICTORY.**

The due-process clause empowers the Court only to protect citizens from state deprivations of their lives, liberties, or property -- not of that which citizens merely expect, or of that which citizens think they, in fairness, deserve.  To survive the Motion to Dismiss, therefore, the Plaintiffs must do more than appeal to an intuition that they were robbed of something they expect; they must allege that they were deprived of property to which the law entitles them.  That is, they must demonstrate that they possessed a property interest in the first-place horse's winnings, titles, and the other benefits they claim.  The Plaintiffs have not done so.  Although the Plaintiffs' disappointment with the outcome of the Racing Commission's dispute-resolution process is, perhaps, understandable, the Plaintiffs have not demonstrated that the law entitles them to claim the allegedly cheating first-place winner's prizes and benefits as their property.  For that reason, the Court will dismiss their procedural due-process claim.

Stripped of their legal varnish, the facts of this case are simple.  The Plaintiffs' horse barely lost a close race, and they have evidence that the winning horse used a substance racing rules prohibit.  The Plaintiffs think that the winning horse cheated, that the purse is rightfully theirs, and that they should have a chance to make their case to an unbiased tribunal.  Before they discovered their evidence, however, the time limit to bring it to the Racing Commission expired.  Since that time, the Plaintiffs have repeatedly tried to hurdle this obstacle.  First, they attempted to intervene in the Racing Commission's disciplinary hearing against the allegedly horse-doping trainer, but the Racing Commission and the state courts rejected their pleas.  They then brought this suit, complaining that the Racing Commissioners had deprived them of their property without due process.

The due process clause, however, does not give the Court free rein to create property rights.  Rather, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  Such a "legitimate claim of entitlement" typically springs not from the due-process clause itself, but from some independent source of positive law, such as statutes, ordinances, or contracts.  See Teigen v. Renfrow, 511 F.3d at 1079 (10th Cir. 2007).  See also Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577 ("Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

The Plaintiffs have not identified such a source to support their claim of entitlement.  The Plaintiffs' claims assume that the Plaintiffs held a property interest in "the first place purse at the All American Futurity and the substantial stud and breeding fees which go along with winning such a prestigious race."  Complaint ¶ 157, at 27.  In their Response, the Plaintiffs argue that they "acquired a property interest in the first place standing when Stolis Winner's test results were positive for caffeine, a banned substance."  Response at 11 (citing Complaint at ¶¶ 13-18, at 13-18).  Standing alone, this conclusory allegation cannot justify the Plaintiffs' position; the Plaintiffs must instead identify a source that, given the fact of this positive test, entitles them to claim the benefits of first-place standing as their property.  They have not done so.  Instead, the Plaintiffs want the Court to infer two conclusions from their allegation: first, because the winning horse's blood tested positive for caffeine, the Racing Commission should have disqualified the winning horse; and second, because the Racing Commission should have

disqualified the winning horse, the Racing Commission also should have redistributed the purse and other benefits to the Plaintiffs.

On close examination of the then-extant regulations governing horse racing in New Mexico, these initially intuitive inferences are wrong.  Although caffeine was a banned substance, see 15.2.6.9(A)(2) NMAC, the horse racing regulations did not require the Racing Commission to disqualify a horse that tested positive for such a drug.  The following paragraph, which introduces the "Medications and Prohibited Substances" section of the regulations, frames the penalty guidelines in discretionary language:

> Upon a finding of a violation of [the following] medication and prohibited substances rules, the stewards shall consider the classification level of the violation as listed at the time of the violation by the Uniform Classification Guidelines of Foreign Substances as promulgated by the Association of Racing Commissioners International and impose guidelines penalties and disciplinary measures consistent with the recommendations contained therein.  The guidelines and recommended penalties shall be provided to all license holders by attachment to this section.  Provided, however, that in the event a majority of the stewards determine [sic] that mitigating circumstances require imposition of a lesser penalty they may impose the lesser penalty.  In the event a majority of the stewards wish [sic] to impose a greater penalty or a penalty in excess of the authority granted them, then, and in such event, they may impose the maximum penalty authorized and refer the matter to the Commission with specific recommendations for further action.

See 15.2.6.9 NMAC.  It is true that the regulations provide "Penalty Recommendations (in the absence of mitigating circumstances)," including "[six] months to one-year suspension and $1,500 to $2,500 fine and loss of purse" for use of a "Class 2" drug, like caffeine.  15.2.6.9(B)(2) NMAC.  Those "Penalties Recommendations (in the absence of mitigating circumstances)" recommended and authorized loss of purse, but, in light of the regulations' repeated mitigating-circumstances qualification, they did not require automatic disqualification and redistribution of purse in the event of a positive test.  See generally 15.2.6.9(B) NMAC.  The regulations, therefore, do not support the Plaintiffs' claim that they acquired a property interest in the benefits

of victory as soon as Stolis Winner tested positive for a banned substance.

The Plaintiffs also did not acquire such a property interest when the Board of Stewards issued its decision.  It is true that the regulations provide: "Purses, prizes, awards, and trophies shall be redistributed if the stewards or Commission order a change in the official order of finish."   15.2.3.8(B)(3)(3)(K) NMAC.   Such a ruling is not, however, final.   As a person aggrieved of the Board of Stewards' ruling, Taylor had a right to appeal to the Racing Commission, see 15.2.1.9(B)(9) NMAC.  The Racing Commission had the power to appoint a presiding officer to hold a hearing,[15] and the Racing Commission had the power to

> adopt the [presiding officer's] proposal for decision, in whole or in part; decline to adopt the proposal for decision, in whole or part; remand the proceeding for further action by the same or a different presiding officer; or direct the presiding officer to give further consideration to the proceeding with or without reopening the hearing.

---

[15] The Plaintiffs suggest that there was something unlawful about the Commission's decision to appoint a panel of three hearing officers rather than a single officer.  It is not clear if the Plaintiffs believe that decision harmed their interests or whether they think the decision departed from the regulations.  Further, the regulations are not clear about the issue.  It is true that the regulations refer to "the presiding officer" in the singular sense.  See, e.g., 15.2.1.7 NMAC ("A person may not serve as the presiding officer of a proceeding in which the person has an economic interest.")(emphasis added).  The regulations also provide, however, that "[o]ne or more members of the Commission, an administrative law judge, or a duly designated hearing officer may serve as the presiding officer for a Commission proceeding."  15.2.1.7(A) NMAC (emphasis added).  The emphasized language suggests, counterintuitively, that the regulations occasionally use "the presiding officer" to refer to an entity of multiple persons.  In any event, even if the regulations did not authorize the Racing Commission to appoint multiple persons to serve as "the presiding officer" for the dispute in this case, the Racing Commission's decision to do so would not give rise to a property interest the due-process clause protects; at most, there would be a violation of state law, and 42 U.S.C. § 1983 does not provide a remedy for violations of state law.  See 42 U.S.C. § 1983 (providing a remedy only for violations of "rights, privileges, or immunities secured by the Constitution and laws").  It may be difficult to argue that a three-judge panel, rather than a one-judge panel, would violate the Constitution, given that a three-judge federal panel is seen as securing more rights and benefits, not less.  See, e.g., Brown v. Civil Serv. Comm'n, 818 F.2d 706, 708 ("[T]he appellate court is structurally better suited to make decisions of law than is a district court," in part because "there are three judges considering the legal issues[.]").  Further, if that facet of the Racing Commission's decision displeased the Plaintiffs, they should have pursued that state-law theory in a state forum.

15.2.1.9(C)(15)(d) NMAC.  Further, Taylor had the right to apply for a stay of the stewards' ruling, and the Racing Commission had the power to grant the stay.  See 15.2.1.9(B)(10) NMAC. The Stewards' initial decision to reorder the race was, therefore, subject to the Racing Commission's essentially plenary review.  Reading the regulatory scheme as a coherent whole, the regulations did not require the Racing Commission automatically to disqualify Stolis Winner and to declare Jet Black Patriot the winner.  Rather than strictly mandating certain results, the regulations gave the Board of Stewards and, by extension, the Commission the discretion to mete out punishment in a more fact-sensitive way.  Further, the Court is aware of no case finding a property right in similar circumstances, and the Plaintiffs have cited no such case.

For the Plaintiffs' position to prevail, the law would have to secure for athletic event losers a property right to step (or gallop) into the shoes of an allegedly ineligible winner and claim the spoils of another's victory as their "property" -- and that the Constitution guarantees the second-place finisher a taxpayer-funded hearing before a state actor may deprive them of that "property."  The Constitution does not require the state to provide any regulations of or hearings for athletic events.  That the State of New Mexico has provided a hearing does not mean it has to be the one the Plaintiffs demand.  The Plaintiffs refused to use the state-court process state law gave them and now demand a hearing they think the Commission owes them.  There is a lot of chance at the race track, for owners and horses, as well as the public; the Constitution does not take that away.  The due-process clause is not so broad as to create a property right for second-place finishers or to give them a special "Constitutional" hearing that state law does not give them.  The Court will, therefore, dismiss the Plaintiffs' procedural due-process claim.[16]

---

[16] Even if the Plaintiffs had a property interest, their argument that the state did not provide sufficient process is unconvincing.  As explained above, the Plaintiffs had the opportunity for further process -- that is, to challenge the Commission's action -- when the state

### B.     THE PLAINTIFFS HAVE NOT ALLEGED CONDUCT THAT SHOCKS THE JUDICIAL CONSCIENCE.

The Plaintiffs also purport to assert a substantive due-process claim.  This claim fails, because the State Defendants' alleged conduct does not shock the judicial conscience.  The Court will, therefore, dismiss the Plaintiffs' substantive due-process claim.

The simplest reason for this conclusion is that the State Defendants lack an interest that the substantive due-process doctrine protects.  The Complaint appears to tie the Plaintiffs' substantive due-process claim to the same property interest the Court rejected above.  In the Plaintiffs' words:

> 168.  The members' adoption of the panel's decision to overturn the first place win also violated the Plaintiffs' Fourteenth Amendment substantive due process rights by taking a way a recognized property interest.
>
> 169.  Substantive due process protects fundamental aspects of personal privacy and integrity against state intrusion, no matter how many procedures the state may follow prior to the intrusion.
>
> 170.  The Supreme Court has previously held depriving a person of his property is a violation of a personal right in the same way that depriving him of his liberty is.
>
> 171. The members [sic] executive decision to adopt the non-Commission panel's decision to overturn Plaintiffs' first place win without hearing from Plaintiffs violated substantive due process because such decision was arbitrary and conscience shocking, in a constitutional sense.
>
> 172.  The Commissions' [sic] delegation of the matter to an ad hoc committee, however established, violated substantive due process because such decision was arbitrary and conscience shocking, in a constitutional sense.

Complaint ¶ 168-72, at 29.  This argument fails for several reasons.  First, as the Court has already explained, the Plaintiffs have no property interest in the benefits of victory.  Second, and more fundamentally, this argument misunderstands the nature of the interests the substantive

---

court issued the Writ of Certiorari that the Plaintiffs requested in their Third Petition.  The Plaintiffs decided not to pursue that avenue to relief.  The Plaintiffs cannot generate a due-process claim by foregoing process to which state law entitles them.

due-process doctrine protects.  The Supreme Court has cautioned that "[o]nly fundamental rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' qualify for such protection."  Chavez v. Martinez, 538 U.S. 760, 775 (2003)(quoting Washington v. Glucksberg, 521 U.S. 702, 721 (1997)).  The Supreme Court once described certain fundamental rights the substantive due-process doctrine protects as follows:

> Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.  Our cases recognize the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.   Our precedents have respected the private realm of family life which the state cannot enter.  These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.  At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 851 (1992)(citations and quotation marks omitted).  The Plaintiffs have not demonstrated such a fundamental "right" to first place at a horse race or to a hearing to determine who should get the bigger purse.

Further, despite the Plaintiffs' conclusory contrary allegation, the State Defendants' alleged conduct is not so outrageous as to shock the Court's conscience.  The Tenth Circuit has explained: "Substantive due process prohibits only the most egregious official conduct.  Even most intentionally inflicted injuries caused by misuse of government authority will not meet this standard."   Koessel v. Sublette Cnty. Sheriff's Dept., 717 F.3d 736, 750 (10th Cir. 2013)(Tymkovich, J.)(internal citations and quotation marks omitted).  Indeed, this case is not of the genus that shocks the judicial conscience.  Such cases typically deal with intentional arbitrary or cruel treatment of the sort in the paradigmatic shocks-the-conscience case, Rochin v.

California, 342 U.S. 165 (1952), in which the Supreme Court held that it shocked the conscience

for police officers to forcibly extract evidence from a suspect's stomach, see 342 U.S. at 172.

Indeed, cases that successfully invoke the substantive due-process doctrine typically involve

abuse of power by a government agent empowered to use force, e.g., law enforcement, prison

guards, or school officials.  See Williams v. Berney, 519 F.3d 1216, 1221 (10th Cir. 2008).  As

an example of how restrictive the doctrine can be, in Gilliam v. USD No. 244 School Dist., 397

F. Supp. 2d 1282 (D. Kan. 2005), United States District Judge John W. Lungstrum of the District

of Kansas concluded that a male teacher did not shock the conscience when his female student

alleged that the teacher had harassed her as follows:

> In February of 2004, he placed a classified Valentine's Day advertisement in the
> Burlington High School newspaper.  The ad was addressed to [the plaintiff ]
> "Rebecca Gilliam" from a "Secret Admirer."  It stated, "you make my heart sing."
> Soon after the newspaper was distributed, plaintiff was in the school
> administrative offices making copies for a teacher.  Defendant Vannocker
> approached her from behind, leaned into her pressing his torso into her back, and
> whispered in her ear, "you know you do make my heart sing."  Plaintiff felt
> physically threatened by his actions.
>
> On another occasion, defendant Vannocker provided plaintiff with a packet of
> research materials for her senior paper, yet he did not provide any other students
> with research materials for their senior papers.  Included in the materials that
> defendant Vannocker provided to plaintiff was a four-page advertisement for a
> male erection enhancement drug, Cialis.  This advertisement did not relate to
> plaintiff's research project in any way.

Gillam v. USD No. 255 School Dist., 397 F. Supp. 2d at 1285, 1287-88.  An adverse quasi-

judicial decision in a horse racing dispute is far afield from the arbitrariness and brutality the

substantive due-process doctrine prohibits.  The Court will, therefore, dismiss the Plaintiffs'

substantive due process claims.[17]

---

[17] The State Defendants also sought to dismiss the Plaintiffs' claims against them for
injunctive and declaratory relief.  There is no longer a claim against the State Defendants on
which the Court could grant injunctive relief.  The Court will, therefore, deny as moot that

IV.     **BECAUSE THE PLAINTIFFS HAVE NOT COMPLIED WITH THE LOCAL
RULES, THE COURT WILL NOT ALLOW THEM LEAVE TO AMEND.**

The Plaintiffs ask the Court to permit them to amend their complaint rather than

dismissing their claims.  The Plaintiffs have not, however, complied with the local rules, which

provide: "A proposed amendment to a pleading must accompany the motion to amend."

D.N.M.LR-Civ. 15.1.  The Plaintiffs need to review this memorandum opinion and see if they

think there is a way to amend to avoid the problems with the Complaint.  It may be that they

cannot, so the Court should not grant them blanket leave to amend at this time.  A scheduling

conference is set for October 29, 2013 at 11:45 a.m.   The Court will set deadlines for

amendments at that time.  Should the Plaintiffs file a motion to amend that complies with Rule

D.N.M.LR-Civ. 15.1, the Court may consider it at that time.   At this time, however, the Court

will not grant leave to amend without seeing whether any amendment would be futile.

**IT IS ORDERED** that the Defendants Marty L. Cope, Arnold J. Real, B. Ray Willis,

Thomas Fowler, Larry Delgado, and the New Mexico Racing Commission's Motion to Dismiss

under Rule 12(b)(6), filed November 20, 2012 (Doc. 22), is granted in part and denied in part.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Robert H. Fritz, III
Fritz Law Firm
Houston, Texas

---

portion of the State Defendants' Motion to Dismiss.

- 78 -

-- and --

Chad W. Dunn
Brazil & Dunn
Houston, Texas

      *Attorneys for the Plaintiffs*

Billy R. Blackburn
Blackburn Law Office
Albuquerque, New Mexico

--and--

Brian O'Toole
Brian O'Toole, P.C.
Austin, Texas

      *Attorneys for Defendants Heath Taylor, Jerry Windham, and Pat Windham*

Gary K. King
  Attorney General of New Mexico
Sally Galanter
  Assistant Attorney General
Albuquerque, New Mexico

      *Attorneys for Defendants Marty L. Cope, Arnold J. Rael, B. Ray Willis, Thomas Fowler,*
        *Larry Delgado, and the New Mexico Racing Commission*