# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RICHARD SIMON; JANELLE SIMON;
ERIC CURTIS and JOSE VEGA,

     Plaintiffs,[1]

vs.                                              No. CIV 12-0096 JB/WPL

HEATH TAYLOR; JERRY WINDHAM;
PAT WINDHAM; MARTY L. COPE;
ARNOLD J. RAEL; B. RAY WILLIS;
THOMAS FOWLER; LARRY DELGADO
and THE NEW MEXICO RACING
COMMISSION,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' First Motion for Summary Judgment as to Claim for Intentional Interference with Prospective Economic Advantage and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 136)("Defendants' Intentional Interference with Prospective Economic Advantage MSJ"); (ii) the Defendants' Second Motion for Summary Judgment as to Claim of Fraud and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 137)("Defendants' Fraud MSJ"); (iii) the Defendants' Third Motion for Summary Judgment as to Prima Facie Tort Claim and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 138)("Defendants' Prima

---

[1]On January 14, 2015, the Court entered an order dismissing without prejudice all of Eric Curtis' and Jose Vega's claims in the Complaint. See Order, filed January 14, 2015 (Doc. 99). Plaintiffs Janelle Simon and Richard Simon are the only remaining plaintiffs in this case. When relating this case's factual and procedural history until the January 14, 2015, order, the Court will use the term "Plaintiffs" to refer to the Simons, Vega, and Curtis collectively, with the understanding that Vega and Curtis are no longer plaintiffs in this case. When referring to the parties' arguments on the motions at issue, however, the Court will refer only to the current Plaintiffs.

Facie Tort MSJ"); (iv) the Defendants' Fourth Motion for Summary Judgment as to Negligence Claim and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 139)("Defendants' Negligence MSJ"); and (v) the Plaintiffs' Motion for Summary Judgment, filed December 22, 2016 (Doc. 140)("Plaintiffs' MSJ"). The Court held a hearing on January 25, 2017. The primary issues are whether: (i) the Defendants are entitled to summary judgment on the Plaintiffs' claims for intentional interference with prospective economic advantage, fraud, prima facie tort, and negligence, because the Plaintiffs did not adduce sufficient evidence for a reasonable jury, based upon the preponderance of the evidence, to return a verdict for the Plaintiffs on those claims; (ii) whether two laboratory test results indicating the presence of caffeine in a urine sample taken from Stolis Winner after the 2008 All American Futurity are sufficient evidence for a reasonable jury, based upon the preponderance of the evidence, to return a verdict for the Plaintiffs on the Plaintiffs' claims for intentional interference with prospective economic advantage, fraud, prima facie tort, and negligence; (iii) whether, on this record, the Plaintiffs can recover on an implied private cause of action arising under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's rules, N.M. Admin. Code § 15.2.6; and (iv) whether, based on the record evidence, the Plaintiffs are entitled to summary judgment on their intentional interference with prospective economic advantage, fraud, prima facie tort, and negligence claims.

The Court concludes: (i) that the Defendants are entitled to summary judgment on the Plaintiffs' intentional interference with prospective economic advantage claim, because the two positive tests results indicating the presence of caffeine in Stolis Winner's urine establish such a miniscule caffeine concentration so as not to amount to even a scintilla of evidence supporting the Defendants' intentional administration of caffeine to the horse with a purpose to interfere

with the Plaintiffs' prospective contractual relations; (ii) that the Defendants are entitled to summary judgment on the Plaintiffs' fraud claim, because the two test results indicating trace amounts of caffeine in Stolis Winner's urine are insufficient for a reasonable jury to find that the any of the Defendants knew that the horse had ingested caffeine and, consequently, knowingly made a false misrepresentation; (iii) that the Defendants are entitled to summary judgment on the Plaintiffs' prima facie tort claim, because the two test results indicating trace amounts of caffeine are insufficient for a reasonable jury to find that the Defendants improperly trained Stolis Winner with a purpose to harm the Defendants; (iv) that the Defendants are entitled to summary judgment on the Plaintiffs' negligence claim, because a reasonable jury could not find by a preponderance of the evidence that the two test results establish a breach of the standard of care reflected by New Mexico Administrative Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L)(3)(c); (v) that, even if the Plaintiffs could establish breach, a reasonable jury could not find by a preponderance of the evidence that the miniscule amount of caffeine present in Stolis Winner caused the Plaintiffs any injury; (vi) that the Plaintiffs cannot recover on an implied private cause of action under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's rules, N.M. Admin. Code § 15.2.6, because Stolis Winner's two test samples do not exceed the Racing Commission's promulgated "regulatory threshold" for caffeine as an "environmental contaminant[] and substance[] of human use" of "100 nanograms per milliliter of plasma or serum [equivalent to ~ 300 ng/ml in urine], below which the Racing Commission does not impose any disciplinary action for the presence of caffeine in a race horse, N.M. Admin. Code § 15.2.6.9(L)(3)(c); and (vii) that the Plaintiffs are not entitled to summary judgment on their claims, because the Plaintiffs have not met their burden to demonstrate that they are entitled to judgment as a matter of law on any of their claims based on the record

evidence of the two positive results indicating trace amounts caffeine in Stolis Winner's urine. Accordingly, the Court (i) grants the Defendants' Intentional Interference with Prospective Economic Advantage MSJ, the Defendants' Fraud MSJ, the Defendants' Prima Facie Tort MSJ, and the Defendants' Negligence MSJ; and (ii) denies Plaintiffs' MSJ.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' assertions of undisputed material fact in their cross motions for summary judgment. See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 1-4; Defendants' Fraud MSJ at 1-4; Defendants' Prima Facie Tort MSJ at 1-3; Defendants' Negligence MSJ at 1-3; Plaintiffs' Response to Defendants' Motions for Summary Judgment at 2-20, filed January 4, 2017 (Doc. 143)("Plaintiffs' Response"); Plaintiffs' MSJ at 1-3; Defendants' Response to Plaintiffs' Motion for Summary Judgment at 1-3, filed January 23, 2017 (Doc. 146)("Defendants' Response").[2]

---

[2]D.N.M.L.R.-Civ. 56.1(b) provides:

The Memorandum must set out a concise statement of all the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies. . . . The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies. . . . The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All

## 1.    The 2008 All American Futurity.

material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.L.R.-Civ. 56.1(b).

In submitting their respective cross motions for summary judgment and respective responses, the parties did not follow Local Rule 56.1(b)'s requirements.  See D.N.M.L.R.-Civ. 56.1(b).  Nor did either party file a reply brief.  See D.N.M.L.R.-Civ. 56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.").  In other words, they each set forth a statement of undisputed facts, but did not tell the Court, as they should have done, which of the other parties' factual allegations they dispute.  At the January 25, 2017, hearing on the parties' cross motions for summary judgment, the Court proposed an approach to resolve the parties' noncompliance with the local rules -- namely, to issue one opinion analyzing the facts from the five separate motions for summary judgment, and do its best to decipher, for all the factual allegations asserted, which are disputed and which are not.  The Court's approach avoided the parties having to resubmit their motions.  See Transcript of Hearing at 35:23-36:2, taken January 25, 2017 (Court)("Tr.").  The parties assented to the Court's suggested approach.  See Tr. at 36:4-5 ("I mean I think the Court can enter one order and resolve all the summary judgments.")(Dunn); Tr. at 35:13-14 ("I guess -- I understand sort of [the] dilemma that the Court is in.")(Blackburn).  In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").  The Court notes that the Defendants' four motions for summary judgment do not contain identical factual allegations, compare, e.g., Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶¶ 1-18, at 1-4, with Defendants' Fraud MSJ ¶¶ 1-16, at 1-4, and so the Court will draw its view of the Defendants' assertions of material fact accordingly.

Moreover, at the hearing, the Court requested that the Plaintiffs clarify any factual disputes they have with the Defendants' enumerated uncontested material facts, which the Defendants provided in the Defendants' four motions for summary judgment.  See Tr. at 22:19-22 ("Well, the facts are the same for all four motions so tell me what the factual disputes are, if any.  Are these legal issues or factual disputes?")(Court).  The Plaintiffs' counsel reviewed the Defendants' enumerated statements of uncontested facts in open court, stating whether the Plaintiffs dispute each factual allegation.  See Tr. at 22:23-23:6 (Dunn); Tr. at 23:9-11 (Dunn); Tr. at 25:21-27:10 (Dunn); Tr. at 27:12-28:1 (Dunn).  In the Court's presentation of the facts in its summary judgment opinion, the Court will consider the Plaintiffs' open-court statements regarding which of the Defendants' factual allegations the Plaintiffs dispute, as well as the allegations on which the Plaintiffs rely in their assertions of factual dispute.  Again, the Court will also consider the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").

This dispute arises out of the tenth and final round of the 2008 All American Futurity, a quarter-horse[3] race at Ruidoso Downs, New Mexico on September 1, 2008. <u>See</u> Plaintiffs' MSJ ¶ 1, at 1 (asserting this fact); Defendants' Response at 1 (not disputing this fact). The winning horse in the 2008 All American Futurity entitled the owners of the winning horse to a purse of one million dollars. <u>See</u> Plaintiffs' MSJ ¶ 5, at 2 (asserting this fact); Defendants' Response at 1 (not disputing this fact). The owners of the second-place horse were entitled to a purse of $285,000.00. <u>See</u> Plaintiffs' MSJ ¶ 5, at 2 (asserting this fact); Defendants' Response at 1 (not disputing this fact).

Defendants Jerry and Pat Windham ("the Windhams") owned a horse, Stolis Winner. <u>See</u> Plaintiffs' MSJ ¶ 2, at 2 (asserting this fact); Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶ 1, at 1 (asserting this fact). At all relevant times, Defendant Heath Taylor trained Stolis Winner. <u>See</u> Plaintiffs' MSJ ¶ 2, at 2 (asserting this fact); Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶ 2, at 1 (asserting this fact). Plaintiffs Richard and Janelle Simons ("the Simons") also owned a horse, Jet Black Patriot. <u>See</u> Plaintiffs' MSJ ¶ 4, at 2 (asserting this fact); Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶ 3, at 1 (asserting this fact). "Stolis Winner held the fastest qualifying time out of all 145 entrants for the 2008 All American Futurity." Defendants' Prima Facie Tort MSJ ¶ 5, at 2 (asserting this fact). <u>See</u> Plaintiffs' Response at 2-4 (not disputing this fact). "Stolis Winner was the strong favorite to win the 2008 All American Futurity." Defendants' Prima Facie Tort MSJ ¶ 7, at 2 (asserting this fact). <u>See</u>

---

[3]The American quarter horse "excels at sprinting short distances. Its name came from its ability to outdistance other horse breeds in races of a quarter mile or less; some individuals have been clocked at speeds up to 55 mph (88.5 km/h)." <u>American Quarter Horse</u>, Wikipedia.org, http://en.wikipedia.org/wiki/American_Quarter_Horse (last visited Apr. 16, 2015).

Plaintiffs' Response at 2-4 (not disputing this fact).

On September 1, 2008, at Ruidoso Downs, immediately before and after the race, many people were in close proximity to Stolis Winner under circumstances that did not control for ambient caffeine contamination. See Videotaped Deposition of Heath Taylor at 181:11-25 (taken April 26, 2016), filed January 4, 2017 (Doc. 143-11)("Taylor Depo.").[4]

> A. . . . To pet the horse if it's standing there or something I don't think is a prohibited activity, but usually the horse is walking or getting ready to run.
>
> Q. In the day of the running of the All American, how many owners usually appear -- at least in 2008 how many owners that you're aware of appeared in the paddock before the race?
>
> A. Oh, countless. It's like opening the gate at a rock concert. You don't have to have pass credentials or any credentials in order to get in the infield of a racetrack. So it was just -- you couldn't hardly walk, basically.

Taylor Depo. at 181:13-25 (Taylor, Blackburn).[5] At the race, Stolis Winner barely crossed the finish line ahead of Jet Black Patriot. See Plaintiffs' MSJ ¶ 4, at 2 (asserting this fact);

---

[4]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment. See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record."). See also supra, at n.2.

[5]The Plaintiffs do not introduce record evidence that controverts the fact that, immediately before and after the race, many people were in close proximity to Stolis Winner under circumstances that did not control for ambient caffeine contamination. The Plaintiffs adduce record evidence, however, that caffeine was absent from the test barn, where a urine sample was taken from Stolis Winner directly after the race, see Plaintiffs' MSJ at 10 (citing Videotaped Deposition of Jesse Unruh at 29:16-25 (taken July 15, 2009), filed January 4, 2017 (Doc. 143-12)("Unruh Depo."), and from the Racing Commission's laboratory area, see Plaintiffs' MSJ at 10 (citing Unruh Depo. at 32:25-33:9). Yet, as the Taylor Depo. reflects, the test barn and the laboratory area are not the only locations where Stolis Winner could have been exposed to caffeine under circumstances that did not control for ambient caffeine contamination. See Taylor Depo. at 181:13-25 (describing the paddock before the race as "a rock concert" and stating "[y]ou don't have to have pass credentials or any credentials in order to get in the infield of a racetrack . . . you couldn't hardly walk, basically").

Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶ 9, at 2 (asserting this fact).[6]

A licensed veterinarian collected test samples from each of the horses that competed in the 2008 All American Futurity. See Plaintiffs' MSJ ¶ 6, at 2 (asserting this fact); Defendants' Response at 1-3 (not disputing this fact).[7] Following the race, blood and urine samples were drawn from all ten horses that had run the race, see Unruh Depo. at 57:14-58:20, and the samples were sent to the Iowa State University Veterinary Diagnostic Laboratory (the "Iowa Lab"), see Videotaped Deposition of Walter Hyde at 56:20-23 (taken June 18, 2009), filed January 4, 2017 (Doc. 143-4)("Hyde Depo.").[8] Among the ten horses that ran the 2008 All American Futurity, at most three horses, including Stolis Winner, provided the blood or urine samples that the Iowa Lab tested. See Hyde Depo. at 127:20-128:8 (testifying that the Iowa Lab tested samples from only three horses that ran any race at the Ruidoso Downs racetrack on September 1, 2008).[9]

---

[6]The Defendants allege that "Jet Black Patriot finished approximately 0.08 seconds behind Stolis Winner in the 2008 All American Futurity, almost exactly the time differential between the two horses during the qualifying race." Defendants' IIPEA MSJ ¶ 9, at 2. As Plaintiffs characterize the finish, Stolis Winner won first place by "a neck." Plaintiffs' MSJ at 4.

[7]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment. See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record."). See also supra, at n.2.

[8]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment. See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record."). See also supra, at n.2.

[9]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary

The Iowa Lab determined a positive finding and estimated that there were 125 nanograms per milliliter ("ng/ml") of caffeine in Stolis Winner's urine sample.     See Hyde Depo. at 67:19-68:7; Letter from Wolfgang F. Mueller, Ph.D. to Julian Luna re: Caffeine in horse urine, #28428 at 1 (executed October 29, 2008), filed January 4, 2017 (Doc. 143-17 at 38)("Mueller Letter").[10]  The New Mexico Horsemen's Association also directed the Louisiana State University Equine Medication Surveillance Laboratory (the "LSU Lab") to determine whether the same urine sample taken from Stolis Winner contained caffeine.  See Letter from Brenda Gabaldon to Steven Barker re: Split Samples for Testing at 1 (executed October 9, 2008), filed January 4, 2017 (Doc. 143-17 at 35)("Gabaldon Letter").[11]  The LSU Lab confirmed the presence of caffeine in Stolis Winner's urine sample at an estimated concentration of 84.2 ng/ml.  See Letter from Steven Barker to Brenda Gabaldon at 1 (executed October 16, 2008), filed January 4, 2017 (Doc. 143-17 at 37)("Barker Letter"); Mueller Letter at 1.[12]

---

judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").  See also supra, at n.2.

[10]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").  See also supra, at n.2.

[11]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").  See also supra, at n.2.

[12]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary

The rules and regulations promulgated by Defendant New Mexico Racing Commission list caffeine as a Class 2 prohibited substance.[13]  See Plaintiffs' MSJ ¶ 6, at 2 (asserting this fact);

---

judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").  See also supra, at n.2.

[13]Under New Mexico Administrative Code § 15.2.6.9,

> The classification guidelines contained within the "uniform classification guidelines for foreign substances and recommended penalties and model rule", April 8, 2016, version 12.0 and "association of racing commissioners international inc. controlled therapeutic medication schedule for horses", version 3.0, revised March 25, 2016 by the association of racing commissioners international, are incorporated by reference.

N.M. Admin. Code § 15.2.6.9.  The Uniform Classification Guidelines for Foreign Substances and Recommended Penalties and Model Rule defines "Class 2" drugs as:

> Drugs that have a high potential to affect performance . . . .  These drugs are 1) not generally accepted as therapeutic agents in racing horses, or 2) they are therapeutic agents that have a high potential for abuse.  Drugs in this class include: psychotropic drugs, certain nervous system and cardiovascular system stimulants, depressants, and neuromuscular blocking agents.  Injectable local anesthetics are included in this class because of their potential for abuse as nerve blocking agents.

See The Uniform Classification Guidelines for Foreign Substances and Recommended Penalties and Model Rule, Classification Deadlines at iv, http://nmrc.state.nm.us/uploads/FileLinks/2337388252b64297a725500fd137ff3d/Attach_1_1.pdf ("Uniform Classification Guidelines").  Caffeine is a class 2 substance.  See Uniform Classification Guidelines at 2.

New Mexico Administrative Code § 15.2.6.9(C)(1) also provides:

> A finding by the commission approved laboratory of a prohibited drug, chemical or other substance in a test specimen of a horse is prima facie evidence that the prohibited drug, chemical or other substance was administered to the horse and, in the case of a post-race test, was present in the horse's body while it was participating in a race. Prohibited substances include: drugs or medications for which no acceptable levels have been established; therapeutic medications in excess of established acceptable levels; substances present in the horse in excess of levels at which such substances could occur naturally; substances foreign to a horse at levels that cause interference with testing procedures.

Defendants' Response at 1-3 (not disputing this fact).  Caffeine is a banned substance under the Racing Commission's policy regarding Class 2 prohibited substances.  <u>See</u> Plaintiffs' MSJ ¶ 6, at 2 (asserting this fact); Defendants' Response at 1-3 (not disputing this fact).  Given the Iowa Lab's and the LSU Lab's results, Stolis Winner tested positive for caffeine.  <u>See</u> Plaintiffs' MSJ ¶ 6, at 2 (asserting this fact); Defendants' Response at 2 (not disputing this fact).  <u>See also</u> Videotaped Deposition of Julian Luna at 17:19-22 (taken May 18, 2009), filed January 4, 2017 (Doc. 143-9)("Luna Depo.")("[W]e had a caffeine positive . . . .").  Indeed, the Defendants state that, "[f]ollowing the running of the race, a tiny amount of caffeine was found to be present in Stolis Winner."  Defendants' Response at 2 (asserting this fact).[14]

The positive tests taken after the race from a sample of Stolis Winner's urine are the only evidence that Stolis Winner allegedly was under the influence of a substance that the Racing Commission prohibits.  <u>See</u> Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶ 11, at 2 (asserting this fact); Plaintiffs' Response at 2-4 (not disputing this fact).  Taylor, J. Windham, and P. Windham did not "knowingly or intentionally provide Stolis Winner with caffeine and did not instruct anyone acting on [his or her] behalf to provide Stolis Winner with caffeine."  Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶¶ 10-12, at 2-3 (alterations added)(asserting this fact)(citing Defendant Heath Taylor's Answers to Plaintiffs' First Set of Interrogatories to All Defendants at 3, filed December 21, 2016 (Doc. 136-5)("Taylor's First Answers"); Defendant Jerry Windham's

---

N.M. Admin. Code § 15.2.6.9(C)(1).

[14]The Plaintiffs did not specifically controvert this assertion of fact, because they did not file a reply brief.  <u>See</u> D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  Accordingly, the Court deems this fact undisputed.

Answers to Plaintiffs' First Set of Interrogatories to All Defendants at 3-4, filed December 21, 2016 (Doc. 136-6)("J. Windham's First Answers"); Defendant Pat Windham's Answers to Plaintiffs' First Set of Interrogatories to All Defendants at 3, filed December 21, 2016 (Doc. 136-7)("P. Windham's First Answers")). <u>See</u> Affidavit of Pat Windham ¶ 5, at 1 (executed April 10, 2015), filed December 21, 2016 (Doc. 136-8)("P. Windham Aff."). <u>See also</u> Plaintiffs' Response at 2-4 (not disputing this fact).[15] Moreover, Taylor, J. Windham, and P. Windham have "no knowledge as to ingestion of caffeine by Stolis Winner." Defendants' Fraud MSJ ¶¶ 14-16, at 3. <u>See</u> Plaintiffs' Response at 2-4 (not disputing this fact).[16] Furthermore, the

---

[15]The Plaintiffs do not specifically controvert this factual allegation in the Plaintiff's Response. This lack of any evidence to the contrary demonstrates that the discovery has not panned out for the Plaintiffs. In their claims of fraud and their intentional interference with prospective economic advantage, the Plaintiffs affirmatively allege that the Defendants provided Stolis Winner with caffeine or instructed someone to provide Stolis Winner with caffeine. <u>See</u> Plaintiffs' Original Complaint ¶ 130 at 23, filed January 31, 2012 (Doc. 1)("Complaint")("The Defendants Windham and Taylor's actions of intentionally providing Stolis Winner with performance substances were designed to disrupt . . . [economic] relationships [with third parties]."); Complaint ¶¶ 135-136 at 24 (alleging that the Defendants knowingly or recklessly made false representations that Stolis winner was not under the influence of substances prohibited by the Racing Commission). The Plaintiffs' Complaint is not verified, and, under D.N.M.L.R.-Civ. 56.1(b), all material facts set forth in a party's memorandum in support of summary judgment "will be deemed undisputed unless specifically controverted." D.N.M.L.R.-Civ. 56.1(b).

[16]The Plaintiffs do not controvert this factual allegation in their response to the Defendants' summary judgment motions. The lack of any evidence to the contrary shows that discovery has not panned out for the Plaintiffs. In their claims of fraud and intentional interference with prospective economic advantage, the Plaintiffs affirmatively allege that the Defendants had knowledge of Stolis Winner's ingestion of caffeine. <u>See</u> Complaint ¶ 130, at 23 ("The Defendants Windham and Taylor's actions of intentionally providing Stolis Winner with performance substances were designed to disrupt . . . [economic] relationships [with third parties]."); Complaint ¶¶ 135-136, at 24 (alleging that the Defendants knowingly or recklessly made false representations that Stolis Winner was not under the influence of substances prohibited by the Racing Commission). The Defendants allege that the Plaintiffs' "only evidence to support an allegation that Defendants knew there was caffeine in Stolis Winner at the time of the 2008 All American Futurity is an alleged positive test from a sample taken after the race." Defendants' Fraud MSJ ¶ 13, at 3. In their response, the Plaintiffs do not deny the Defendants' allegation regarding the lack of evidence of the Defendants' knowledge that Stolis

Windhams were not aware of any prospective economic relationship between the Simons and any third party relating to Jet Black Patriot.  See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 3 (citing Affidavit of Jerry Windham ¶ 8, at 1 (executed April 10, 2015), filed December 21, 2016 (Doc. 136-3)("J. Windham Aff."); P. Windham Aff. ¶¶ 3-4, at 1); Plaintiffs' Response at 5-8 (not disputing this fact).[17]  Taylor, however, has been, "and continues to be, suspended from racing and fined for substance violations similar to the violation at issue in this matter."  Plaintiffs' MSJ ¶ 3, at 2 (asserting this fact).  See Defendants' Response at 1-3 (not disputing this fact).

Caffeine is a known environmental contaminant.  See Defendants' Negligence MSJ ¶ 10, at 2 (alleging this fact); Plaintiffs' Response at 2-4 (not disputing this fact).[18]  "There is a standard within the horse racing industry to consider levels of caffeine of 100 ng/mL in blood

_____

Winner had ingested caffeine.  See Plaintiffs' Response at 2-4.

[17]In accordance with the Court's proposal at the January 25, 2017, hearing, the Court will take its presentation of the facts from (i) each of the Defendants' four motions for summary judgment; (ii) the Plaintiffs' cross motion for summary judgment; (iii) the parties' respective responses; and (iv) the record materials that the parties attach to their cross motions for summary judgment.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").  See also supra, at n.2.

[18]Although the Plaintiffs do not dispute that caffeine is a known environmental contaminant, see Plaintiffs' Response at 2-4, the Plaintiffs dispute the materiality of the Defendants' factual allegations regarding environmental contamination, see Plaintiffs' Response at 3, 12.  The Plaintiffs rely on the Racing Commission's zero-tolerance for caffeine to assert that the amount of caffeine found to be present in Stolis Winner -- which is allegedly small -- is irrelevant.  See Plaintiffs' Response at 3, 12; Plaintiffs' MSJ at 8 ("The presence of caffeine in a horse's system is so prohibitive, that the Commission is not supposed to even consider the levels of a substance found in a horse's system when penalizing violators.").  Regarding the Plaintiffs' relevance argument, the Court has previously explained that "[a]rguments and concerns about the materiality and relevance of a fact do not dispute [it]." Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)(citing O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)("[The Defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.")).

serum (a level greater than alleged in this case) to be environmental contamination."

Defendants' Negligence MSJ ¶ 10, at 2 (alleging this fact). <u>See</u> Plaintiffs' Response at 2-4 (not

disputing this fact).[19] "Stolis Winner was not under the influence of caffeine at the time of the

2008 All American Futurity because the minimal amount of caffeine detected in the sample

could not have had any possible effect on the performance of a horse during a sprint race."

Defendants' Fraud MSJ ¶ 12, at 3 (asserting this fact). <u>See</u> Plaintiffs' Response at 2-4 (not

disputing this fact).[20]

---

[19]Although the Plaintiffs do not dispute that an amount of caffeine of 100 ng/mL in blood serum reflects environmental contamination, or that Stolis Winner's test samples presented levels of caffeine less than the levels that environmental contamination ordinarily cause, <u>see</u> Plaintiffs' Response at 2-4, Plaintiffs dispute the materiality of the Defendants' factual allegations regarding environmental contamination, <u>see</u> Plaintiffs' Response at 3, 12. The Plaintiffs rely on the Racing Commission's zero-tolerance for caffeine to assert that the amount of caffeine found to be present in Stolis Winner -- which is allegedly small -- is irrelevant. <u>See</u> Plaintiffs' Response at 3, 12; Plaintiffs' MSJ at 8 ("The presence of caffeine in a horse's system is so prohibitive, that the Commission is not supposed to even consider the levels of a substance found in a horse's system when penalizing violators."). Regarding the Plaintiffs' relevance argument, the Court has previously explained that "[a]rguments and concerns about the materiality and relevance of a fact do not dispute [it]." <u>Walton v. N.M. State Land Office</u>, 49 F. Supp. 3d at 924 n.2 (citing <u>O'Brien v. Mitchell</u>, 883 F. Supp. 2d at 1058 n.1 ("[The Defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.")).

[20]Although the Plaintiffs do not controvert the allegation that Stolis Winner was not under the influence of caffeine at the time of the 2008 All American Futurity, <u>see</u> Plaintiffs' Response at 2-4, the Plaintiffs dispute the materiality of the Defendants' factual allegations regarding the non-effect of caffeine on Stolis Winner during the race, <u>see</u> Plaintiffs' Response at 3, 12. The Plaintiffs rely on what they characterize as the Racing Commission's zero-tolerance for caffeine to assert that the amount of caffeine found to be present in Stolis Winner -- which is miniscule -- is irrelevant. <u>See</u> Plaintiffs' Response at 3, 12; Plaintiffs' MSJ at 8 ("The presence of caffeine in a horse's system is so prohibitive, that the Commission is not supposed to even consider the levels of a substance found in a horse's system when penalizing violators."). Regarding the Plaintiffs' relevance argument, the Court has previously explained that "[a]rguments and concerns about the materiality and relevance of a fact do not dispute [it]." <u>Walton v. N.M. State Land Office</u>, 49 F. Supp. 3d at 924 n.2 (citing <u>O'Brien v. Mitchell</u>, 883 F. Supp. 2d at 1058 n.1 ("[The Defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.")).

2.    **The Stewards' Decision and the Resulting Appeal to the Racing Commission.**

The Racing Commission held a hearing of stewards[21] on January 8, 2009, to consider disciplinary action against Taylor and the Windhams. See Plaintiffs' MSJ ¶ 7, at 2-3 (asserting this fact); Defendants' Response at 1 (not disputing this fact). The stewards disqualified Stolis Winner, declared Jet Black Patriot the winner, and issued penalties against Taylor. See Plaintiffs' MSJ ¶ 7, at 3 (asserting this fact)(citing Order of the Sunland Park Board of Stewards at 17-18, filed December 22, 2016 (Doc. 140-16)("Stewards Order")); Defendants' Response at 1 (not disputing this fact). The stewards, having declared Jet Black Patriot the winner, also issued an order requiring redistribution of the first-place purse. See Plaintiffs' MSJ ¶ 7, at 3 (asserting this fact)(citing Stewards Order at 17-18); Defendants' Response at 1 (not disputing this fact).

Taylor appealed the stewards' decision and requested a de novo review of the evidence. See Plaintiffs' MSJ ¶ 8, at 3 (asserting this fact); Defendants' Response at 1 (not disputing this fact). The Racing Commission appointed a three-judge administrative panel to hear Taylor's appeal. See Defendants' Negligence MSJ ¶ 15, at 3 (asserting this fact); Plaintiffs' MSJ ¶ 9, at 3 (not disputing this fact). The Racing Commission excluded the Plaintiffs from the administrative proceedings. See Plaintiffs' MSJ at 18 (alleging this fact)(citing Racing Commission Order Denying Application to Appear as Parties and Motion for Continuance at 22-27, filed December 22, 2016 (Doc. 140-16)("Racing Commission Order"); Videotaped Deposition of Julian Luna at

---

[21]Section 60-1A-2 of the Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 through 60-1A-30, defines "steward" as "an employee of the commission who supervises horse races and oversees a race meet while in progress, including holding hearings regarding licensees and enforcing the rules of the commission and the horse racetrack." N.M. Stat. Ann. § 60-1A-2GG. One of the stewards' duties is to conduct hearings on complaints brought on the stewards' motion, or on receipt of an official's or third party's complaint. See 15.2.1.9(B)(2)(a) N.M.A.C.

31:1-24, 32:14-33:2 (dated May 18, 2009), filed February 22, 2016 (Doc. 140-10)("Luna Depo.")); Defendants' Response at 2-4 (not disputing this fact). The Racing Commission also denied the Plaintiffs any right to intervene. See Plaintiffs' MSJ at 18 (alleging this fact); Defendants' Response at 2-4 (not disputing this fact). Plaintiffs' counsel appeared at the administrative panel hearing, but the administrative panel denied him the opportunity to participate or to provide the panel with documentation and evidence that had been excluded from the proceedings. See Plaintiffs' MSJ at 18 (alleging this fact)(citing Oral Deposition of Leasa Johnson at 28:23-29:12 (dated September 6, 2016), filed February 22, 2016 (Doc. 140-7)("Johnson Depo.")); Defendants' Response at 2-4 (not disputing this fact). The Plaintiffs refer to the procedure surrounding the appeal of the stewards' decision as "highly questionable," which "deviated in important respects from the prior adopted rules, as well as the traditions and notions of due process . . . ." Plaintiffs' MSJ ¶ 9, at 3 (alleging this fact); Defendants' Response at 2-4 (not disputing this fact). The Plaintiffs allege that "the Commission, for the first time ever, allowed Stolis Winner to remain the winner and therefore overturned the ruling of the Stewards." Plaintiffs' MSJ ¶ 9, at 3 (alleging this fact); Defendants' Response at 2-4 (not disputing this fact). The three-judge administrative panel recommended that the Racing Commission conclude that the Defendants did not violate the rules of racing. See Defendants' Negligence MSJ ¶ 15, at 3 (asserting this fact); Plaintiffs' MSJ ¶ 9, at 3 (not disputing this fact). See also Report of the Hearing Officer Panel at 21, filed December 21, 2016 (Doc. 137-7)("Hearing Officer Panel Report")("The disciplinary rulings issued in this proceeding do not meet the regulatory test necessary to be sustained because the prima facie evidence that a prohibited drug was administered to Stolis Winner prior to winning the 2008 All American Futurity has been rebutted"). The Racing Commission adopted the three-judge administrative panel's

recommendation and determined that the Defendants did not violate any applicable rule.  See Defendants' Negligence MSJ ¶ 15, at 3 (asserting this fact); Plaintiffs' MSJ ¶ 9, at 3 (not disputing this fact).

### 3. The Plaintiffs' Texas Complaint.

The Plaintiffs filed a complaint in the United States District Court for the Western District of Texas on November 11, 2008.  See Simon v. Taylor, No. CIV 08-0827 LY (W.D. Tex., filed Nov. 11, 2008)("Texas Complaint").  On November 4, 2010, the Honorable Lee Yeakel, United States District Judge for the Western District of Texas, entered an order dismissing the Texas Complaint for failure to state a claim upon which relief could be granted. See Order, filed Nov. 5, 2010 (Doc. 1-1), Simon v. Taylor, No. CIV 08-0827 LY (W.D. Tex.)("Texas Order").  The Texas Order was based, in part, on the Racing Commission's decision that no violation of racing rules had occurred.  See Texas Order at 5.  The Plaintiffs appealed to the United States Court of Appeals for the Fifth Circuit.  See Simon v. Taylor, No. 10-51148 (5th Cir., filed April 29, 2011)(Doc. 1-2).  On December 22, 2011, the United States Court of Appeals for the Fifth Circuit vacated the district court opinion and ordered the case dismissed without prejudice for lack of diversity jurisdiction.   See Simon v. Taylor, 455 F. App'x 444, 445-46 (5th Cir. 2011).

### PROCEDURAL BACKGROUND

### 1. The Plaintiffs' New Mexico Complaint.

On January 31, 2012, the Plaintiffs filed a complaint in the District of New Mexico.  See Complaint at 1.  In the Complaint, the Plaintiffs assert claims against Taylor and the Windhams for: (i) intentional interference with prospective economic advantage, see Complaint ¶¶ 127-32, at 23; (ii) fraud, see Complaint ¶¶ 133-39, at 24; and (iii) prima facie tort, see Complaint ¶¶ 140-44, at 24-25.  The Plaintiffs also assert a count against Taylor and the Windhams for what the

Plaintiffs alternatively describe as negligence or breach of contract, see Complaint ¶¶ 146-52, at 26.[22]  Further, the Plaintiffs assert two claims under the Fourteenth Amendment to the Constitution of the United States of America, alleging that Marty L. Cope, Arnold J. Real, B. Ray Willis, Thomas Fowler, Larry Delgado ("the Racing Commissioners"), and the Racing Commission (collectively, "the State Defendants") violated the Plaintiffs' procedural and substantive due process rights.  Complaint ¶¶ 153-73, at 26-29.  The Plaintiffs also request a jury trial.  See Complaint ¶ 174, at 30.  The Complaint seeks the following relief: (i) an order to the Racing Commission to release all the blood and urine samples taken from any horse on the day of the race so that the samples can be tested for the presence of caffeine to determine whether contamination occurred; (ii) an order prohibiting the Defendants from stating, advertising, or declaring Stolis Winner is the winner of the 2008 All American Futurity; (iii) an order declaring Jet Black Patriot the winner of the 2008 All American Futurity; (iv) an order requiring the Defendants to state that a court has declared Jet Black Patriot the winner of the 2008 All American Futurity when inquired; (v) an order awarding the Plaintiffs the difference in purse between the first and second place finishers at the All American Futurity; (vi) an order awarding the Plaintiffs the difference in value of Jet Black Patriot had he been declared the winner of the All American Futurity without court intervention; (vii) an order awarding the Plaintiffs reasonable stud fees and other income Jet Black Patriot would have earned but for the Defendants' wrongful conduct; (viii) in the alternative to an order awarding the race purse and a declaration of the race order, an order requiring the Racing Commission to conduct a new hearing, allowing the Plaintiffs to present evidence and argument, and granting the Plaintiffs the

---

[22]The Plaintiffs state that "[i]n the event the claims made in this case are determined to sound in contract, Plaintiffs allege the Defendants Windham and Taylor breached their contact and such breach proximately caused Plaintiffs' damages."  Complaint ¶ 152, at 26.

right to appeal the decision of the hearing if necessary; and (ix) an order awarding the Plaintiffs their reasonable attorneys' fees and costs incurred in prosecuting this suit. See Complaint ¶ 175, at 30.

2.      **The Court Granted in Part and Denied in Part the Defendants' Motion to Dismiss.**

The Defendants moved to dismiss the Plaintiffs' claims. See Defendants Heath Taylor, Jerry Windham and Pat Windham's Motion to Dismiss Under Rule 12(b) and Memorandum in Support Thereof at 1-13, filed May 9, 2012 (Doc. 7)("Defendants' MTD"). On September 26, 2013, the Court granted in part and denied in part Defendants' MTD. See Simon v. Taylor, No. 1:12-cv-0096, 2013 WL 5934420, at *65 (D.N.M. Sept. 26, 2013)(Browning, J.). First, the Court rejected the Defendants' argument that the Racing Commission's decision collaterally estopped all of the Plaintiffs' claims. See Simon v. Taylor, 2013 WL 5934420, at *56-65. Second, the Court rejected the Defendants' argument that the Plaintiffs failed to state a claim for prospective economic loss or prima facie tort, because "the Supreme Court of New Mexico would hold that the Complaint states a valid claim for intentional interference with prospective contractual relations and a valid claim for prima facie tort to the extent the prima facie tort claim is premised on the intentional act of improperly training Stolis Winner." 2013 WL 5934420, at *27. The Court concluded, however, that,

> to the extent the Plaintiffs' prima facie tort claim is premised on the intentional act of providing Stolis Winner with a performance enhancing substance, the Supreme Court of New Mexico would hold that that claim does not satisfy the first element of prima facie tort, because that element requires the commission of an intentional lawful act.

2013 WL 5934420, at *27. Third, the Court held that the Supreme Court of New Mexico would find an implied right of action under the New Mexico Horse Racing Act and "that the legislative intent behind the Horse Racing Act supports an implied private right of action." Simon v.

Taylor, 2013 WL 5934420, at *27 (citing Nat'l Trust for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, ¶ 10, 874 P.2d 798, 801)). Accordingly, the Court granted the Defendants' motion to dismiss the prima facie tort claim "to the extent that the claim is premised on the intentional act of providing Stolis Winner with a performance enhancing substance," and the Court denied the motion as to the remaining claims. Simon v. Taylor, 2013 WL 5934420, at *65.

3.      **The Court Dismissed the Plaintiffs' Claims Against the State Defendants.**

The Court dismissed the Plaintiffs' claims against the State Defendants. See Simon v. Taylor, 981 F. Supp. 2d 1020, 1058 (D.N.M. 2013); Simon v. Taylor, No. CIV 12-0096 JB/WPL, 2014 WL 3563268, at *3 (D.N.M. July 11, 2014). On October 29, 2013, the Court held that Eleventh Amendment immunity bars the Plaintiffs' claims against the Racing Commission and that the Racing Commissioners are entitled to quasi-judicial immunity from the Plaintiffs' claims for damages. See 981 F. Supp. 2d at 1064. The Court also held that immunity did not, however, shield the Racing Commissioners from injunctive relief. See 981 F. Supp. 2d at 1064. The Court dismissed the Plaintiffs' due process claims, because the Plaintiffs failed to "demonstrate that they 'possessed a property interest to which due process protection was applicable[.]'" 981 F. Supp. 2d at 1064 (quoting Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)). The Court did not allow the Plaintiffs leave to amend the Complaint, because the Plaintiffs did not comply with D.N.M. LR-Civ 15.1. See 981 F. Supp. 2d at 1070 ("A proposed amendment to a pleading must accompany the motion to amend.")(quoting D.N.M. LR--Civ. 15.1). At the October 29, 2013, scheduling conference, however, the Court allowed the Plaintiffs to file a motion to amend that complied with D.N.M. LR-Civ 15.1. See 981 F. Supp. 2d at 1070. The Plaintiffs did not file a compliant

motion.  See 2014 WL 3563268, at *1.  Accordingly, on July 11, 2014, the Court dismissed the

Plaintiffs' claims against the State Defendants with prejudice.  See 2014 WL 3563268, at *1.

The Court did not, however, "enter final judgment at [that] time or include the language from

rule 54(b) making the dismissal order immediately appealable."  2014 WL 3563268, at *3.

### 4. The Court Issued Discovery Orders Relating to Horse Blood and Urine Samples, and Interrogatories to the Plaintiffs.

After the Court ruled on the Defendants' motions to dismiss, the Plaintiffs sought to

discover blood and urine samples from twenty-three horses that participated in a series of races

held at Ruidoso Downs, New Mexico, on September 1, 2008.  See Simon v. Taylor, No. CIV 12-

0096 JB/WPL, 2014 WL 6633917, at *1 (D.N.M. Nov. 18, 2014).  The Plaintiffs wanted the

Court to compel the Racing Commission to produce the samples.  See 2014 WL 6633917, at *1.

The Court denied the Plaintiffs' motion to compel, because the motion was premature and the

Plaintiffs' informal discovery requests were procedurally improper, failing to satisfy either the

Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the

District of New Mexico.  See 2014 WL 6633917, at *1.  Because the test results were relevant,

however, the Court held that the Plaintiffs could subpoena the Racing Commission and Iowa

State University to produce the samples for testing.  See 2014 WL 6633917, at *1.

In a subsequent discovery order, the Court ordered R. Simon and J. Simon to verify their

amended interrogatory answers under oath, as rule 33(b)(3) of the Federal Rules of Civil

Procedure requires.  See Simon v. Taylor, No. CIV 12-0096 JB/WPL, 2015 WL 2225653, at *37

(D.N.M. Apr. 30, 2015).  Further, the Court ordered: (i) the Simons to identify which documents

are responsive to certain of the Defendants' Interrogatories relating to stud/mating agreements

concerning Jet Black Patriot; (ii) J. Simon to amend her answer to an Interrogatory regarding

communications between herself and the Defendants concerning this lawsuit or its subject

matter; and (iii) the Simons to respond to certain RFPs regarding J. Simon's bank statements and tax returns.  See 2015 WL 2225653, at *37.

5.        **The Defendants' December 21, 2016, Motions for Summary Judgment**.

On December 21, 2016, the Defendants requested, pursuant to rule 56 of the Federal Rules of Civil Procedure, that the Court enter summary judgment in their favor and against the Plaintiffs on the Plaintiffs' claims for: (i) intentional interference with prospective economic advantage, see Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 1-6; (ii) fraud, see Defendants' Fraud MSJ at 1-7; (iii) prima facie tort, see Defendants' Prima Facie Tort MSJ, at 1-6; and (iv) negligence, see Defendants' Negligence MSJ, at 1-8.

a.        **The Defendants' Intentional Interference with Prospective Economic Advantage MSJ**.

The Defendants argue that New Mexico law applies to the Plaintiffs' claim for intentional interference with prospective economic advantage, see Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 4-5, and that, under New Mexico law, a plaintiff must provide "there was an actual prospective contractual relation which, but for the Defendant's interference, would have been consummated," Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 5 (emphasis in original)(citing Anderson v. Dairyland Ins. Co., 1981-NMSC-130, 637 P.2d 837, 841)("Dairyland Ins."). The Defendants then state that, in light of the undisputed material facts, the "Plaintiffs cannot prove there was any 'actual' prospective relationship which was not consummated as a result of Stolis Winner finishing ahead of Jet Black Patriot . . . ." Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 5. The Defendants argue that the Plaintiffs' claim is grounded on only speculation that, had Jet Black Patriot won the 2008 All American Futurity, an unidentified third party would have entered into an economic relationship with them. See Defendants' Intentional

Interference with Prospective Economic Advantage MSJ at 5. The Defendants press that such speculation is insufficient to overcome the Defendant's motion for summary judgment on the Plaintiffs' intentional interference with prospective economic advantage claim. See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 5. The Defendants further argue that, because Stolis Winner is a gelding and, hence, incapable of breeding, it is factually impossible that the Defendants took gainful opportunities to breed Jet Black Patriot away from the Plaintiffs. See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 6.

    **b.**   **The Defendants' Fraud MSJ.**

    Next, the Defendants assert that New Mexico law applies to the Plaintiffs' fraud claim, see Defendants' Fraud MSJ at 4, and that the Plaintiffs failed to present clear-and-convincing evidence to support any element of fraud, see Defendants' Fraud MSJ at 5. The Defendants proceed to march through the elements of fraud. See Defendants' Fraud MSJ at 5-7. First, the Defendants contend that although the Plaintiffs offer evidence that Stolis Winner competed in the 2008 All American Futurity, they "produced no evidence showing how the mere fact of competing was a representation that the horse was not in violation of the Race rules." Defendants' Fraud MSJ at 5 (internal quotation marks omitted). Second, the Defendants argue, assuming that they represent that Stolis Winner was not under the influence of caffeine or improperly trained, the Plaintiffs do not introduce sufficient evidence to show that "such a representation would be false." Defendants' Fraud MSJ at 5-6 (internal quotation marks omitted). The Defendants indicate that the Plaintiffs present evidence showing only that a "miniscule amount of caffeine" was found in the sample taken from Stolis Winner and that such an amount, "to a scientific certainty," had no effect on the horse's performance. Defendants'

Fraud MSJ at 6. Third, the Defendants argue that the Plaintiffs fail to produce clear-and-convincing evidence showing that the Defendants either had knowledge of, or were reckless about, the presence of caffeine in Stolis Winner. See Defendants' Fraud MSJ at 6. Fourth, the Defendants press that the Plaintiffs introduce no evidence that the Defendants had an "intent to deceive." Defendants' Fraud MSJ at 6. Last, the Defendants argue that the Plaintiffs took an action in reliance on the Defendants' representation. See Defendants' Fraud MSJ at 6-7. In support of this argument, the Defendants maintain that the Plaintiffs' entry of Jet Black Patriot in the 2008 All American Futurity does not demonstrate that the Plaintiffs detrimentally relied on any representation that the Defendants made. See Defendants' Fraud MSJ at 6-7.

c.     **The Defendants' Prima Facie Tort MSJ.**

The Defendants also assert that New Mexico law applies to the Plaintiffs' prima facie tort claim. See Defendants' Prima Facie Tort MSJ at 4. The Defendants argue that the Plaintiffs' claim should not survive summary judgment, because the Plaintiffs have not produced any evidence to satisfy the first element of prima facie tort -- namely, that Defendants "committed . . . a lawful intentional act . . . ." Defendants' Prima Facie Tort MSJ at 4 (citing Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 10, 945 P.2d 992, 995). The Defendants correctly state that the Court dismissed the Plaintiffs' prima facie tort claim to the extent it relied on allegations that the Defendants provided Stolis Winner with caffeine, because such an act would not be "lawful" as required to satisfy the first element of prima facie tort. Defendants' Prima Facie Tort MSJ at 4-5 (citing Simon v. Taylor, 2013 WL 5934420, *46 (D.N.M. 2013)). The Defendants also note, however, that the Court permitted the Plaintiffs' prima facie tort claim upon allegations that the Defendants "improperly trained Stolis Winner." Defendants' Prima Facie Tort MSJ at 5 (citing Simon v. Taylor, 2013 WL 5934420, *46 (D.N.M.

2013)(Browning, J.)). The Defendants assert that, after discovery, the Plaintiffs' only evidence that the Defendants improperly trained Stolis Winner is the positive test for caffeine. <u>See</u> Defendants' Prima Facie Tort MSJ at 5. Consequently, the Defendants argue that the Plaintiffs' prima facie tort claim cannot survive summary judgment, because the Plaintiffs had to produce evidence other than Stolis Winner's positive test for caffeine to substantiate a lawful intentional act, and the Plaintiffs have forwarded no such evidence. <u>See</u> Defendants' Prima Facie Tort MSJ at 5. The Defendants additionally argue that "even if providing Stolis Winner with caffeine were a lawful act," the Plaintiffs have failed to introduce evidence that the Defendant's intentionally committed such an act. Defendants' Prima Facie Tort MSJ at 5. Accordingly, the Defendants maintain that they are entitled to summary judgment on the Plaintiffs' prima facie tort claim. <u>See</u> Defendants' Prima Facie Tort MSJ at 5.

### d. **The Defendants' Negligence MSJ.**

The Defendants assert that New Mexico law applies to the Plaintiffs' negligence claim, <u>see</u> Defendants' Negligence MSJ at 4, and that the Plaintiffs' negligence claim should not survive summary judgment, <u>see</u> Defendants' Negligence MSJ at 4-7. First, the Defendants assert that the Plaintiffs impute to them not only "a duty not to provide caffeine to Stolis Winner," but also "a duty to prevent the presence of caffeine below accepted contamination levels." Defendants' Negligence MSJ at 5. The Defendants argue that New Mexico tort law imposes no such duty and that "[p]ublic policy does not support a finding of a duty to prevent the presence of environmental contaminants accepted by the industry." Defendants' Negligence MSJ at 5 (alteration added).

Second, the Defendants argue that the Plaintiffs do not present evidence to support a finding of the Defendants' breach of any duty. <u>See</u> Defendants' Negligence MSJ at 5. The

Defendants maintain that the uncontested facts demonstrate that they did not administer caffeine, or cause caffeine to be administered, Stolis Winner, because "the alleged level of caffeine is less than . . . the level recognized industry-wide as a threshold for differentiating environmental contamination from purposeful administration." Defendants' Negligence MSJ at 5. Assuming that the Plaintiffs' theory of breach is grounded on Stolis Winner's positive test for caffeine, the Defendants assert that the Plaintiffs have produced no evidence of breach or "of any other possible violation of the rules of racing." Defendants' Negligence MSJ at 6.

Third, the Defendants argue that the Plaintiffs fail to introduce evidence supporting negligence's cause-in-fact element. See Defendants' Negligence MSJ at 6-7. The Defendants press that, even if the Defendants provided Stolis Winner with caffeine or otherwise violated any duty owed to the Plaintiffs, the Plaintiffs produced no evidence demonstrating that such a breach caused the Plaintiffs any injury. See Defendants' Negligence MSJ at 6-7. The Defendants indicate that "Stolis Winner beat Jet Black Patriot by nearly the same time differential in both qualifying and the finals of the 2008 All American Futurity." Defendants' Negligence MSJ at 7. The Defendants accordingly argue that "[t]he tiny amount of caffeine alleged to be in the sample was so insignificant it could not have altered the performance of Stolis Winner in any way." Defendants' Negligence MSJ at 7. The Defendants maintain that the Plaintiffs presented no evidence suggesting that Jet Black Patriot would have won the race but for the amount of caffeine that Stolis Winner's ingested. See Defendants' Negligence MSJ at 7. The Defendants, therefore, conclude that the Plaintiffs' negligence claim cannot survive summary judgment, because the Plaintiffs introduce no evidence "that any alleged breached premised on the caffeine positive caused them any damages." Defendants' Negligence MSJ at 7.

6. **The Plaintiffs' Response to the Defendants' December 21, 2016, Motions for Summary Judgment.**

The Plaintiffs respond to the Defendants' four separate motions for summary judgment. See Plaintiffs' Response at 5-21. First, the Plaintiffs contend that there are factual issues that preclude summary judgment for the Defendants on the Plaintiffs' claim for intentional interference with prospective economic advantage. See Plaintiffs' Response at 5-8. The Plaintiffs state that the issue of the Defendants' intent to interfere is a question of fact and allege that, by "put[ting] Stolis Winner in the race while the horse was under the influence of a banned substance," the Defendants "intentionally interfered with prospective contractual relationships of Jet Black Patriot." Plaintiffs' Response at 6. The Plaintiffs also maintain that the Defendants were aware of economic relationships between the winner of the 2008 All American Futurity and third parties that redound to the winner, including breeding business. See Plaintiffs' Response at 6-7. The Plaintiffs contend that "although Stolis Winner is a gelding . . . it does not follow that Stolis Winner is incapable of taking breeding business from Jet Black Patriot," because "if Jet Black Patriot were rightfully declared the First place winner, breeding business would go to Jet Black Patriot as the winner of the race." Plaintiffs' Response at 7. Accordingly, the Plaintiffs maintain that factual issues remain regarding (i) whether there were economic relationships between the Plaintiffs and third parties related to Jet Black Patriot; and (ii) whether the Defendants acted with the intent to interfere with those relationships by entering Stolis Winner, which had ingested some quantum of caffeine, into the race. See Plaintiffs' Response at 8.

Second, the Plaintiffs argue that there are genuine issues of material fact which preclude summary judgment on their fraud claim. See Plaintiffs' Response at 8-15. The Plaintiffs maintain that the Defendants misrepresented that their horse was free of prohibited substances, including caffeine. See Plaintiffs' Response at 9. The Plaintiffs contend that there is a genuine

issue of material fact whether Stolis Winner was improperly under the influence of caffeine, adverting to evidence that "Stolis Winner had caffeine in his system and it was metabolized therefore ruling out any post-race contamination." Plaintiffs' Response at 12. The Plaintiffs state that, at trial, they "could offer expert testimony and scientific evidence to show that the amount of caffeine in Stolis Winner's system effected [sic] the horse's performance." Plaintiffs' Response at 13. The Plaintiffs also contend that there is a genuine issue of material fact regarding whether the Defendants intentionally or knowingly provided Stolis Winner with caffeine. See Plaintiffs' Response at 14-15. The Plaintiffs argue that there is a factual dispute whether Taylor provided Stolis Winner with caffeine, adverting to evidence that "Defendant Taylor has been banned from racing and penalized for the use of prohibitive substances before." Plaintiffs' Response at 13. Consequently, the Plaintiffs maintain that factual issues regarding (i) whether the Defendants provided Stolis Winner with caffeine; and (ii) whether the caffeine that the horse ingested affected its performance, preclude summary judgment on Plaintiffs' fraud claim. See Plaintiffs' Response at 14-15.

Third, as to their prima facie tort claim, the Plaintiffs argue that "[t]here is no question that the entry of Stolis Winner in the race was itself a lawful act." Plaintiffs' Response at 15. The Plaintiffs also state that "there is no question that Stolis Winner's inclusion with the knowledge of his caffeine treatment was intended to injure Plaintiffs and the other sponsors of horses in the race." Plaintiffs' Response at 15. Nevertheless, the Plaintiffs maintain, in the alternative, that "the question of [the Defendant's] intent [to commission a lawful act to injure the Plaintiffs] is a disputed issue of material fact," foreclosing summary judgment. Plaintiffs' Response at 16.

Last, regarding their negligence claim, the Plaintiffs state that the "Defendants owed

Plaintiffs a duty to abide by the Rules and regulations of the Racing Commission . . . as a competitor in a Race in which Plaintiffs were involved." Plaintiffs' Response at 16. The Plaintiffs rely on "the clear rules that governed this race," arguing that the Racing Commission's prohibition of caffeine is a "strict liability zero-tolerance" rule and, consequently, includes no safe harbor for levels of caffeine below a certain level that the horse racing industry would consider as an environmental contaminant. Plaintiffs' Response at 17. The Plaintiffs again assert that the Defendants breached a duty "when their horse had caffeine in its system," Plaintiffs' Response at 17, but argue, in the alternative, that "even if environmental contamination were relevant, the question of contamination would be a fact question for a jury," Plaintiffs' Response at 19. The Plaintiffs further contend that the "Defendants' breach of duty caused Plaintiffs' injuries because the disqualification of Defendants' horse . . . would place Plaintiffs' horse in First upon a reorder of the Race." Plaintiffs' Response at 17 (alterations added).

**7.      The Plaintiffs' MSJ.**

The Plaintiffs cross-moved for summary judgment on their tort claims for intentional interference with prospective contract relations, fraud, prima facie tort, and negligence. See Plaintiffs' MSJ at 23-27. At the outset of their argument, the Plaintiffs restate a series of facts about which, they contend, there is no genuine dispute. See Plaintiffs' MSJ at 4. First, the Plaintiffs contend that Jet Black Patriot would have been declared the winner "[h]ad the disqualification of Stolis Winner been enforced as it should have . . . ." Plaintiffs' MSJ at 5. Second, the Plaintiffs contend that damages are not in dispute, stating that they should be awarded the difference between the first-place purse of $1 million and the second-place purse of $285,000. See Plaintiffs' MSJ at 5. Third, the Plaintiffs maintain that "[i]t is also uncontested

that [Stolis Winner] tested positive for caffeine." Plaintiffs' MSJ at 5.[23]

The Plaintiffs then assert that "[t]he mere presence of caffeine in a horse's system requires automatic disqualification." Plaintiffs' MSJ at 7. In support of that assertion, the Plaintiffs rely on § 15.2.6.9C(1) of the New Mexico Administrative Code, which provides that a finding of

> "a prohibited drug, chemical, or other substance in a test specimen of a horse is prima facie evidence that the prohibited drug, chemical, or other substance was administered to the horse and, in the case of a post-race test, was present in the horse's body while it was participating in the race."

Plaintiffs' MSJ at 7-8 (quoting N.M. Admin. Code § 15.2.6.9C(1)). The Plaintiffs contend that the "presence of caffeine is so prohibitive, that the [Racing] Commission is not supposed to even consider levels of a substance found in a horse's system when penalizing violators." Plaintiffs' MSJ at 8. The Plaintiffs further allege that, "even were contamination a factor that could allow Defendants to avoid liability, . . . there is no credible evidence and only speculation that any contamination occurred." Plaintiffs' MSJ at 10.

The Plaintiffs then attempt to shoehorn their theory of the case into an argument for summary judgment on the four separate New Mexico tort actions. Regarding their claim for intentional interference with prospective contract relations, the Plaintiffs argue that they "have shown 'there was an actual prospective contractual relation which, but for [the Defendants'] interference, would have been consummated.'" Plaintiffs' MSJ at 23 (alterations original)(quoting Dairyland Ins., 1981-NMSC-130, ¶ 13, 637 P.2d at 841). The Plaintiffs also state that their "horse would have placed First but for Defendants' interference." Plaintiffs'

---

[23]In the Plaintiffs MSJ, the Plaintiffs state that it is "uncontested that Jet Black Patriot tested positive for caffeine." Plaintiffs' MSJ at 5. The Court concludes that this statement is an error in the Plaintiffs' brief, because the Plaintiffs' entire theory of the case is premised on Stolis Winner, not Jet Black Patriot, testing positive for caffeine.

MSJ at 24.

Regarding their fraud claim, the Plaintiffs contend that the "Defendants misrepresented that their horse was free of prohibited substances, including caffeine." Plaintiffs' MSJ at 25. The Plaintiffs also assert that "[i]t may be inferred from the circumstances, including Defendant Taylor's prior history of violations, the Defendants' intent was to deceive or induce reliance." Plaintiffs' MSJ at 25. The Plaintiffs then state that they "relied on the representation that a competitor, Defendants' horse, was free of the prohibited substance and that the rightful winner would be provided with the First Place purse." Plaintiffs' MSJ at 25.

With respect to their prima facie tort claim, the Plaintiffs list the elements of prima facie tort, see Plaintiffs MSJ at 25 (citing <u>Lexington Ins. Co. v. Rummel</u>, 1997-NMSC-043, ¶ 10, 945 P.2d at 995), and then make a series of allegations ostensibly related to those elements, see Plaintiffs' MSJ at 26. The Plaintiffs state:

> In the alternative, if Defendants did not intentionally provide Stolis Winner with the illegal substance, the fact remains that the substance was, indeed, in the horse's system. This is a serious offense as is indicated by the Rules zero-tolerance policy. The re-placement of the drugged horse as having finished First was also highly unfair, and even unheard of before this matter arose. All of these factors and more, point in favor of a finding by his Court of intent. The Plaintiffs were injured as a result of Defendants' actions, specifically the presence of caffeine in Defendants' horse.

Plaintiffs' MSJ at 26.

Finally, regarding the Plaintiffs' negligence claim, the Plaintiffs argue, in entirety, that

> Defendants owed Plaintiffs a duty to abide by the Rules and regulations of the Racing Commission and State of New Mexico as a competitor in a Race in which Plaintiffs were involved. Defendants breached that duty when their horse had caffeine in its system, as was shown unequivocally by the two undisputed test samples. As a result of this breach, Plaintiffs were injured, losing both the First Place purse and the monies and profits directly related to wining [sic] First Place at the All American Futurity.

Plaintiffs' SJM at 27 (alteration added).

8.    **The Defendants' Response to the Plaintiffs' MSJ.**

The Defendants respond to the Plaintiffs' MSJ.  See Defendants' Response at 1-9. Throughout their Response, the Defendants rely on the settled proposition that, in the summary judgment posture, "[t]he moving party bears the initial burden of a prima facie showing that they are entitled to summary judgment."  Defendants' Response at 3 (alteration added)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex")).  The Defendants state that, "[i]n this case, Plaintiffs have not met their initial burden because they have presented no evidence of any act, omission, or other activity of these particular Defendants [as opposed to the State Defendants] to support liability under any of their theories of liability."  Defendants' Response at 3 (alterations added).

First, regarding the Plaintiffs' claim for intentional interference with prospective economic relations, the Defendants contend that the "Plaintiffs had the burden to present uncontested evidence both of actual prospective contractual relations which, but for Defendants' interference, would have been consummated . . . ."  Defendants' Response at 3 (emphasis in original)(citing Dairyland Ins., 1981-NMSC-135, ¶ 13, 637 P.2d at 841).  The Defendants also allege that the Plaintiffs have the burden to make "a strong showing that the primary motive behind Defendants' actions was personal vengeance or spite."  Defendants' Response at 3 (citing Lenscrafters, Inc. v. Kehoe, 2012-NMSC-020, ¶ 42, 282 P.3d 758, 768).  The Defendants then argue that, because the Plaintiffs failed to present any evidence "of any actual contractual relation that was not consummated or any improper motive of Defendants," the Plaintiffs are not entitled to summary judgment on their claim for intentional interference with prospective economic relations.  Defendants' Response at 3.

Second, regarding the fraud claim, the Defendants contend that the "Plaintiffs are

required to provide clear-and-convincing uncontested evidence to support each element." Defendants' Response at 4 (citing <u>Simon v. Taylor</u>, 2013 WL 5934420, at *18). The Defendants then contend that the Plaintiffs "presented no evidence of any misrepresentation made by any of Defendants to them," offering only the fact that Stolis Winner competed in the 2008 All American Futurity as evidence of the Defendants' alleged misrepresentation. Defendants' Response at 4. Further, the Defendants allege that the "Plaintiffs have provided no evidence, let alone clear and convincing evidence, that any Defendant had any knowledge of any false representations or recklessness regarding the same, any intent to deceive Plaintiffs, or that [the Plaintiffs] detrimentally relied on any representation." Defendants' Response at 4. The Defendants assert that counsel's arguments are not evidence and, having offered no evidence of any misrepresentation, the Plaintiffs are not entitled to summary judgment on their fraud claim. <u>See</u> Defendants' Response at 4.

Third, regarding the prima facie tort claim, the Defendants allege that the Plaintiffs argue that the "Defendants <u>intentionally</u> provided Stolis Winner with a banned substance in violation of law." Defendants' Response at 5 (emphasis in original)(citing Plaintiffs' MSJ at 26). The Defendants maintain that the Plaintiffs fail to produce any evidence that the Defendants intentionally provided Stolis Winner with a banned substance, but even if the Plaintiffs produce such evidence, then "this would preclude recovery under a theory of prima facie tort because it would be an unlawful act." Defendants' Response at 5 (citing <u>Simon v. Taylor</u>, 2013 WL 5934420, at *46). The Defendants maintain that the undisputed facts show that the Defendants did not "intentionally commit any lawful act with the intent to harm Plaintiffs," and, accordingly, the Plaintiffs are not entitled to summary judgment on their prima facie tort claim. Defendants' Response at 5.

Last, the Defendants argue that the Plaintiffs are not entitled to summary judgment on their negligence claim. See Defendants' Response at 5-8. Responding to the Plaintiffs' argument that the Defendants had a duty to abide by the Racing Commission rules, the Defendants contend that "[e]ach provision cited by Plaintiffs . . . address[es] the conduct of a trainer, not an owner." Defendants' Response at 6 (alterations added). Consequently, the Defendants argue that the Plaintiffs "have failed to present any duty potentially breached by Defendants Windham." Defendants' Response at 6. As to Taylor, the Defendants press that "the regulatory authorities charged with overseeing horseracing in New Mexico determined there was no violation of any duty on . . . [his] part." Defendants' Response at 6 (alterations added). The Defendants also argue that the Plaintiffs, by asserting their negligence claim, attempt to impute a duty on the Defendants "to prevent the presence of caffeine below accepted contamination levels." Defendants' Response at 6. The Defendants counter, however, that the law knows no such duty. See Defendants' Response at 6.

The Defendants argue not only that summary judgment is inappropriate, because they owed no duty to the Plaintiffs, but also that the Plaintiffs are not entitled to summary judgment, because the Plaintiffs fail to make a prima facie showing that the Defendants breached any duty owed to the Plaintiffs. See Defendants' Response at 7. According to the Defendants, "[t]he uncontested facts show Defendants did not administer caffeine to Stolis Winner or otherwise cause caffeine to be administered to Stolis Winner." Defendants' Response at 7. To support this conclusion, the Defendants advert to "the fact that the alleged level of caffeine is less than the equivalent 100 ng/ml as measured in blood serum, the level recognized industry-wide as a threshold for differentiating environmental contamination from purposeful administration." Defendants' Response at 7. The Defendants contend that, as the New Mexico Racing

Commission determined, "there was no violation of the rules of racing," and, because the Plaintiffs fail to present evidence otherwise, their negligence claim fails. Defendants' Response at 7.

The Defendants additionally argue that, even if the presence of caffeine in Stolis Winner violated a duty they had to the Plaintiffs, the Plaintiffs failed to show that this alleged breach caused the Plaintiffs an injury. See Defendants' Response at 7-8. The Defendants assert that "[t]he tiny amount of caffeine alleged to be in the sample was so insignificant it could not have altered the performance of Stolis Winner in any way." Defendants' Response at 8. They argue that, because the "Plaintiffs have not shown Jet Black Patriot would have been the first place horse but for any act or omission of Defendants," the Plaintiffs do not establish their prima facie showing and, consequently, are not entitled to summary judgment on their negligence claim. Defendants' Response at 8. The Defendants conclude by requesting that the Court enter summary judgment in their favor, and against the Plaintiffs, as to all the Plaintiffs' claims in the Complaint.

### 9. **The Hearing.**

On January 25, 2017, the Court held a hearing on the Defendants' four December 21, 2016, motions for summary judgment and the Plaintiffs' MSJ. See Draft Transcript of Summary Judgment Motion Hearing, taken January 25, 2017, at 1:21-23 (Court)("Tr.").[24] The Court began by inquiring whether the parties thought there were any facts in dispute, necessitating a trial. See Tr. at 1:19-2:4 (Court). The parties did not provide the Court with a clear answer, but suggested that there was no disputed fact requiring a jury and that the Court could decide the Plaintiffs'

---

[24]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

claims as a matter of law.  See Tr. at 3:10-14 ("I guess let me just be blunt about it.  If we go to trial in this case we're not exactly sure what it is that is the fact issue you submit [to the] jury[.]  I mean what does the charge look like if you go to trial[?]")(Dunn).

The Court then inquired into the damages that the Plaintiffs seek, querying the meaning of the Plaintiffs' concession, made in their briefing, that if the Court grants summary judgment in the Plaintiffs' favor, the "plaintiffs consent to dismissal of their other claims for actual damages." Tr. at 5:1-6 (Court).  See Plaintiffs' MSJ at 1 n.1 ("In the event the Court grants this Motion for Summary Judgment, Plaintiffs consent to dismissal of their other claims for actual damages other than the difference in purse . . . .").  The Plaintiffs responded that, if the case goes to trial, there would be fact issues concerning their damages -- such as lost stud fees and marketing fees -- but suggested that, in the summary judgment posture, they only seek the difference in purse.  See Tr. at 4:7-5:4 (Dunn).  The Plaintiffs, who are unsure of which state tort action is the proper vehicle for a claim predicated on Stolis Winner's positive caffeine sample, ostensibly proposed to limit their damages to expedite a resolution on appeal.  See Tr. at 7:1-7:4 ("So we decided to facilitate, even though it cuts off our client's damages[,] to try to facilitate a way to get appellate review of this without the expense of a trial.")(Dunn).  The Plaintiffs then stated their belief that they are entitled to summary judgment, because the positive caffeine sample violated the Racing Commission's rules "and that reordering of the purse was necessary."  Tr. at 7:20 (Dunn).  The Court then queried which "cause of action of your four or five is that?"  Tr. at 8:1-2 (Court).  The Plaintiffs were uncertain, but suggested negligence.  See Tr. at 8:3-8 ("Well, so I've worked through that, and I'm not sure what the answer to that is, [but I think] it's the negligence claim cause of action, whereas the duty is created by virtue of the New Mexico regulations, there is a breach and there is causation . . . .")(Dunn).  See also Tr. at 12:10-13 ("So the reason we listed

all the claims is because we're not sure ultimately where Your Honor or the court of appeals will decide, okay, this is the cause of action for this kind of case.")(Dunn).

The Plaintiffs indicated that, before trial, they would seek an appellate ruling on the issue that might inform their theory of the case. The Plaintiffs stated:

> [L]et's go up to the circuit, let them tell us. Perhaps, they'd certify the question to the New Mexico Supreme Court but at some point we [get a] ruling on whether or not a duty [is] created under the rules. And if the answer is [no], that's a whole different case that is going to have to come back and be tried. If the answer is yes a duty is created, then there are no issues of fact, because everything else is known.

Tr. at 8:25-9:6 (Dunn). The Court then asked the Plaintiffs if they would rather the Court certify its motion to dismiss ruling on the negligence claim in Plaintiffs' favor to the Tenth Circuit as "an immediately appealable order." Tr. at 9:14-18 (Court). The Plaintiffs balked at the Court's proposal, asserting instead that they are entitled to summary judgment -- a ruling which could then be considered on appeal. See Tr. at 10:11-17 (Dunn). The Court consequently turned its attention to whether either party is entitled to summary judgment, see Tr. at 10:18-23, and invited argument from the Defendants, see Tr. at 13:3-4.

The Defendants first responded to the duty element of the Plaintiffs' negligence claim. See Tr. at 13:24-15:5 (Blackburn). The Defendants indicated that the Racing Commission rules relate only to a horse's trainer, and, hence, the Plaintiffs do not have a negligence action against J. Windham or P. Windham. See Tr. at 13:24-15:5 (Blackburn). The Defendants then contested the legal effect of Stolis Winner's positive test for caffeine, arguing that "[j]ust because the horse has some type of illegal contaminant in its system does not mean it is strict liability." See Tr. at 16:8-10 (Blackburn). The Defendants emphasized that Stolis Winner's positive test for caffeine is only a "prima facie showing" of a rule violation, Tr. at 16:7-8 (Blackburn), and that, after a preliminary hearing before the stewards, the Racing Commission concluded "that there was no

violation of the rules," Tr. at 17:2-3 (Blackburn).

The Court then addressed the Defendants' four summary judgment motions, beginning with the Defendants' motion for summary judgment on the Plaintiffs' intentional interference with prospective economic relations claim. See Tr. at 18:1-20 (Court). The Defendants replied that the Court should grant summary judgment in their favor on this claim, because the Plaintiffs do not demonstrate the Defendants' intent to interfere with a prospective contract. See Tr. at 19:9-12 (Blackburn); id. at 20:10-15 (Blackburn). The Court then addressed how the Plaintiffs responded to the Defendants' summary judgment motions, asking whether the Court should find the facts that the Defendants advance in their four motions to be uncontested. See Tr. at 21:2-4 (Court).

The Court pressed the Plaintiffs to say "what the factual disputes are, if any." Tr. at 22:21-22 (Court). The Plaintiffs then read through a statement of relevant uncontested facts and stated that they disagreed with the Defendants' allegation that neither Taylor, J. Windham, nor P. Windham knowingly or intentionally provided caffeine to Stolis Winner. See Tr. at 23:5-7, 9-10 (Dunn). The Court consequently inquired what evidence the Plaintiffs offer in dispute. See Tr. at 23:7-8 (Court). The Plaintiffs responded by adverting only to the positive test and, then, relying on § 15.2.6.9(C)(1) of the New Mexico Administrative Code, which states that such a positive test "is prima facie evidence that the prohibited . . . substance was administered to the horse . . . ." Tr. at 24:11-12. The Court expressed doubt whether that provision helps the Plaintiffs in the summary judgment posture. See Tr. at 24:16-18.

The Plaintiffs also disputed the Defendants' factual allegations that neither the Plaintiffs nor the Defendants are aware of any person who refused to enter into an economic relationship with the Plaintiffs as a result of Jet Black Patriot finishing behind Stolis Winner. See Tr. at

25:22 (Dunn); Tr. at 27:11-28:1 (Dunn). After the Court pressed for evidence to substantiate the Plaintiffs' contention of a factual dispute, the Plaintiffs did not name a specific economic relationship, but suggested they could "show this is what other horses in similar situations would have earned . . . ." Tr. at 26:15-18 (Dunn). The Court then asked the Defendants if they had anything to add regarding the intentional interference with prospective economic advantage claim. See Tr. at 29:5-8 (Court). The Defendants responded by emphasizing that the Plaintiffs' prima facie showing of a rule violation is necessarily rebuttable, especially "in a different circumstance when you're talking about caffeine or some issue like that that is in the environment." See Tr. at 30:22-24 (Blackburn). The Defendants also argued that New Mexico Administrative Code § 15.2.6.9(C)(1) is not a zero-tolerance rule; otherwise, according to the Defendants, the rule would not create a rebuttable presumption upon a positive test for a banned substance. See Tr. at 32:2-23 (Blackburn).

The Court inquired whether evidence of the presence of caffeine in Stolis Winner creates a factual dispute precluding summary judgment in the Defendants' favor on the Plaintiffs' intentional interference with prospective economic advantage claim. See Tr. at 32:24-33:5 (Court). The Defendants responded that, while Stolis Winner's positive test for caffeine might create a factual dispute regarding intent, the Court should grant summary judgment, because the Plaintiffs did not produce evidence of a contractual relationship. See Tr. at 33:16-20 (Blackburn). Before the Court addressed the next claim, it allowed the Plaintiffs to interject. See Tr. at 36:16-18 (Dunn, Court). The Plaintiffs then clarified that "this issue on intent [to interfere with a prospective contract] only matters if the Court finds that it can't just grant summary judgment on the rule violation and the difference in purse." Tr. at 37:23-38:1 (Dunn).

The Court then addressed the Plaintiffs' fraud claim and asked the Plaintiffs' counsel to

state "what the misrepresentation is." Tr. at 39:20-21 (Court). The Plaintiffs replied that the Defendants' misrepresentation was "the entering of the horse in the race," because that action is a "representation to all participants that this horse [is in] compliance with the New Mexico Racing Commission rules . . . ." Tr. at 39:23-25 (Dunn). Upon the Court's invitation, the Defendants offered nothing further on their summary judgment motion on the Plaintiffs' fraud claim. See Tr. at 40:20-22 (Court, Blackburn).

The Court next addressed the Defendants' summary judgment motion regarding the Plaintiffs' prima facie tort claim. See Tr. at 40:23-24 (Court). The Defendants stated that they had no argument in addition to those provided in their briefing. See Tr. at 40:25-41:6 (Blackburn). The Defendants reminded the Court that the Court had authored a prior opinion expressing that the prima facie tort claim requires a showing of a lawful intentional act. See Tr. at 41:6-8 (Blackburn). The Court asked the Plaintiffs "what . . . legal act you're complaining about." Tr. at 41:19 (Court). The Plaintiffs replied that "[i]t was certainly legal for the Defendants to train a horse and offer the horse for competition in the race," Tr. at 41:20-22 (Dunn), and propounded that "the entry into the race is a lawful act," Tr. at 42:10 (Dunn). The Plaintiffs then argued that a factual dispute exists whether the Defendants acted with the intent to cause the Plaintiffs injury, precluding summary judgment. See Tr. at 42:3-6 (Dunn).

The Court inquired whether the Defendants wanted to make an additional argument concerning the Plaintiffs' negligence claim. See Tr. at 42:16-18 (Court). The Defendants emphasized that Stolis Winner was not under the influence of caffeine, "because a minimal amount of caffeine detected in the sample could not have any positive effect . . . ." Tr. at 42:25-43:2 (Blackburn). The Defendants also pressed that the Racing Commission's regulations do not impose a duty on a horse's owners, but only on the trainer. See Tr. at 43:12-23 (Blackburn).

The Court then asked the Plaintiffs to clarify their theory of the alleged negligent act, inquiring whether the Plaintiffs allege a single act of negligence or multiple negligent acts.  See Tr. at 44:2-6 (Court).  The Plaintiffs responded that there "are two negligent acts."  Tr. at 44:7 (Dunn). First, the Plaintiffs pointed to the no-caffeine rule violation, stating that the rule operates with strict liability.  See Tr. at 44:9-13 (Dunn).  The Plaintiffs then explained that their second theory of negligence sounds in "negligent training of the horse."  Tr. at 45:1 (Dunn).  The Plaintiffs hypothesized that the Defendants committed a negligent act in the "negligent supervision of the horse, more negligent application of medications or negligence in maintaining the area around the horse to prevent contamination."  Tr. at 45:9-12 (Dunn).

The Court then repeated its request that the Plaintiffs clarify their theories of negligence. See Tr. at 45:21-22 (Court).  The Plaintiffs replied that "[t]he first is [a] duty created by the rules, [the] rules were breached; that's one negligence."  Tr. at 45:23-24 (Dunn).  The Court inquired whether there is a particular rule that was breached.  Tr. at 45:25-46:1 (Court).  The Plaintiffs responded affirmatively, adverting to "the absolute insurer rule . . . section 15.2.6.11(B) and [subsections 15.2.6.11(E)(1)-(2)]."  Tr. at 46:8-12 (Dunn).  The Court then asked the Plaintiffs to repeat their other theory of negligence.  See 46:12-13 (Court).  The Plaintiffs responded, "[i]t's that caffeine is a level 2 drug and that the rules require immediate or . . . unconditional disqualification."  Tr. at 46:14-17 (Dunn).  The Court inquired whether the Plaintiffs' negligence claim is entirely grounded on violations of Racing Commission rules.  See Tr. at 47:5-6 (Court). The Plaintiffs then explained that they assert a second theory of negligence travelling under their "negligent training claim . . . ."  Tr. at 47:11-12 (Dunn).  The Court made certain it understood the Plaintiffs' claims: "So you've got three reg[ulations] that you're alleging violation . . . and then the duty to train[.]  [T]hose are the basis [for your] four negligence claims?"  Tr. at 48:11-14

(Court).  The Plaintiffs represented that the Court correctly understood their negligence claims.
See Tr. at 48:15 (Dunn).

The Plaintiffs then pressed that, at least with their negligence claims premised on Racing Commission rule violations, there is no fact issue.  See Tr. at 48:18-49:1 (Dunn).  "So," the Plaintiffs contended, they "are entitled to a judgment for recovery of the difference in purse." Tr. at 49:1-3 (Dunn).  The Plaintiffs also represented that, "in the event the Court is inclined to do that, my clients are willing to abandon the rest of their claims to have resolution of this case finally.  So there would be nothing more to try or decide . . . ."  Tr. at 49:3-7 (Dunn).  "On the other hand," the Plaintiffs added, "if there [are] . . . fact issues to be tried, then we believe, if we're going to a jury trial, we should try it all."  Tr. at 49:9-12 (Dunn).

After the Court inquired whether the parties' arguments fairly addressed the Plaintiffs' tort claims, see Tr. at 49:19-25 (Court), the Plaintiffs again attempted to explain their negligence claims:

> It wasn't clear to me from the Court's order on dismissal whether . . . the Court recognized a cause of action for enforcement of the rules . . . .  So the reason that we moved for summary judgment on those four claims is that we read Your Honor's dismissal to mean that the enforcement of the rules was through one of those claims, probably negligence, but if the Court has decided or is in fact the case that there is a sort of common law cause of action for enforcement of the New Mexico racing commission rules as is suggested in this Court's ruling . . . , then we've also intended summary judgment on that point.  But again, when I read the Court's earlier order I assumed that the Court thought that we could enforce the New Mexico racing rules under negligence so that's why we mentioned those four claims.  But we believe that we're entitled to enforcement of the rules whatever the name of the claims . . . .  And so our point is we're entitled to summary judgment for enforcement of the rules, and we believe the Court could enter a plain and simply judgment . . . for the plaintiff for the difference in the purse, for the recovery of the $720,000.00, whatever the difference in purse is.

Tr. at 50:3-51:9 (Dunn).

The Plaintiffs then adverted in passing to a breach-of-contract claim.  See Tr. at 51:12-13

- 42 -

(Dunn). The Court then asked the Plaintiffs "what is the contract that you think exists here?" Tr. at 51:13-14 (Court). The Plaintiffs replied:

> Well, I don't think that there is any contract but if you go and look at some of the cases that Your Honor cited and we had cited in the dismissal motion, other states and indeed some early English 1500s common law cases treated it as a breach of contract, an implied contract case essentially that there was an informal agreement between these parties that we're going to go and participate in this contest and these will be the rules it could be horse racing, could be playing Monopoly, could be whatever. We agree these are the rules we've committed to abide by . . . and then have a fair contest . . . . So some early common law cases refer to it as a breach of contract case, because, everybody presumably agreed to the rules to compete.

Tr. at 51:15-52:5 (Dunn). The Plaintiffs tied their contract theory to their general attempt at recovery, explaining that they were

> hesitant to talk about this [i.e. their lawsuit] in terms of particular claims . . . . So that's why we're relying on . . . rule 10 in our complaint. We've laid out a short and plain statement of the facts that give rise to the claim, and if it ultimately sounds in contract, then we're pursuing a contract claim.

Tr. at 52:13-23 (Dunn).

The Plaintiffs returned to their implied cause of action under the Racing Commission rules. See Tr. at 53:21-24 (Dunn). The Plaintiffs alleged that, in its dismissal order, the Court "found that it believed that the New Mexico Supreme Court would see the New Mexico racing act . . . as having an implied common law cause of action that creates a duty that can be enforced in Court." Tr. at 53:21-24 (Dunn). The Plaintiffs added: "So that's the whole issue that we think there is no fact issue on [and] that summary judgment can be granted on." Tr. at 53:24-54:1 (Dunn). The Court noticed that the Defendants' summary judgment motions did not address the Plaintiffs' implied contract claim. See Tr. at 54:14-15 (Court). The Court asked the Defendants whether they "were trying to knock out the case with [their] four motions." Tr. at 54:14-15 (Court). The Defendants replied that they understood their motions to be case dispositive. See

Tr. at 54:16 (Blackburn); id. at 54:19-24 (Blackburn).

Last, the Plaintiffs alerted the Court to the parties' decision not to mediate their dispute. See Tr. at 58:1-14 (Dunn). The Defendants confirmed that decision. See Tr. at 58:17-18 (Dunn). The Court noted its willingness to assist with locating a mediator for the parties if they are inclined to attempt mediation. See Tr. at 59:18-60:8 (Court).

The Court indicated that it would take the parties' summary judgment motions under advisement. See Tr. at 56:10-12 (Court). The Court also stated its inclination to issue one summary judgment opinion, "us[ing] the facts and evidence and record in all five motions together." Tr. at 56:10-12 (Court). The Court thanked the parties for their presentations. See Tr. at 56:20-21 (Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex, 477 U.S. at 323.

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish

the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[25]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

---

[25]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11

F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[26]] explained that the

---

[26]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have

blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

"'The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment.'"  Cannon v. State Farm Mut. Auto. Ins. Co., No. 2:13-CV-186 DN, 2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013)(Nuffer, J.)(quoting Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp., 700 F. Supp. 838, 840 (W.D. Pa. 1988)(Mencer, J.).  "Thus, '[t]he court handles cross-motions as if they were two distinct, independent motions . . . [and] in evaluating each motion, the court must consider the facts and inferences in the light most favorable to the non-moving party.'"  Cannon v. State Farm Mut. Auto. Ins. Co., 2013 WL 5563303, at *1 (alterations in original)(quoting Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp., 700 F. Supp. at 840).

### LAW REGARDING THE NEW MEXICO RACING COMMISSION[27]

Pursuant to NMSA 1978, § 60-1A-3, the Racing Commission consists of five members,

---

generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

[27]The Court takes its understanding of the then-extant Racing Commission regulations from the Plaintiffs' submission in response to a motion to dismiss.  See Plaintiffs', Richard Simon, Janelle Simon, Eric Curtis, and Jose Vega, Response to Defendants' Motion to Dismiss, filed May 23, 2010 (Doc. 11-2).  The regulations have since changed, but the changes do not alter the Court's conclusion.

which the Governor of New Mexico appointed and the New Mexico Senate confirmed, knowledgeable in horse racing. The New Mexico Legislature has provided the Racing Commission with broad powers over licensees. These powers include the ability to promulgate regulations, to investigate the licensees' operations, to compel discovery, to subpoena witnesses, to administer oaths, to appoint hearing officers to conduct required hearings, and to issue a final decision upon review of the hearing officer's recommendations. See NMSA, § 60-1A-4. The Legislature statutorily conferred on the Racing Commission broad powers and duties "to implement the Horse Racing Act, and to ensure that horse racing in New Mexico is conducted with fairness and that the participants and patrons are protected against illegal practices" on the racing grounds. NMSA 1978, § 60-1A-5(A) (2007). The Racing Commission implemented these Legislative enactments through regulations, including N.M. Admin. Code § 15.2.6.6, which makes the Commission's objective "to protect the integrity of horse racing, to ensure the health and welfare of race horses and to safeguard the interests of the public and the participation in racing."

The regulations regulate many aspects of horse racing, including the substances that race horses may take. See N.M. Admin. Code §15.2.6.9. The regulations include guidelines that place each drug in a "Class" and recommend penalties for certain violations. N.M. Admin. Code § 15.2.6.9. The regulations provide, however, "that in the event a majority of the stewards determine [sic] that mitigating circumstances require imposition of a lesser penalty they may impose the lesser penalty." N.M. Admin. Code § 15.2.6.9.

The regulations authorize the Racing Commission to review a decision or action of the Board of Stewards, and to accept or overturn the decision or action after a hearing. See NMSA 1978, § 60-1A-12 (2007). Enacted regulations specify procedures for complaints that the Board

of Stewards addresses and procedures for the Racing Commission's review of the Board of Stewards' decision. <u>See</u> N.M. Admin. Code § 15.2.1.9. A person aggrieved of the Board of Stewards' ruling has a right to appeal to the Commission. <u>See</u> N.M. Admin. Code §§ 15.2.1.9(B)(9) & 15.2.1.9(C)(7). The Commission may appoint a presiding officer to conduct a hearing. <u>See</u> § 15.2.1.9(C)(7). The hearing officer shall prepare proposed "findings of fact, conclusions of law and recommendation for Commission action." N.M. Admin. Code § 15.2.1.9(C)(15)(a). Parties may file exceptions to the proposal within a certain time. <u>See</u> N.M. Admin. Code § 15.2.1.9(C)(15)(c). Further,

> [a]fter the expiration of the time for filing exceptions and replies, the Commission shall consider the proposal for decision in open meeting. The Commission may: adopt the proposal for decision, in whole or in part; decline to adopt the proposal for decision, in whole or part; remand the proceeding for further action by the same or a different presiding officer; or direct the presiding officer to give further consideration to the proceeding with or without reopening the hearing.

N.M. Admin. Code § 15.2.1.9(C)(15)(d). The regulations also govern the manner in which the Commission issues orders and administers penalties, the process to request rehearing of an adverse decision, and many other matters. <u>See</u> N.M. Admin. Code § 15.2.1.9.

## NEW MEXICO LAW REGARDING TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

The Supreme Court of New Mexico recognizes the tort of interference with prospective contractual relations and has adopted the definition in § 766B of the Restatement (Second) of Torts. <u>See</u> <u>Horizon AG-Prods. v. Precision Sys. Eng'g, Inc.</u>, No. CIV 09-1109 JB/DJS, 2010 WL 4054131, *6 (D.N.M. Sept. 28, 2010)(Browning, J.)(citing <u>M & M Rental Tools, Inc. v. Milchem, Inc.</u>, 1980-NMCA-072, ¶¶ 16-20, 612 P.2d 241, 244-45). Section 766B states:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:

> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979). Accord Horizon AG-Prods. v. Precision Sys. Eng'g, Inc., 2010 WL 4054131, *6-7 (quoting Restatement (Second) of Torts § 766(B) (1979), and citing M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 20, 612 P.2d at 245)). To state a claim for interference with prospective contractual relations, "a plaintiff must allege that 'there was an actual prospective contractual relation which, but for the [defendant's] interference, would have been consummated.'" Horizon AG-Prods. v. Precision Sys. Eng'g, Inc., 2010 WL 4054131, *7 (alteration in original)(quoting Dairyland Ins., 1981-NMSC-130, ¶ 13, 637 P.2d 837, 841).

## NEW MEXICO LAW REGARDING FRAUD

Under New Mexico law, the elements of fraudulent misrepresentation are: "(i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance on the misrepresentation, and (iv) detrimental reliance on the misrepresentation." Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d 1162, 1167 (D.N.M. 2009)(Browning, J.)(quoting Cain v. Champion Window Co., 2007-NMCA-085, ¶ 22, 164 P.3d 90, 97 (internal quotation marks and citation omitted)). Fraudulent "[i]ntent may be inferred from the circumstances surrounding the dealings . . . ." Maxey v. Quintana, 1972-NMCA-069, ¶ 19, 499 P.2d 356, 360. Accord Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d at 1167. The party asserting fraudulent misrepresentation must prove each of those elements by clear-and-convincing evidence. See Applied Cap., Inc. v. Gibson, No. CIV 05-98 JB/ACT, 2007 WL

5685131, *13 (D.N.M. Sept. 27, 2007)(Browning, J.)(citing <u>Cyprus Amax Minerals Co. v. Duran</u> <u>Sand & Gravel, Inc.</u>, No. CIV 03–1473 JB/ACT, 2006 WL 4079084, at *10 (D.N.M. May 31, 2006)(Browning J.)).

## NEW MEXICO LAW REGARDING PRIMA FACIE TORT

In <u>Schmitz v. Smentowski</u>, the Supreme Court of New Mexico recognized a cause of action for prima facie tort. <u>See</u> 1990-NMSC-002, ¶¶ 49-52, 785 P.2d 726, 736. The underlying premise of prima facie tort is that a party who intends to cause injury to another should be liable for that injury if the conduct is generally culpable and is not justifiable under the circumstances. <u>See</u> <u>Schmitz v. Smentowski</u>, 1990-NMSC-002, ¶ 37, 785 P.2d at 734. There are four generally recognized elements of prima facie tort: (i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act. <u>See</u> <u>Lexington Ins. Co. v. Rummel</u>, 1997-NMSC-043, ¶ 10, 945 P.2d 992, 995; U.J.I. 13–1631, N.M. Rules Ann.

In <u>Schmitz v. Smentowski</u>, the Supreme Court of New Mexico emphasized the importance of limiting the cause of action for prima facie tort, because the prima facie tort was not intended to provide a remedy for every intentionally caused harm. <u>See</u> <u>Schmitz v.</u> <u>Smentowski</u>, 1990-NMSC-002, ¶ 47, 785 P.2d at 734. <u>See also</u> <u>Lexington Ins. Co. v. Rummel</u>, 1997-NMSC-043, ¶ 10, 945 P.2d at 995. Because not every intentionally caused harm gives rise to an actionable tort, once a plaintiff establishes intent to injure, the trial court must balance the defendant's act or acts against the justification for the act or acts, and the severity of the injury, weighing three factors: (i) the injury; (ii) the culpable character of the conduct; and (iii) whether the conduct is unjustifiable under the circumstances. <u>See</u> <u>Portales Nat'l Bank v. Ribble</u>, 2003-NMCA-093, ¶ 4, 75 P.3d 838, 840. The Court of Appeals of New Mexico refined these factors

in <u>Beavers v. Johnson Controls World Services, Inc.</u>, 1995-NMCA-070, ¶¶ 18-36, 901 P.2d 761, 769, and the Uniform Jury Instructions incorporate the following factors that the <u>Beavers v. Johnson Controls World Services, Inc.</u> court articulated: (i) the nature and seriousness of the harm to the plaintiff; (ii) the fairness or unfairness of the means used by the defendant; (iii) the defendant's motive or motives; and (iv) the value to defendant or to society in general of the interests that the defendant's conduct advances. <u>See</u> U.J.I. 13-1631A, N.M. Rules Ann. <u>See</u>, <u>e.g.</u>, <u>Mosley v. Titus</u>, 762 F. Supp. 2d 1298, 1332-33 (D.N.M. 2010)(Browning, J.).

## <u>NEW MEXICO LAW REGARDING NEGLIGENCE</u>

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach must be a cause-in-fact and proximate cause of the plaintiff's damages. <u>See</u> <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86 ("<u>Herrera</u>"). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." <u>Ramirez v. Armstrong</u>, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, <u>overruled on other grounds by Folz v. State</u>, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249. Generally, negligence is a question of fact for the jury. <u>See</u> <u>Schear v. Bd. of County Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." <u>Schear v. Bd. of County Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." <u>Schear v. Bd. of County Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." <u>Baxter v. Noce</u>, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff. See Herrera, 2003-NMSC-018, ¶ 8, 73 P.3d at 186. The New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted). To determine whether the obligation of the defendant is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera, 2003-NMSC-018, ¶ 9, 73 P.3d at 187.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (internal quotation marks and citation omitted). "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (alterations in original)(internal quotation marks and citation omitted). "It need not be the only cause, nor the last nor nearest cause." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (internal quotation marks and citation omitted). "It is sufficient if it occurs with some other cause acting at the same

time, which in combination with it, causes the injury." <u>Herrera</u>, 2003-NMSC-018, ¶ 33, 73 P.3d

at 187 (internal quotation marks and citation omitted).

**LAW REGARDING THE SPECULATIVE NATURE OF SPORTING EVENTS'**
**<u>OUTCOME</u>**

Scholarly authority opines that the speculative nature of the outcome of sporting events

and contests often results in a denial of recovery in court. Professors Prosser and Keeton

summarize the prevailing rule and the rationale for denying recovery in sports contests as

follows:

> When the attempt has been made to carry liability for interference . . . into such
> areas as . . . deprivation of the chance of winning a contest, the courts have been
> disturbed by a feeling that they were embarking upon uncharted seas, and
> recovery has been denied; and it is significant that the reason usually given is that
> there is no sufficient degree of certainty that the plaintiff ever would have
> received the anticipated benefits.

W. Prosser & W. Keeton, Torts § 130, at 1006 (5th ed. 1984). The <u>Restatement (Second) of</u>

<u>Torts</u> describes circumstances under which the results of races or contests will not be

speculative. <u>See</u> <u>Restatement (Second) of Torts</u>, § 744B, special note, at 59-60 (1979). In

commenting on the possible situations that may justify liability for interferences with prospective

economic benefits of a noncommercial character, the <u>Restatement</u> authors point to

> [c]ases in which the plaintiff is wrongfully deprived of the expectancy of winning
> a race or a contest, when he has had <u>a substantial certainty or at least a high</u>
> <u>probability of success</u>. For example, the plaintiff is entered in a contest for a large
> cash prize to be awarded to the person who, during a given time limit, obtains the
> largest number of subscriptions to a magazine. At a time when the contest has
> one week more to run and the plaintiff is leading all other competitors by a
> margin of two to one, the defendant unjustifiably strikes the plaintiff out of the
> contest and rules him ineligible. In such a case there may be sufficient certainty
> established so that the plaintiff may successfully maintain an action for loss of the
> prospective benefits.

<u>Restatement (Second) of Torts</u>, <u>supra</u> § 744B, at 59-60 (emphasis added). The <u>Restatement</u>

authors further opine: "On the other hand, if the plaintiff has a horse entered in a race and the

defendant wrongfully prevents him from running, there may well not be sufficient certainty to entitle the plaintiff to recover . . . ." Restatement (Second) of Torts, supra § 744B, at 59-60.

In Youst v. Longo, 729 P.2d 728, 738 (Cal. 1987), the Supreme Court of California addressed the question of the speculative nature of tort claims between competitors in the horse racing context. In Youst v. Longo, the plaintiff alleged that the defendant drove his horse into the path of the plaintiff's horse and that the defendant struck the plaintiff's horse with a whip, thereby causing the plaintiff's horse to break stride. See 729 P.2d at 730-31. The plaintiff's horse finished sixth while the defendant's horse finished second. See 729 P.2d at 730-31. The California Horse Racing Board reviewed the race's events and disqualified the defendant's horse, which moved the plaintiff's horse into fifth place, entitling the plaintiff to a fifth place purse of $5,000. See 729 P.2d at 731. The plaintiff requested compensatory damages in the purse amount for either first, second, or third place, less the fifth place prize of $5,000. See 729 P.2d at 731. The Supreme Court of California held that tort liability was not available as a matter of law, because the sporting event's outcome, including a horse race, is speculative. See 729 P.2d at 732-33, 737. The Supreme Court of California stated: "It is a well-settled general tort principle that interference with the chance of winning a contest, such as the horserace at issue here, usually presents a situation too uncertain upon which to base tort liability." 729 P.2d at 730 (emphasis in original). The Supreme Court of California explained that, to "[a]scertain . . . the amount of actual damages," the court "would need to determine the position in which [the plaintiff's horse] would have finished but for defendant's interference." 729 P.2d at 731 (alterations added). The court explained that such an inquiry presented a seemingly "impossible" task. 729 P.2d at 736. Specifically, the court opined:

> Determining the probable expectancy of winning a sporting contest but for the
> defendant's interference seems impossible in most if not all cases, including the

instant case. Sports generally involve the application of various unique or unpredictable skills and techniques, together with instances of luck or chance occurring at different times during the event, any one of which factors can drastically change the event's outcome. In fact, certain intentional acts of interference by various potential "defendant" players may, through imposition of penalties or increased motivation, actually allow the "victim" player or team to prevail. Usually, it is impossible to predict the outcome of most sporting events without awaiting the actual conclusion.

729 P.2d at 736. In distinguishing cases in which courts have allowed a cause of action to proceed, the court drew support from section 744B of the Restatement (Second) of Torts, which "indicate[s] . . . certain contests may have a higher probability of ultimate success than others." 729 P.2d at 736 (alterations added)(citing Restatement (Second) of Torts, supra § 744B, at 59-60). The court reasoned: "To this end, the cases cited by the Court of Appeals here, awarding damages to competitors in contests, are distinguishable because in each case there was a high probability of winning." 729 P.2d at 736-37 (citation omitted).

Under California law, a threshold requirement for an interference with prospective business advantage claim is "the probability of future economic benefit." Youst v. Longo, 729 P.2d at 733 (emphasis in original)(internal quotation marks and citations omitted). The Youst v. Longo court explained that application of the threshold requirement in the context of a sporting contest prevents the opening of the "proverbial floodgates to a surge of litigation based on alleged missed opportunities to win various types of contests, despite the speculative outcome of many of them." 729 P.2d at 735. The court held that the plaintiff had not established the threshold probable expectancy of future economic benefit, because the plaintiff's complaint did not adequately allege facts showing interference with a probable economic gain, i.e., that the plaintiff's horse would have won the horse race, or at least won a larger prize, if the defendant had not interfered. See 729 P.2d at 737. The Supreme Court of California therefore concluded that "the threshold element of probability for interference with prospective economic advantage

was not met by the facts alleged" and that "[i]t was not reasonably <u>probable</u>, on the facts alleged, that [the plaintiff's horse] would have finished in a better position."  729 P.2d at 737 (alterations added)(emphasis in original).  <u>See</u> <u>Simon v. Taylor</u>, 2013 WL 5934420, at *22.

### <u>LAW REGARDING IMPLIED STATUTORY PRIVATE RIGHTS OF ACTION</u>

When a party seeks to enforce a statute that provides no express mechanism for its enforcement, a court must examine whether a cause of action may be implied through the common law.  <u>See</u> <u>Starko, Inc. v. Presbyterian Health Plan, Inc.</u>, 2012-NMCA-053, ¶ 33, 276 P.3d 252, 264-65.  In <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), the Supreme Court of the United States held: "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  532 U.S. at 286 (citation omitted).  The Supreme Court explained: "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  <u>Alexander v. Sandoval</u>, 532 U.S. at 286 (citation omitted).  "Statutory intent on this latter point is determinative," and "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." <u>Alexander v. Sandoval</u>, 532 U.S. at 286-87 (citations omitted).

The federal test for determining whether legislative intent exists is set forth in <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975).  <u>See</u> <u>Alexander v. Sandoval</u>, 532 U.S. at 287.  In <u>Cort v. Ash</u>, the Supreme Court set forth the test for determining whether to recognize an implied private cause of action:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

Cort v. Ash, 422 U.S. at 78 (internal quotation marks and citations omitted). See also Nat'l Trust for Historical Pres. v. City of Albuquerque, 117 N.M. at 593, 874 P.2d at 801 (citing Cort. v. Ash, 422 U.S. at 78).

The Supreme Court has recognized, however, that the standard for discerning whether state statutes create private rights of action is less stringent than the federal standard: "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." Alexander v. Sandoval, 532 U.S. at 287. In recognition of this distinction between federal and state statutes, the Court of Appeals of New Mexico in National Trust for Historical Preservation v. City of Albuquerque, 1994-NMCA-057, 874 P.2d 798, rejected the argument that the federal test articulated in Cort v. Ash exclusively applies to determine whether an implied private right of action under a state statute exists. See 1994-NMCA-057, ¶¶ 6-10, 874 P.2d at 801. The Court of Appeals of New Mexico applied a less stringent standard for implying a private right of action from a state statute. See 1994-NMCA-057, ¶¶ 11-12, 874 P.2d at 801. In adopting this standard, the Court of Appeals of New Mexico explained that a "state court, because it possesses common-law authority, has significantly greater power than a federal court to recognize a cause of action not explicitly expressed in a statute." 1994-NMCA-057, ¶ 10, 874 P.2d at 801-02. The Court of Appeals of New Mexico rejected the notion that statutory intent alone is determinative and instead held that a New Mexico court may "look beyond legislative intent in exercising common-law authority to recognize a private cause of action." 1994-NMCA-057, ¶ 10, 874 P.2d at 801. The Court of Appeals of New Mexico explained that "a common-law court may utilize the statute solely to demonstrate what is public policy," and the "public policy then forms the predicate for a common-law cause of action." 1994-NMCA-057, ¶ 10, 874 P.2d at 801 (citations omitted). The

Supreme Court of New Mexico has advanced the proposition that a state court may imply a private right of action based upon public policy, and not legislative intent, and has cited National Trust for Historical Preservation v. City of Albuquerque in support of this proposition. "[F]ederal courts do not presume that Congress intended for the common law to apply when interpreting a statute, . . . 'a state court, because it possesses common-law authority, has significantly greater power than a federal court to recognize a cause of action not explicitly expressed in a statute' and may do so in order to further public policy." See San Juan Agr. Water Users Ass'n v. KNME-TV, 2011-NMSC-011, ¶ 40, 257 P.3d 884, 893 (quoting Nat'l Trust for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, ¶ 10, 874 P.2d at 801-02).

The National Trust for Historical Preservation v. City of Albuquerque court held that the federal legislative intent test articulated in Cort v. Ash did not control, because that test "was developed to assist in the interpretation of federal statutes," and "[d]ifferent considerations arise when state courts decide matters of state law." 1994-NMCA-057, ¶ 8, 874 P.2d at 801. One such consideration stems from the fact that "[f]ederal courts have very limited authority beyond that conferred by statute or the Constitution. As the United States Supreme Court has stated, 'The instances where we have created federal common law are few and restricted.'" 1994-NMCA-057, ¶ 9, 874 P.2d at 801 (quoting Wheeldin v. Wheeler, 373 U.S. 647, 651 (1963)). Thus, the Cort v. Ash test essentially is a test to determine whether Congress intended to create, either expressly or by implication, a private cause of action. See Nat'l Trust for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, ¶¶ 7-11, 874 P.2d at 801 (citation omitted). The Court of Appeals of New Mexico explained that the Cort v. Ash factors are not irrelevant to the question whether a private right of action exists under a state statute, but rather that they are not exclusive. See Nat'l Trust for Historical Pres. v. City of Albuquerque, 1994-NMCA-057, ¶¶ 7-

11, 874 P.2d at 801 (citation omitted).  Instead, "a state's public policy, independent of the first three <u>Cort v. Ash</u> factors, may be determinative in deciding whether to recognize a cause of action."  <u>See</u> <u>Nat'l Trust for Historical Pres. v. City of Albuquerque</u>, 1994-NMCA-057, ¶ 11, 874 P.2d at 801 (citation omitted).

## LAW REGARDING RELIANCE ON THE COURT OF APPEALS OF NEW MEXICO'S CASE LAW

The Court considers Court of Appeals of New Mexico's opinions with the understanding that, while the Court "certainly may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."  <u>Mosley v. Titus</u>, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(alterations added)(noting that, where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).

The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court.  In the past, the Supreme Court directed federal courts, in the absence of controlling authority from the highest state court, to follow intermediate state court decisions:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more

convincing evidence of what the state law is, should be followed by a federal court in deciding a state question. We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law. . . . The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).

"The Supreme Court has softened this position over the years." Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 (D.N.M. 2014)(Browning, J.). Federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)(citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20[2], at 124-75 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted). See also Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243; Mosley v. Titus, 762 F. Supp. 2d at 1332.

## LAW REGARDING JUDICIAL NOTICE

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that

are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). See Leon v. Fedex Ground Package Sys., Inc., 163 F. Supp. 3d 1050, 1066 (D.N.M. 2016)(Browning, J.). "Adjudicative facts are simply the facts of the particular case." United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, regardless whether requested. See Fed. R. Evid. 201(c). On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. See Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e). See Leon v. Fedex Ground Package Sys., Inc., 163 F. Supp. 3d at 1066. Moreover, "a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial." St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979)(citations omitted). See United States v. Sinclair Refining Co., 126 F.2d 827, 830 (10th Cir. 1942)(taking judicial notice of general custom and industry procedure in the summary judgment posture); 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2723, at 408 (3d ed. 1998)("The doctrine of judicial notice applies to motions under Rule 56: thus the court may consider anything in support of or in opposition to summary judgment that it may judicially notice.").

The Supreme Court has stated that firmly established scientific principles are properly subject to judicial notice under rule 201 of the Federal Rules of Evidence. See Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 592 n.11 (1993). According to rule 201, "[t]he court

may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Facts that are not subject to reasonable dispute include facts established by the relevant scientific community. See Melong v. Micronesian Claims Comm'n, 643 F.2d 10, 12 (D.C. Cir. 1980)("Rule 201(b)(2) of the Federal Rules of Evidence . . . is designed to permit judicial recognition of material such as scientific data or historical fact that, although outside the common knowledge of the community, is nevertheless ascertainable with certainty without resort to cumbersome methods of proof."). Because judicial notice "bypasses the safeguards that are present when evidence is admitted through the usual evidentiary process, . . . the type of facts which a court will ordinarily take judicial notice are . . . established scientific facts . . . ." Bravos v. U.S. Bureau of Land Mgmt., No. 6:09-CV-00037-RB-LFG, 2011 WL 3924496, at *3 (D.N.M. Aug. 3, 2011)(Brack, J.). "In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable." United States v. Sauls, 981 F. Supp. 909, 920-21 (D. Md. 1997)(Rosenberg, M.J.)(emphasis added)(citing Clemmons v. Bohannon, 918 F.2d 858, 865-68 (10th Cir. 1990), vacated on other grounds, on reh. en banc, 956 F.2d 1523 (10th Cir. 1992)). In Clemmons v. Bohannon, 918 F.2d at 865 n.5, the Tenth Circuit took "judicial notice of federal statutes and regulations, state statutes, government reports, municipal ordinances, and the Surgeon General's reports referred to or incorporated into the Congressional Record." Concluding that "[t]he most comprehensive source of scientific evidence concerning the harmful effects of [environmental tobacco smoke] is" a 1986 Surgeon General's Report, 918

F.2d at 865 n.5, the Tenth Circuit noticed "the mounting scientific evidence of the potentially

lethal effects of long-term exposure to tobacco smoke," 918 F.2d at 865.  Regarding the judicial

notice of scientific evidence, <u>McCormick on Evidence</u>, § 330 explains:

> Thus it is that while the various propositions of science are a suitable topic of judicial notice, the content of what will actually be noticed is subject to change as the tenets of science evolve. <u>It is manifest, moreover, that the principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community</u>. In determining the intellectual viability of the proposition, of course, the judge is free to consult any sources that he thinks are reliable . . . .  In the increasingly important practice of judicial notice of scientific and technological facts, some of the possibilities of error are, first, that the courts may fail to employ the doctrine of judicial notice in this field to the full measure of its usefulness; second, that they may mistakenly accept as authoritative scientific theories that are outmoded or are not yet received by the specialists as completely verified; and third, that in taking judicial notice of accepted scientific facts, the courts, in particular cases may misconceive the conclusions or applications which are supposed to flow from them. Of these, it seems that the first has thus far been the most frequent shortcoming.

Kenneth Broun, et al., 2 <u>McCormick on Evidence</u>, § 330, at 605-6, 608-09 (7th

ed. 2013)(emphasis added).

The federal courts have long taken judicial notice of scientific facts established and

accepted in the appropriate scientific community.  <u>See</u> <u>Siegel v. Dynamic Cooking Sys., Inc.</u>,

501 F. App'x 397, 404 (6th Cir. 2012)(holding that "[t]aking notice of the relative pressure

exerted by propane verses natural gas" is not an abuse of discretion, because the judicial notice

was of an "accepted scientific principle"); <u>U.S. Wood Preserving Co. v. Sundmaker</u>, 186 F. 678,

681 (6th Cir. 1911)("Notice, therefore, will be taken of the fact that the creosote oil of commerce

called for by the specifications contains both anthracene and anthracene oil. Anthracene is one of

its high boiling constituents, a fact which the specifications themselves suggest."); <u>Rahman v.</u>

<u>Taylor</u>, No. CIV. 10-0367 JBS/KMW, 2011 WL 4386733, at *7 (D.N.J. Sept. 20,

2011)(Simandle, J.)(taking "judicial notice that as many as ten weeks may be required to display

a positive reaction to tuberculin skin testing after exposure and infection," because the court was able to verify that fact on a Center for Disease Control website); <u>Helen of Troy, L.P. v. Zotos Corp.</u>, 235 F.R.D. 634, 640 (W.D. Tex. 2006)(Martinez, J.)(taking notice that urea was an acid having a very low pH in deciding a bottler seller's summary judgment motion in buyer's suit to recover for leaks of its hair care products, because the fact was not subject to reasonable dispute in that it was capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned); <u>Illinois Cudahy Packing Co. v. Kansas City Soap Co.</u>, 247 F. 556, 558 (D. Kan. 1918)(Pollock, J.)("That crude gylcerine is a product derived from animal fats is not only a scientific fact, of which courts take judicial notice . . . ."). <u>See also</u> <u>Application of Norris</u>, 179 F.2d 970, 974 (C.C.P.A. 1950)(taking judicial notice "that structural isomers have defined predictable physical properties, and that the chemical similarity in such a large group justified the coming of the term 'metameric' to characterize such isomeric compounds")(citation omitted); <u>United States v. Ryan</u>, No. NMCCA 9900374, 2005 WL 3591183, at *3 (Navy-Marine Corps. Ct. Crim. App. Dec. 30, 2005)("[W]e take judicial notice of the well-known scientific fact that it is possible to pour pure cocaine into a urine sample and produce [the cocaine metabolite] BZE in that sample.").

## <u>ANALYSIS</u>

The Court concludes that the Defendants are entitled to summary judgment on the Plaintiffs' intentional interference with prospective economic advantage claim, because a reasonably jury would not conclude, based on a preponderance of the evidence, that the Plaintiffs have demonstrated that the Defendants intentionally and improperly supplied Stolis Winner with caffeine with a purpose to interfere with any contractual relationship between the Plaintiffs and a third party. The Defendants adduce record evidence indicating that they did not intentionally

provide Stolis Winner with caffeine or instruct anyone to do so. For their part, the Plaintiffs adduce only two positive tests results indicating the presence of caffeine in Stolis Winner's urine sample; however, these test results establish such a miniscule caffeine concentration in Stolis Winner's urine that they do not amount to even a "scintilla" of evidence supporting the Defendants' intentional administration of caffeine to the horse with a purpose to interfere with the Plaintiffs' prospective contractual relations. Liberty Lobby, 477 U.S. at 252. A reasonable jury, therefore, could not find for the Plaintiffs on the positive caffeine tests alone. The Court next concludes that the Defendants are entitled to summary judgment on the Plaintiffs' fraud claim, because the two test results indicating trace amounts of caffeine in Stolis Winner's urine are insufficient for a reasonable jury to find that the any of the Defendants knew that the horse had ingested caffeine and, consequently, knowingly made a false misrepresentation. The Court further concludes that the Defendants are entitled to summary judgment on the Plaintiffs' prima facie tort claim, because the two test results indicating trace amounts of caffeine are insufficient for a reasonable jury to find that the Defendants improperly trained Stolis Winner with a purpose to harm the Defendants.

The Court additionally concludes that the Defendants are entitled to summary judgment on the Plaintiffs' negligence claim, because a reasonable jury could not find by a preponderance of the evidence that the two test results establish a breach of the standard of care reflected by New Mexico Administrative Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L)(3)(c). Even if the Plaintiffs could establish breach, a reasonable jury could not find by a preponderance of the evidence that the miniscule amount of caffeine present in Stolis Winner caused the Plaintiffs' any injury. Nor can the Plaintiffs establish causation by arguing that, in light of the positive caffeine tests, the Racing Commission should have disqualified Stolis Winner and reordered the purse. See N.M.

Admin. Code § 15.2.6.9(L)(3)(c). Stolis Winner's two test samples do not exceed the Racing Commission's promulgated "regulatory threshold" for caffeine as an "environmental contaminant[] and substance[] of human use." N.M. Admin. Code § 15.2.6.9(L). For caffeine, the Racing Commission imposed a "regulatory threshold" of "100 nanograms per milliliter of plasma or serum [equivalent to ~ 300 ng/ml in urine]," below which the Racing Commission does not impose any disciplinary action for the presence of caffeine in a race horse. N.M. Admin. Code § 15.2.6.9(L)(3)(c). See N.M. Admin. Code § 15.2.6.9 ("Any threshold herein incorporated by reference by inclusion in one of the documents above shall not supersede any threshold or restriction adopted by the commission as specified by this section.").

By a similar rationale, the Court also concludes that the Plaintiffs cannot recover on an implied private cause of action under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's rules, N.M. Admin. Code § 15.2.6, because the caffeine concentrations present in Stolis Winner's two test samples do not exceed the "regulatory threshold" of "100 nanograms per milliliter of plasma or serum [equivalent to ~ 300 ng/ml in urine]." N.M. Admin. Code § 15.2.6.9(L)(3)(c). The Plaintiffs cannot succeed on an implied private cause of action arising under the Horse Racing Act and the Racing Commission's rules, because the Plaintiffs present evidence that would not sustain a rule violation in light of all of the applicable Racing Commission rules. See N.M. Admin. Code §§ 15.2.6.9 & 15.2.6.9(L)(3)(c). Last, the Court concludes that the Plaintiffs are not entitled to summary judgment on their claims, because the Plaintiffs have not met their burden to demonstrate that they are entitled to judgment as a matter of law on any of their claims based on the record evidence of the two positive results indicating trace amounts caffeine in Stolis Winner's urine.

I.   **THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**.

The Court will grant the Defendants' motion for summary judgment on the Plaintiffs' claim for intentional interference with prospective economic advantage. New Mexico courts follow section 766B of the Restatement (Second) of Torts regarding the tort of intentional interference with prospective economic advantage. See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 50, 785 P.2d at 736 ("We have adopted the cause of action of intentional interference with prospective contractual relations, relying on the tort as articulated in Restatement (Second) of Torts § 766(B) (1977)."); Dairyland Ins., 1981-NMSC-130, ¶ 11, 637 P.2d at 841. The Restatement approach, as the Supreme Court of New Mexico has adopted it, "requires intentional and improper interference [-- i.e.,] either an improper motive (solely to harm plaintiff), or an improper means is required for liability." Dairyland Ins., 1981-NMSC-130, ¶ 11, 637 P.2d at 841. See Key v. Chrysler Motors Corp., 1996-NMSC-038, ¶ 29, 918 P.2d 350, 358 ("In the tort of intentional interference with a prospective advantage, the basis for the imposition of liability requires proof of improper motive (intent to harm) or utilization of some improper means."); Restatement (Second) of Torts § 766B. Furthermore, to state a claim for interference with prospective contractual relations, the Supreme Court of New Mexico requires that a plaintiff "must prove that there was an actual prospective contractual relation which, but for the [defendant's] interference, would have been consummated." Dairyland Ins., 1981-NMSC-130, ¶ 13, 637 P.2d at 841 (alteration added).

The Defendants move for summary judgment, arguing that the Plaintiffs adduced insufficient evidence to establish two elements of their intentional interference with prospective economic advantage claim. See Defendants' Intentional Interference with Prospective Economic

Advantage MSJ at 5.  First, the Defendants contend that they are entitled to summary judgment, because the Plaintiffs fail to proffer sufficient evidence showing that the Defendants intentionally acted to interfere with any prospective economic relationship between the Plaintiffs and a third-party.  See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 2-5.  See also Tr. at 19:9-12 (Blackburn); id. at 20:10-15 (Blackburn).  Second, the Defendants argue that they are entitled to summary judgment, because the Plaintiffs fail to adduce sufficient evidence showing that there was any prospective economic relationship between the Plaintiffs and a third-party that would have been consummated but for the Defendants' improper conduct.  See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 5 (stating that the Plaintiffs cannot show either that there "was any 'actual' prospective relationship which was not consummated as a result of Stolis Winner finishing ahead of Jet Black Patriot" or that "any 'actual' economic relationship was disrupted as a result . . . .").

The Defendants marshal record evidence in support of their assertion that they did not intentionally act to interfere with any prospective economic relationship between the Plaintiffs and a third-party.  The Defendants advert to answers and affidavits indicating that they did not knowingly or intentionally provide Stolis Winner with caffeine or instruct anyone acting on their behalf to do so.  See Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶¶ 10-12, at 2-3 (citing Taylor's First Answers at 3; J. Windham's First Answers at 3-4; P. Windham's First Answers at 3); P. Windham Aff. ¶ 5, at 1.  The Defendants also rely on record evidence indicating that they were not aware of any economic relationship between the Plaintiffs and a third party relating to Jet Black Patriot.  See Defendants' Intentional Interference with Prospective Economic Advantage MSJ at 3 (citing J. Windham Aff. ¶ 8, at 1; P. Windham Aff. ¶¶ 3-4, at 1).  The Defendants refer to their lack of awareness of any contractual relationship to

support the inference that they did not intentionally act to disrupt it.  See Defendants' Intentional

Interference with Prospective Economic Advantage MSJ at 3.

In light of the Defendants' summary judgment arguments, the Plaintiffs have the burden

to "set forth specific facts showing that there is a genuine issue for trial as to those dispositive

matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated

Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Fed. R. Civ. P. 56(c)(1).    Consequently,

the Plaintiffs must adduce specific facts supported by record materials for a reasonable jury to

find, based on a preponderance of the evidence, the element of the Defendants' "intentional and

improper interference."  Dairyland Ins., 1981-NMSC-130, ¶ 11, 637 P.2d at 841.  The Plaintiffs

must also show sufficient record evidence supporting "an actual prospective contractual relation

which, but for the [Defendants'] interference, would have been consummated."  Dairyland Ins.,

1981-NMSC-130, ¶ 13, 637 P.2d at 841 (alteration added).

A.    **THE PLAINTIFFS DO NOT SATISFY THEIR BURDEN TO ADDUCE SUFFICIENT EVIDENCE THAT THE DEFENDANTS IMPROPERLY INTENDED TO INTERFERE WITH THE PLAINTIFFS' PROSPECTIVE ECONOMIC RELATIONSHIPS, BECAUSE THE PLAINTIFFS PROFFER EVIDENCE ONLY OF STOLIS WINNER'S POSITIVE CAFFEINE TEST.**

The Plaintiffs have not met their burden.  In their Response, the Plaintiffs argue that "the

Defendants acted intentionally to interfere with prospective contractual relationships of . . . Jet

Black Patriot," because the Defendants "intentionally plac[ed] Stolis Winner in the race while

the horse was under the influence of an automatically disqualifying substance . . . ."  Plaintiffs'

Response at 6 (alterations added).  The Plaintiffs argue that the Defendants are not entitled to

summary judgment on the intentional interference with prospective economic relations claim,

because the Defendants intended to enter a horse that had ingested caffeine in the race,

irrespective whether the Defendants knew, or even had reason to know, that the horse had

ingested caffeine. See Plaintiffs' Response at 6. In support of this argument, the Plaintiffs stress that "[t]he trainer is responsible for the horse from the time the horse ends the race to the time the horse leaves the test barn." Plaintiffs' Response at 6 (citing N.M. Admin. Code § 15.2.6.11(B), (E)(1)-(2)). The Plaintiffs also emphasize a statement contained in the Luna Depo. Plaintiffs' Response at 7 (quoting Luna Depo. at 17:19-22). Luna, the "agency director of the Racing Commission," stated that "'we had a caffeine positive.'" Plaintiffs' Response at 7 (quoting Luna Depo. at 17:19-22). See also Luna Depo. at 5:5-6. Additionally, in their motion for summary judgment, the Plaintiffs' advert to New Mexico Administrative Code § 15.2.6.9(C)(1), which provides:

> A finding by the commission approved laboratory of a prohibited drug, chemical or other substance in a test specimen of a horse is prima facie evidence that the prohibited drug, chemical or other substance was administered to the horse and, in the case of a post-race test, was present in the horse's body while it was participating in a race.

N.M. Admin. Code § 15.2.6.9(C)(1). Pulling these assertions together, the Plaintiffs argue that there is a fact question regarding the Defendants' intention to interfere with the Plaintiffs' prospective economic relations, because (i) New Mexico Administrative Code § 15.2.6.9 requires that Stolis Winner was free of caffeine; (ii) New Mexico Administrative Code §§ 15.2.6.11(B) & 15.2.6.11(E)(1)-(2) impose a duty on Taylor to ensure Stolis Winner was free of caffeine; and (iii) Stolis Winner tested positive for caffeine. See Plaintiffs' Response at 5-6. The only record evidence that the Plaintiffs adduce to show that the Defendants improperly intended to interfere with a prospective contractual relationship, however, are the positive caffeine tests taken from Stolis Winner's split urine sample. See Plaintiffs' Response at 5-6. They argue that this single brick of evidence, in combination with New Mexico Administrative Code §§ 15.2.6.9, 15.2.6.11(B) and 15.2.6.11(E)(1)-(2), creates a genuine dispute regarding the

Defendants' intention to interfere with the Plaintiffs' contractual relationships.

The Plaintiffs' argument borrows heavily from the doctrine of negligence per se. Under that doctrine, the violation of a duty that an administrative regulation imposes is evidence of a defendant's breach of the standard of care in a common law negligence action. See Heath v. La Mariana Apartments, 2008-NMSC-017, ¶¶ 7-9, 14, 19, 22, 180 P.3d 664, 666-70 ("Heath")(holding that a negligence per se jury instruction was inappropriate). See also Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d 1200, 1208 (D.N.M. 2009)(Browning, J.)("In negligence per se, violation of a separate legal duty is evidence of negligence . . . ."); W. Page Keeton, et al., Prosser and Keeton on Torts § 36, at 220-231 (5th ed.1984); Restatement (Second) on Torts § 286 (1965). Unpacking this doctrine, Prosser and Keeton on Torts § 36, entitled "Violation of Statute," explains:

> The standard of conduct required of a reasonable person may be prescribed by legislative enactment. When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard for all members of the community, from which it is negligence to deviate. The same may be true of municipal ordinances and regulations of administrative bodies. . . . Once the statute is determined to be applicable -- which is to say, once it is interpreted as designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation -- and once its breach has been established, probably a majority of the courts hold that the issue of negligence is thereupon conclusively determined. . . . [However, a] large number of courts have held that a violation is only evidence of negligence, or prima facie evidence thereof, which may be accepted or rejected according to all of the evidence.

Prosser and Keeton on Torts § 36, at 220-231 (alterations added).

The Plaintiffs contend that Stolis Winner's positive caffeine test violated New Mexico Administrative Code §§ 15.2.6.9, 15.2.6.11(B) & 15.2.6.11(E)(1)-(2), and that these violations constitute evidence of the Defendants' intention to interfere improperly with the Plaintiffs' prospective economic advantage. See Plaintiffs' Response at 5-6; Plaintiffs' MSJ at 7-8. This

argument appears as a suggestion that the Court may transpose the doctrine of negligence per se into the area of intentional torts and, consequently, conclude that a defendant's violation of an administrative regulation is evidence of an intentional tort claim's intentionality element. The New Mexico Administrative Code § 15.2.6.9(C)(1) provides that a finding of a prohibited substance "in a test specimen of a horse is prima facie evidence that the prohibited drug . . . was administered to the horse . . . ." N.M. Admin. Code § 15.2.6.9(C)(1). Further, at least one court has expressly found that, "while a violation of an administrative safety code is not *per se* an intentional tort, it may be some evidence" of the intent element of an intentional tort. Patton v. J&H Reinforcing & Structural Erectors, Inc., No. 93-CA-2194, 1994 WL 693929, at *3 (Ohio Ct. App. Dec. 9, 1994)(citations omitted).

The Court concludes that the Supreme Court of New Mexico would probably agree that a violation of an administrative rule is evidence of an element of an intentional tort. In this case, the Court concludes that, while the positive caffeine test would not, by itself, establish a per se intentional tort, it is some evidence. The Court notes that the Racing Commission held that the Defendants did not violate any administrative rule,[28] but the Court does not consider the Racing

---

[28]The Court notes that a three-judge administrative panel determined that "[t]he disciplinary rulings issued in this proceeding do not meet the regulatory test necessary to be sustained because the prima facie evidence that a prohibited drug was administered to Stolis Winner prior to winning the 2008 All American Futurity has been rebutted." Hearing Officer Panel Report at 21. Accordingly, the three-judge administrative panel concluded that the Defendants did not violate any administrative code provision, see Hearing Officer Panel Report at 21, and the Racing Commission adopted the three-judge administrative panel's recommended conclusion, see Defendants' Negligence MSJ ¶ 15, at 3 (asserting this fact); Plaintiffs' MSJ ¶ 9, at 3 (not disputing this fact). Hence, there is no administratively determined rule violation on which to hang the Plaintiffs' argument that the Defendants' rule violation necessarily constitutes evidence of an improper intention to interfere with the Plaintiffs' contractual relationships. The Court also notes, however, that the Plaintiffs did not have the opportunity to litigate in the administrative proceeding that concluded that the Defendants did not violate any New Mexico regulation. See Plaintiffs' MSJ at 18 (alleging this fact)(citing Racing Commission Order at 22-27); Defendants' Response at 2-4 (not disputing this fact). See also Luna Depo. at 31:1-24,

Commission's conclusion to be dispositive of the question whether sufficient evidence establishes the Defendants' intention to improperly interfere with the Plaintiffs' contractual relationships. New Mexico Administrative Code § 15.2.6.9 prohibits caffeine, and Stolis Winner's urine contained caffeine. See Luna Depo. at 17:19-22. Thus, the positive caffeine test is some evidence of the Defendants' improper intention to interfere with the Plaintiffs' prospective economic relations.

In light of New Mexico Administrative Code § 15.2.6.9(C)(1), the Plaintiffs have established a prima facie case that caffeine was administered to Stolis Winner. In that case, the Court concludes that the Supreme Court of New Mexico would then shift the burden of production and proof to the Defendants to establish that they did not intentionally administer caffeine to Stolis Winner. The Court also concludes that, if the Defendants produce undisputed evidence that they did not administer caffeine to Stolis Winner, the Court can conclude that the Defendants have not only rebutted the Plaintiffs' prima facie case, but that the facts are undisputed. Once the Defendants come forward with evidence that they did not administer caffeine to Stolis Winner, the Plaintiffs retain the burden to establish that the positive caffeine test, which undergirds the rule violation, creates a fact question regarding the Defendants' intentional actions that is sufficient to defeat the Defendants' motion for summary judgment. In other words, once the Defendants point to evidence that rebuts the presumption that the rule produces, the Plaintiffs must demonstrate that positive caffeine test is more than "a scintilla of evidence in support of the plaintiff's position" and, in fact, is sufficient "evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252. After all, given the elements of the New Mexico tort of intentional interference with prospective economic relations,

---

32:14-33:2.

see Dairyland Ins., 1981-NMSC-130, ¶¶ 11-13, 637 P.2d at 841, the issue is not whether Stolis Winner tested positive for caffeine, but whether the Defendants intentionally and improperly supplied Stolis Winner with caffeine to interfere with some contractual relationship between the Plaintiffs and a third party.

The Plaintiffs cannot meet this burden: they have not marshalled any evidence in support of the intentional-interference element, except for the positive caffeine tests which create only a prima facie case that caffeine was intentionally administered. The Court agrees with the Plaintiffs that Jet Black Patriot's entry into the 2008 All American Futurity amounts to "an actual prospective contractual relation." Dairyland Ins., 1981-NMSC-130, ¶ 13, 637 P.2d at 841. Once the Defendants rebut the presumption that caffeine was administered, however, Luna's Depo. testimony that Stolis Winner's urine tested positive for caffeine does not, alone, support that the Defendants intentionally and improperly interfered with any contractual relation between the Defendants and a third party. See Luna Depo. at 4:6-142:8. The Plaintiffs rely on Luna's Depo. for the fact that the Racing Commission "had a caffeine positive," Luna Depo. at 17:19-22, but the positive caffeine sample, standing alone -- and after the Defendants have rebutted any prima facie case -- is not a basis for a fact finder, based on a preponderance of the evidence, to reasonably credit Plaintiffs' allegation that "[t]he Defendants Windham and Taylor's actions of intentionally providing Stolis Winner with performance substances were designed to disrupt [economic] relationships" between the Plaintiffs and third parties. Plaintiffs' Original Complaint ¶ 130, at 23. The Supreme Court has instructed:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can

properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

Liberty Lobby, 477 U.S. at 252 (alteration in original)(quoting Schuylkill, 81 U.S. at 448 (emphasis in original)). In light of the record materials, the positive test samples, standing alone and after the Defendants have met their burden of rebutting the prima facie case, are insufficient to permit a reasonable jury to find by a preponderance of the evidence that the Defendants intentionally supplied Stolis Winner with caffeine. See Luna Depo. at 5:5-6. The Luna Depo. does not provide any evidence how Stolis Winner ingested caffeine. See Luna Depo. at 4:6-142:8. Without such evidence, there is not a sound basis -- or any basis -- for the Plaintiffs to move forward on their intentional interference claim. The single fact that the positive test for caffeine in Stolis Winner's urine violated New Mexico Administrative Code § 15.2.6.9(C)(1) is not sufficient, after the Defendants have rebutted the prima facie case, for "reasonable jurors [to] find by a preponderance of the evidence that the plaintiff[s are] entitled to a verdict" on their intentional interference claim. Liberty Lobby, 477 U.S. at 252 (alterations added). Because the Plaintiffs do not satisfy their burden to adduce sufficient evidence that the Defendants improperly intended to interfere with the Plaintiffs' prospective economic relationships, the Defendants are entitled to summary judgment on the Plaintiffs' intentional interference with prospective economic advantage claim.

**B.      THE PLAINTIFFS DO NOT SATISFY THEIR BURDEN TO ADDUCE SUFFICIENT EVIDENCE THAT THE DEFENDANTS IMPROPERLY INTENDED TO INTERFERE WITH THE PLAINTIFFS' PROSPECTIVE ECONOMIC RELATIONSHIPS, BECAUSE NO REASONABLE JURY COULD CONCLUDE FROM THE TRACE AMOUNT OF CAFFEINE DETECTED IN STOLIS WINNER'S URINE THAT THE DEFENDANTS INTENTIONALLY AND IMPROPERLY ADMINISTERED STOLIS WINNER WITH CAFFEINE TO INTERFERE WITH THE PLAINTIFFS' PROSPECTIVE ECONOMIC RELATIONSHIPS.**

There is another reason why the positive caffeine tests are insufficient to defeat summary

judgment.  The positive caffeine tests provide, at most, prima facie evidence that caffeine was administered to Stolis Winner, but the Defendants offer record evidence that they did not administer caffeine the horse.  The Plaintiffs then have the burden to adduce additional and sufficient evidence of administration.  The Plaintiffs have not, however, met their burden to adduce sufficient facts for a reasonable juror to find by a preponderance of the evidence that the Defendants intentionally acted to interfere with any prospective economic relation between the Plaintiffs and a third party.  See Liberty Lobby, 477 U.S. at 252.  The single piece of evidence on which the Plaintiffs rely -- the positive caffeine tests -- are insufficient for a reasonable jury to conclude that the Defendants intentionally administered caffeine to Stolis Winner.  The positive tests, when examined closely, reflect a miniscule amount of caffeine that does not support an inference that the Defendants intentionally administered caffeine to Stolis Winner with a purpose to interfere with the Plaintiffs' economic relationships.

Following the 2008 All American Futurity, blood and urine samples were drawn from all ten horses that had run the race, see Unruh Depo. at 57:14-58:20, and the samples were sent to the Iowa Lab, see Hyde Depo. at 56:20-23.  Among the ten horses that ran the 2008 All American Futurity, at most three horses, including Stolis Winner, provided the blood or urine samples that the Iowa Lab tested.  See Hyde Depo. at 127:20-128:8 (testifying that the Iowa Lab tested samples from only three horses that ran any race at the Ruidoso Downs racetrack on September 1, 2008).   The Iowa Lab determined a positive finding and estimated that there were 125 ng/ml of caffeine in Stolis Winner's urine sample.   See Mueller Letter at 1.  The New Mexico Horsemen's Association also directed the LSU Lab to determine whether the same urine sample contained caffeine.  See Gabaldon Letter at 1.  The LSU Lab confirmed the presence of caffeine in Stolis Winner's urine sample at an estimated concentration of 84.2 ng/ml.  See Barker

Letter at 1; Mueller Letter at 1. These test results are insufficient for a reasonable fact finder to reasonably conclude by a preponderance of the evidence that the Defendants intentionally and improperly administered caffeine to Stolis Winner.

Caffeine is ubiquitous in our environment, and "commonly found in equine feeds and environments." Amit Budhraja, et al., "Caffeine and Theobromine Identifications in Post-Race Urines: Threshold Levels and Regulatory Significance of Such Identifications," 53 <u>Proceedings of the American Association of Equine Practitioners</u> 87-92 (2007)("Budhraja, et al."). Caffeine concentrations in plasma of less than 100 ng/ml, equivalent to approximately 300 ng/ml in urine, are associated with environmental exposure to caffeine and, for that reason, findings of such concentrations are "pharmacologically ineffective and of no forensic interest." Budhraja, et al. at 89. The Budhraja study concludes:

> Caffeine is inextricably associated with the presence of humans. Domestic horses are, therefore, inevitably exposed to varying concentrations of caffeine. Caffeine identifications in horse urines have been associated with a variety of sources, including the feeding of caffeine-containing bee pollen and the inappropriate use of caffeine-containing pH strips. . . . Behavioral data suggests that performance effects require caffeine concentrations of >2000 ng/ml in plasma or 10,000 ng/ml in urine; lesser concentrations are unlikely to be pharmacologically significant.

Budhraja, et al. at 92. Furthermore, according to another published scientific study, human contamination of the equine environment by humans is commonplace. <u>See</u> Steven A. Barker, "Drug Contamination of the Equine Racetrack Environment: a Preliminary Examination," 31 <u>J. Vet. Pharmacol. Therap.</u> 466-471, 470 (2008)("Barker"). According to Barker, caffeine is a common contaminant in stall floor samples taken from a racetrack test barn and water on the backstretch of a sample racetrack. <u>See</u> Barker at 470 ("Caffeine is also a common contaminant in the lagoon water and in 6-of-10 stalls tested."). Barker concludes that the presence of caffeine at racetracks "may be seen as evidence of general contamination of the equine environment by

humans, the major consumers of caffeine, and the careless spreading of this compound in human sweat, saliva or urine and/or the disposal of coffee, colas, tea and the myriad other products that contain the drug." Barker at 470. Moreover, routine post-race testing for caffeine is highly sensitive, and such tests can detect urinary concentrations of caffeine and its metabolites as low as 10 ng/ml. See Budhraja, et al. at 88; Barker at 466 ("[O]ur instrumentation and methods have become so sophisticated and sensitive that we may now be detecting concentrations of drugs in equine urine and/or blood samples that arise from contaminants that may be common to both the human and equine environment, such as caffeine . . . .").

Further, another study conducted by T.M. Dyke and R.A. Sams of the Ohio State University measures caffeine concentrations in horse urine that Dyke and Sams collected after the controlled administration of chocolate-coated peanuts over eight days. See T.M. Dyke & R.A. Sams, "Detection and Determination of Theobromine and Caffeine in Urine after Administration of Chocolate-Coated Peanuts to Horses," 22 J. of Analytical Toxicology 112, 112-16 (1998)("Dyke"). In this study, twenty chocolate-coated peanuts containing a total of 7.3 mg of caffeine were fed daily, for eight days, to three healthy, Standardbred mares, aged 3-5 years and weighing 450-500 kg. See Dyke at 112. To properly understand how much caffeine was administered to these horses, a cup of coffee contains between 95-200 mg of caffeine. See Mayo Clinic Staff, "Caffeine content for coffee, tea, soda and more," http://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/in-depth/caffeine/art-20049372. After chocolate-coated peanuts were administered to the horses for eight days, Dyke and Sams found:

> No behavioral effects were observed after ingestion of chocolate-coated peanuts. . . . Twenty-four hours after the administration of the seventh dose and before the administration of the last dose, apparent caffeine concentrations in urine measured by ELISA [enzyme-linked immunoassay] were between 1.1 and

> 1.6 µg/mL [i.e. 1,100 to 1,600 ng/ml]. These increased to 2.3-5.0 µg/mL [i.e. 2,300 to 5,000 ng/ml approximately 4-6 h[ours] after ingestion of the last dose and decreased to between 50 and 83 ng/mL at 120 h[ours after the last dose].[29]

Dyke at 114. In other words, the amount of caffeine that the Iowa Lab and the LSU Lab measured in Stolis Winner's urine approximately equaled the amount of caffeine that Dyke and Sam measured in horse urine taken from a horse five days after that horse has eaten a handful of chocolate-covered peanuts containing an amount of caffeine less than that in one-tenth of one cup of weak coffee. Compare Barker Letter at 1, with Dyke at 114. The Plaintiffs build their case on that trace amount of caffeine, and they ask this Court to conclude that this measurement is sufficient evidence for a reasonable jury to find that the Defendants intentionally administered Stolis Winner with caffeine to improperly interfere with the Plaintiffs' contractual relations. See Plaintiffs' Response at 6. It is not.

In determining whether to take judicial notice of a fact, the Court may consider medical and scientific reports and journals which the Court deems reliable. See Melong v. Micronesian Claims Comm'n, 643 F.2d at 12 ("Rule 201(b)(2) of the Federal Rules of Evidence . . . is designed to permit judicial recognition of material such as scientific data or historical fact that, although outside the common knowledge of the community, is nevertheless ascertainable with certainty without resort to cumbersome methods of proof."); United States v. Sauls, 981 F. Supp. at 920-21 ("In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable.")(emphasis added)(citation omitted); Bravos v. U.S. Bureau of Land Mgmt., 2011 WL 3924496, at *3

---

[29]There are 1000 nanograms (ng) in one microgram (µg).

("[T]he type of facts which a court will ordinarily take judicial notice are . . . established scientific facts . . . ."). See also McCormick on Evidence § 330, at 605-6 ("[T]he principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. . . . [t]he judge is free to consult any sources that he thinks are reliable . . . ."). Accordingly, in resolving the Defendants' motions for summary judgment, and considering the aforementioned scientific studies, the Court takes judicial knowledge that caffeine concentrations in urine of less than 300 ng/ml are associated with environmental exposure to caffeine. See Budhraja, et al. at 89. Moreover, the Plaintiffs do not dispute the Defendants' factual allegation that, within the horse racing industry, levels of caffeine of 100 ng/ml in blood serum, the approximate equivalent of 300 ng/ml in urine, to be environmental contamination. See Defendants' Negligence MSJ ¶ 10, at 2 (alleging this fact). See also Plaintiffs' Response at 2-4 (not disputing this fact).[30] The Court also judicially notices that caffeine concentrations in urine of less than 300 ng/ml are not associated with performance effects in a horse. See Budhraja et al. at 92 (stating that caffeine concentrations in urine of less than 10,000 ng/ml are not associated with performance effects in a horse); Dyke at 114. The Iowa Lab estimated 125 ng/ml of caffeine in Stolis Winner's urine sample. See Hyde Depo. at 67:19-68:7; Mueller Letter at 1. The LSU lab determined that there was 84.2 ng/ml in Stolis Winner's urine sample. See Barker Letter at 1; Mueller Letter at 1.

---

[30]Caffeine concentrations in amounts of 100 ng/ml in blood serum or plasma approximately equal concentrations in amounts of 300 ng/ml in urine. See Budhraja, et al. at 87 ("plasma caffeine concentrations of <100 ng/ml, [are] equivalent to ~300 ng/ml in urine"); Budhraja, et al. at 90 ("10 ng/ml in plasma . . . is equivalent to ~30 ng/ml in urine"). See also Eugenie W. Greene, et al., "Pharmacology, pharmacokinetics, and behavioral effects of caffeine in horses," 44 Am. J. of Veterinary Res. 57, 59 (1983)("Greene, et al.")("When injected [through IV], caffeine concentrations reached peak within 5 minutes after IV injection of the drug and then decreased slowly. The decreases of plasma and urinary concentrations were parallel, with urinary concentrations being consistently about 3-fold higher than plasma concentrations of the drug.").

These estimated measurements of caffeine with Stolis Winner's urine sample fall within the amount of caffeine in a horse urine sample that is associated with environmental exposure to caffeine and, to a scientific certainty, has no performance effect. See Budhraja et al. at 89, 92. Cf. Siegel v. Dynamic Cooking Sys., Inc., 501 F. App'x at 404 (holding that "[t]aking notice of the relative pressure exerted by propane verses [sic] natural gas" is not an abuse of discretion because the judicial notice was of an "accepted scientific principle"); Helen of Troy, L.P. v. Zotos Corp., 235 F.R.D. at 640 (taking notice that urea was an acid having a very low pH in deciding a bottler seller's summary judgment motion in buyer's suit to recover for leaks of its hair care products, because the fact was not subject to reasonable dispute in that it was capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned); Rahman v. Taylor, 2011 WL 4386733, at *7 (taking "judicial notice that as many as ten weeks may be required to display a positive reaction to tuberculin skin testing after exposure and infection," because the court was able to verify that fact on a Center for Disease Control website).

Moreover, there were myriad opportunities by which Stolis Winner was exposed to caffeine in the environment simply by being exposed to the presence of humans under circumstances in which there was no control against the commonplace exposure to caffeine in the environment. See generally Barker at 470 (concluding that caffeine is a common contaminant in racetrack environments). Immediately before and after the race, many people were in close proximity to Stolis Winner under circumstances that did not control for ambient caffeine contamination. See Taylor Depo. at 181:11-25.

> A. . . . To pet the horse if it's standing there or something I don't think is a prohibited activity, but usually the horse is walking or getting ready to run.

Q.  In the day of the running of the All American, how many owners usually appear -- at least in 2008 how many owners that you're aware of appeared in the paddock before the race?

A.  Oh, countless.  It's like opening the gate at a rock concert.  You don't have to have pass credentials or any credentials in order to get in the infield of a racetrack. So it was just -- you couldn't hardly walk, basically.

Taylor Depo. at 181:13-25 (Taylor, Blackburn).

In sum, rule 56(c) record materials and judicially-cognizable facts provide a context in which to evaluate the Luna Depo that Stolis Winner's urine produced "a caffeine positive." Luna Depo. at 5:5-6.  The Iowa Lab estimated 125 ng/ml in Stolis Winner's urine sample, see Hyde Depo. at 67:19-68:7; Mueller Letter at 1, and the LSU lab determined that there was 84.2 ng/ml in Stolis Winner's urine sample, see Barker Letter at 1; Mueller Letter at 1.  Each measurement is significantly less than the 300 ng/ml mark, under which the presence of caffeine, is associated with environmental exposure and has no performance effect.  See Budhraja et al., supra at 89, 92; Baker, supra at 470.  There were myriad circumstances leading up to the race by which Stolis Winner could have been exposed to the ambient presence of low concentrations of caffeine that resulted in the horse's urine.  See, e.g., Taylor Depo. at 181:13-25 (Taylor, Blackburn).

The Plaintiffs allege that the Defendants caused the presence of caffeine in Stolis Winner's urine sample by intentionally administering caffeine to Stolis Winner to disrupt economic relationships between the Plaintiffs and third parties.  See Plaintiffs' Original Complaint ¶ 130, at 23.  To be sure, how Stolis Winner came to have between 125 ng/ml and 84.2 ng/ml of caffeine in his urine at the time of the race is a question of fact; however, this question of fact does not defeat summary judgment for the Defendants on the Plaintiffs' claim for intentional interference with prospective economic relations.   The Plaintiffs have not offered

any evidence, apart from the positive test for caffeine, to support their allegation that the Defendants intentionally administered caffeine to Stolis Winner, much less with a purpose to interfere with some economic relationship between the Plaintiffs and a third party.  Nor have the Plaintiffs offered any expert testimony -- or any other record evidence -- that suggests that the trace amount of caffeine in Stolis Winner's urine is either not attributable to environmental contamination or associated with any effects on Stolis Winner's performance at the 2008 All American Futurity.  See Plaintiffs' Response at 2-20; Plaintiffs' Motion at 1-27.  Nor do the Plaintiffs advert to any scientific studies that suggest caffeine concentrations of 125 ng/ml or less are either not associated with environmental contamination or associated with performance effects in a horse.  The Court, in its review, did not find any conflicting scientific evidence. Furthermore, the urine of other horses that ran the 2008 All American Futurity was not tested for the presence of caffeine, see Hyde Depo. at 127:20-128:8, and the absence of such control variables undermines the ability of a reasonable jury to find that causes separate from environmental contamination were responsible for the low concentration of caffeine in Stolis Winner's urine.

In light of the record materials and judicially-cognizable facts supporting the Defendants' position that environmental contamination caused the low concentration of caffeine in Stolis Winner's urine, the positive test alone, without other evidence, does not amount to even a "scintilla" of support for the Plaintiffs' allegation and is insufficient evidence for a jury to "'properly proceed to find a verdict for the party producing it.'"  Liberty Lobby, 477 U.S. at 252 (alteration in original)(quoting Schuylkill, 81 U.S. at 448).  Accordingly, the Plaintiffs do not defeat the Defendants' motion for summary judgment on the Plaintiffs' intentional interference

with prospective economic relations by adverting to the Luna Depo. and the positive caffeine tests that the deposition testimony referenced.

## II.    THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIM FOR FRAUD.

In New Mexico, "[a] successful fraud claim must prove a misrepresentation of fact, known by the maker to be untrue, made with the intent to deceive and to induce the other party to act upon it, and upon which the other party relies to his detriment." Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 1991-NMSC-097, ¶ 15, 820 P.2d 1323, 1328. The Defendants move for summary judgment on the Plaintiffs' fraud claim, arguing that the Plaintiffs have not proffered sufficient evidence on any element of their fraud claim to withstand a ruling of summary judgment against that claim. See Defendants' Fraud MSJ at 5-7. First, the Defendants argue that the "Plaintiffs lack clear and convincing evidence of any misrepresentation by Defendants." Defendants' Fraud MSJ at 5. Second, the Defendants argue that, even if entering Stolis Winner in the 2008 All American Futurity amounted to the Defendants' representation that Stolis Winner was neither in violation of the race rules nor improperly trained, the Plaintiffs have not adduced "sufficient evidence to show such a representation would be false." Defendants' Fraud MSJ at 5-6. Third, the Defendants contend that the Plaintiffs have not adduced sufficient evidence "of knowledge or recklessness on the part of the Defendants as to the alleged presence of caffeine in Stolis Winner," or of the Defendants' intent to deceive. Defendants' Fraud MSJ at 6.

In their Original Complaint, the Plaintiffs allege that the Defendants knowingly or recklessly made false representations "that Stolis Winner had been trained in compliance with New Mexico Racing Commission Rules," and that "Stolis Winner was not under the influence of substances prohibited by New Mexico Racing Commission Rules." Plaintiffs' Original

Complaint ¶¶ 135-36, at 24. The Defendants respond that they did not knowingly make any untrue representation that Stolis Winner was not under the influence of caffeine, <u>see</u> Defendants' Fraud MSJ at 6, and support that contention by adverting to record materials which indicate that the Defendants "did not knowingly or intentionally provide Stolis Winner with caffeine and did not instruct anyone acting on [their] behalf to provide Stolis Winner with caffeine and ha[ve] no knowledge as to ingestion of caffeine by Stolis Winner," Defendants' Fraud MSJ ¶¶ 14-16, at 3 (citing Taylor's First Answers at 3; J. Windham's First Answers at 3-4; P. Windham's First Answers at 3). <u>See</u> P. Windham Aff. ¶ 5, at 1. Throughout their motions, the Defendants repeatedly point to record materials stating that they did not knowingly or intentionally provide Stolis Winner with caffeine and did not instruct anyone acting on their behalf to do so, <u>see</u>, <u>e.g.</u>, Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶¶ 10-12, at 2-3; Defendants' Fraud MSJ ¶¶ 14-16, at 3, and, although the Plaintiffs might contest the materiality of the Defendants' factual assertion, they do not specifically dispute it, <u>see</u> Plaintiffs' Response at 2-4 (not disputing this fact).

Instead, the Plaintiffs counter the Defendants' argument and supporting record evidence by insisting that the positive tests for caffeine in Stolis Winner's urine create a factual question whether Taylor intended to deceive the Plaintiffs regarding whether Stolis Winner's training complied with the Racing Commission's rules. <u>See</u> Plaintiffs' Response at 9, 14. The Plaintiffs argue that summary judgment against their fraud claim is inappropriate, because "[t]he material facts at issue for this claim are whether Stolis Winner was improperly under the influence of caffeine and whether Defendants intentionally or knowingly provided Stolis Winner with caffeine." Plaintiffs' Response at 14-15. The two positive tests for caffeine in Stolis Winner's urine are the principal evidence that the Plaintiffs adduce to support their allegation that the

Defendants <u>knowingly</u> made a false representation that Stolis Winner was free from substances that the Racing Commission proscribes.  <u>See</u> Plaintiffs Response at 9-12.  The two positive tests, however, detected an amount of caffeine in Stolis Winner's urine that the relevant scientific community ascribes to environmental contamination and does not associate with any performance effect in a horse.  <u>See</u> Budhraja, et al. at 89, 92; Dyke at 114.  Consequently, the positive tests do not reflect, even at best, a "scintilla" of evidence that the Defendants' <u>knew</u> of the falsity of any representation on their part that Stolis Winner was entirely free of caffeine was false.  <u>Liberty Lobby</u>, 477 U.S. at 252 (alteration in original)(citing <u>Schuylkill</u>, 81 U.S. at 448).  While the Court agrees with the Plaintiffs that the entry of Stolis Winner into the 2008 All American Futurity amounted to the Defendants' representation that Stolis Winner was not administered caffeine, the two test results reflecting trace amounts of caffeine are insufficient for a reasonable jury to conclude that the any of the Defendants knew that Stolis Winner had ingested caffeine and, consequently, knowingly made a false misrepresentation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 252 (citing <u>Schuylkill</u>, 81 U.S. at 448).

Moreover, the Plaintiffs fail to proffer any additional record evidence that J. Windham or P. Windham intended to deceive the Plaintiffs or that the Defendants' <u>relied</u> on any misrepresentation of the Defendant to the Plaintiffs' detriment, and both showings are necessary to the Plaintiffs' fraud claim.  <u>See</u> <u>Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.</u>, 1991-NMSC-097, ¶ 15, 820 P.2d at 1328.  A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  <u>Colony Nat'l Ins. Co. v. Omer</u>, 2008 WL 2309005, at *1 (citing <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d at 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' fraud claim.

## III. THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIM FOR PRIMA FACIE TORT.

In New Mexico, prima facie tort consists of four elements: (i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act. See Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 10, 945 P.2d at 995. Once a plaintiff establishes intent to injure, the trial court must balance the defendant's act or acts against the justification for the act or acts, and the severity of the injury, weighing the following factors: (i) the nature and seriousness of the harm to the plaintiff; (ii) the fairness or unfairness of the means used by the defendant; (iii) the defendant's motive or motives; and (iv) the value to defendant or to society in general of the interests that the defendant's conduct advances. See Beavers v. Johnson Controls World Services, Inc., 1995-NMCA-070, ¶¶ 18-36, 901 P.2d at 766-769. See also Mosley v. Titus, 762 F. Supp. 2d at 1332-33. The Defendants move for summary judgment on Plaintiffs' prima facie tort claim, arguing that the Plaintiffs have not proffered sufficient evidence to establish the first element of prima facie tort -- the commission of a lawful act with the intention to injure the Plaintiffs. See Defendants' Prima Facie Tort MSJ at 4-5. The Defendants argue that the Plaintiffs have not adduced sufficient evidence that the Defendants improperly trained Stolis Winner.[31] See Defendants' Prima Facie Tort MSJ at 4-5.

---

[31]When ruling on the Defendants' motion to dismiss, the Court rejected the Defendants' argument that the Plaintiffs failed to state a claim for prospective economic loss or prima facie tort, because "the Supreme Court of New Mexico would hold that the Complaint states a valid claim for intentional interference with prospective contractual relations and a valid claim for prima facie tort to the extent the prima facie tort claim is premised on the intentional act of improperly training Stolis Winner." Simon v. Taylor, 2013 WL 5934420, at *27. The Court concluded, however, that,

> to the extent the Plaintiffs' prima facie tort claim is premised on the intentional
> act of providing Stolis Winner with a performance enhancing substance, the

The Defendants state that the Plaintiffs offer only the positive caffeine test as evidence that the Defendants' improperly trained Stolis Winner. See Defendants' Prima Facie Tort MSJ at 3. The Defendants further contend that the undisputed material facts show that the Defendants did not intentionally administer caffeine to Stolis Winner. See Defendants' Prima Facie Tort MSJ at 5.

In the Plaintiffs' Response, the Plaintiffs counter that "[t]here is no question that Stolis Winner's inclusion with the knowledge of his caffeine treatment was intended to injure Plaintiffs and the other sponsors of horses in the race." Plaintiffs' Response at 15. The Plaintiffs argue, in the alternative, that, even "if Defendants did not intentionally provide Stolis Winner with the illegal substance, the fact remains that the substance was, indeed, in the horse's system." Plaintiffs' Response at 16. The Plaintiffs contend, therefore, that the Defendants committed some "act that [caused] the illegal presence of a banned substance" in Stolis Winner. Plaintiffs' Response at 16. The Plaintiffs conclude that there is a disputed question of material fact regarding the Defendants' intent in committing that act. See Plaintiffs' Response at 16.

In the Defendants' Prima Facie Tort MSJ, the Defendants point to record evidence indicating that the Defendants "did not knowingly or intentionally provide Stolis Winner with caffeine and did not instruct anyone acting on [their] behalf to provide Stolis Winner with caffeine and [have] no knowledge as to the ingestion of caffeine by Stolis Winner." Plaintiffs Prima Facie Tort MSJ at 2-3 (alterations added)(citing Taylor's First Answers at 3; J. Windham's First Answers at 3-4; P. Windham's First Answers at 3). See P. Windham Aff. ¶ 5, at 1. Throughout their motions, the Defendants repeatedly point to record materials stating that

---

Supreme Court of New Mexico would hold that that claim does not satisfy the first element of prima facie tort, because that element requires the commission of an intentional lawful act.

Simon v. Taylor, 2013 WL 5934420, at *27 (emphasis original).

they did not knowingly or intentionally provide Stolis Winner with caffeine and did not instruct anyone acting on their behalf to do so, <u>see</u>, <u>e.g.</u>, Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶¶ 10-12, at 2-3; Defendants' Fraud MSJ ¶¶ 14-16, at 3, and, although the Plaintiffs might contest the materiality of the Defendants' factual assertion, they do not specifically dispute it, <u>see</u> Plaintiffs' Response at 2-4 (not disputing this fact).

Instead, the Plaintiffs counter the Defendants' argument and supporting record evidence by insisting that the positive tests for caffeine in Stolis Winner's urine create a factual question whether the Defendants commissioned an intentional act to injure the Plaintiffs. <u>See</u> Plaintiffs' Response at 16. The two positive tests for caffeine in Stolis Winner's urine are the principal evidence that the Plaintiffs adduce in support of the first element of their prima facie tort claim. <u>See</u> Plaintiffs' Response at 15-16. That evidence is insufficient, however, for a jury to conclude by a preponderance of the evidence that the Defendants commissioned some intentional lawful act to injury the plaintiffs.

First, at the motion-to-dismiss juncture in this litigation, the Court held that the Plaintiffs cannot support their prima facie tort claim with evidence that the Defendants intentionally administered a performance enhancing substance, including caffeine, to Stolis Winner, because the first element of prima facie tort "requires the commission of an intentional <u>lawful</u> act." <u>Simon v. Taylor</u>, 2013 WL 5934420, at *27 (emphasis original). The Plaintiffs' only remaining argument, therefore, must be that the two positive caffeine tests constitute sufficient evidence that Defendants lawfully but improperly trained Stolis Winner with the intent to injure the Plaintiffs. <u>See</u> Plaintiffs' Response at 16. <u>See also</u> <u>Simon v. Taylor</u>, 2013 WL 5934420, at *27. The Plaintiffs do not, however, even state which hypothesized act of lawful but improper training they might have in mind. <u>See</u> Plaintiffs' Response at 16. Moreover, the positive caffeine tests

are insufficient evidence that the Defendants intentionally and improperly trained, with a purpose to injure the Plaintiffs, because the two positive tests detected an amount of caffeine in Stolis Winner's urine that the relevant scientific community ascribes to environmental contamination and does not associate with any performance effect in a horse. See Budhraja, et al. at 89, 92; Dyke at 114. Consequently, the positive tests do not reflect, even at best, a "scintilla" of evidence that the Defendants' intentionally acted to train Stolis Winner improperly with an unjustifiable purpose to injure the Plaintiffs. Liberty Lobby, 477 U.S. at 252 (alteration in original)(citing Schuylkill, 81 U.S. at 448). The two test results reflecting trace amounts of caffeine are insufficient for a reasonable jury to conclude by a preponderance of the evidence that the Defendants intentionally but improperly trained Stolis Winner with a purpose to harm the Plaintiffs. See Liberty Lobby, 477 U.S. at 252. The Plaintiffs fail to proffer any other evidence of a lawful, intentional, and improper act constituting prima facie tort, and a party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' prima facie tort claim.

## IV.      THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' NEGLIGENCE CLAIM.

In New Mexico, a negligence claim requires the existence of a duty that a defendant owes to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach must be both a cause-in-fact and proximate cause of the plaintiff's injury. See Herrera, 2003-NMSC-018, ¶ 6, 73 P.3d at 185-86. "[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a

reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (internal quotation marks and citation omitted).

The Defendants move for summary judgment on the Plaintiffs' negligence claim, advancing three primary arguments. First, the Defendants argue that, under New Mexico tort law, they do not "have a duty to prevent the presence of caffeine below accepted contamination levels." Defendants' Negligence MSJ at 5. The Defendants assert that public policy prevents the recognition of a duty in tort law to prevent against a level of caffeine associated with environmental contamination. See Defendants' Negligence MSJ at 5. Second, the Defendants contend that the Plaintiffs have introduced insufficient evidence that the Defendants breached any duty that the Defendants owed to the Plaintiffs. See Defendants' Negligence MSJ at 5-6. The Defendants assert that the only duty they owed to the Plaintiffs was not to purposefully administer caffeine to Stolis Winner, and the Defendants allege that the Plaintiffs do not adduce sufficient evidence to establish that the Defendants intentionally administered caffeine to the horse. See Defendants' Negligence MSJ at 6. Third, the Defendants argue that the Plaintiffs proffer insufficient evidence that the "tiny amount of caffeine alleged to be in" Stolis Winner's urine samples caused the Plaintiffs' damages. Defendants' Negligence MSJ at 7. The Defendants contend that the Plaintiffs have no evidence to support a finding of causation, and "their negligence claim fails for lack of proof." Defendants' Negligence MSJ at 7.

The Plaintiffs counter that the Defendants had a duty, which the rules of the New Mexico Racing Commission reflect, to ensure that Stolis Winner was free of prohibited substances. See Plaintiffs' Response at 17. The Plaintiffs state that the rules of racing include a zero-tolerance rule for the presence of caffeine in a horse. See Plaintiffs' Response at 17 (citing Videotaped

Deposition of Rosemary Leeder at 59:5-6 (taken July 16, 2009), filed January 4, 2017 (Doc. 143-8)("Leeder Depo.")(stating that caffeine is not an acceptable substance in a horse at any level). The Plaintiffs assert that the Defendants "breached their duty when their horse had caffeine in its system, as was shown unequivocally by the two test samples." Plaintiffs' Response at 17. The Plaintiffs also argue that there is a fact question regarding causation, asserting that the "Plaintiffs' horse would have placed First but for Defendants' breach of duty." Plaintiffs' Response at 19. The Plaintiffs conclude, therefore, that summary judgment in the Defendants' favor is inappropriate, because a reasonable factfinder could conclude that, but for the Defendants' negligence, the Plaintiffs' "horse would have won the race." Plaintiffs' Response at 19. The Plaintiffs also allege that it is "only speculation that any contamination occurred" and cite the Unruh Depo. that there was no contamination of the urine samples when they were taken in the testing barn. See Plaintiffs' Response at 18 (citing Unruh Depo. at 29:16-25; Unruh Depo. at 32:25-33:9). The Plaintiffs then argue in the alternative that, "even if environmental contamination were relevant, the question of contamination would be a fact question for the jury rendering summary judgment inappropriate for the negligence claim." Plaintiffs' Response at 19.

At the hearing, the Plaintiffs argued that their negligence claim is an attempt to "enforce the New Mexico racing rules . . . ." Tr. at 50:3-51:9 (Dunn). New Mexico has long adopted the doctrine of negligence per se. See Heath, 2008-NMSC-017, ¶ 7, 180 P.3d at 666; Melkusch v. Victor Am. Fuel Co., 1916-NMSC-007, ¶ 8, 155 P. 727, 729. Under the doctrine of negligence per se, the violation of a duty that an administrative regulation imposes is evidence of a defendant's breach of the standard of care in a common law negligence action. See Heath, 2008-NMSC-017, ¶¶ 7-9, 14, 19, 22, 180 P.3d at 666-670 (holding that a negligence per se jury

instruction was inappropriate). See also Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d at 1208 (D.N.M. 2009)(Browning, J.)("In negligence per se, violation of a separate legal duty is evidence of negligence . . . ."); Prosser and Keeton on Torts § 36, at 220-231; Restatement (Second) on Torts § 286. The Supreme Court of New Mexico "appl[ies] a four-part test to determine whether a negligence per se instruction is appropriate in a given case." Heath, 2008-NMSC-017, ¶ 7, 180 P.3d at 666. According to that test,

> "(1) [t]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent."

Heath, 2008-NMSC-017, ¶ 7, 180 P.3d at 666 (alteration added)(quoting Archibeque v. Homrich, 1975-NMSC-066, ¶ 15, 543 P.2d 820, 825). Furthermore, a negligence per se instruction may be predicated on a violation of an administrative regulation. See Heath, 2008-NMSC-017, ¶ 22, 180 P.3d at 670 (explaining that "when a statute, ordinance, or regulatory provision sets forth a standard of care that is different from the common law . . . [that] standard serves to supplement the common law standard, and the jury may be instructed on negligence per se").

Under the Uniform Classification Guidelines for Foreign Substances and Recommended Penalties and Model Rule, caffeine is classified as a Drug Class 2 substance and a Penalty Class B substance. See Uniform Classification Guidelines for Foreign Substances and Recommended Penalties and Model Rule at 2. New Mexico Administrative Code § 15.2.6.9(B)(2) recommends penalties against a licensed owner and a licensed trainer "for violations due to the presence of a drug carrying a category B penalty and for the presence of more than one [non-steroidal anti-inflammatory drug] in a plasma or serum sample . . . ." N.M. Admin. Code § 15.2.6.9(B)(2).

For the first offense of a licensed trainer, New Mexico Administrative Code § 15.2.6.9(B)(2) recommends "[a] minimum 15-day suspension absent mitigating circumstances or the presence of aggravating factors could be used to impose a maximum 60-day suspension [and a] minimum fine of $500 absent mitigating circumstances or the presence of aggravating factors . . . ." N.M. Admin. Code § 15.2.6.9(B)(2)(alterations added). For the first offense of a licensed owner, New Mexico Administrative Code § 15.2.6.9(B)(2) recommends "[d]isqualification, loss of purse (in the absence of mitigating circumstances), and [the] horse must pass a commission-approved examination before becoming eligible to be entered." N.M. Admin. Code § 15.2.6.9(B)(2)(alterations added).

New Mexico Administrative Code § 15.2.6.9 also includes provisions related to "environmental contaminants and substances of human use," N.M. Admin. Code § 15.2.6.9(L), and states that "[s]ubstances of human use and addiction . . . may be found in the horse due to its close association with humans," N.M. Admin. Code § 15.2.6.9(L)(2). New Mexico Administrative Code § 15.2.6.9(L) lists caffeine as an environmental contaminant. <u>See</u> N.M. Admin. Code § 15.2.6.9(L)(3)(c). The Plaintiffs suggest that the administrative regulations impose a duty on Defendants to ensure against the presence of caffeine in a horse, at any amount. <u>See</u> Plaintiffs' Response at 17 (citing Leeder Depo. at 59:5-6)(arguing that the administrative regulations impose a "strict liability zero-tolerance rule"). N.M. Admin. Code § 15.2.6.9(L)(3)(c), however, provides that "[d]isciplinary action shall only be taken if test sample results exceed the regulatory threshold," which, for caffeine, is "100 nanograms per milliliter of plasma or serum." N.M. Admin. Code § 15.2.6.9(L)(3)(c). Moreover, New Mexico Administrative Code § 15.2.6.9 states that "[a]ny threshold herein incorporated by reference by inclusion in one of the documents above shall not supersede any threshold or restriction adopted

by the commission as specified by this section." N.M. Admin. Code § 15.2.6.9. Based on New Mexico Administrative Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L), the Court cannot conclude, as the Defendants' suggest, that the administrative regulations impose a duty, cognizable in tort law, on the Defendants to guard against the presence of caffeine in a racehorse, at any amount. See N.M. Admin. Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L)(3)(c).

For a duty that an administrative regulation imposes to be evidence of a duty of reasonable care imposed by negligence at common law, the Supreme Court of New Mexico requires that the regulation "prescribe[] certain actions or defines a standard of conduct, either explicitly or implicitly . . . ." Heath, 2008-NMSC-017, ¶ 7, 180 P.3d at 666 (alteration added)(quoting Archibeque v. Homrich, 1975-NMSC-066, ¶ 15, 543 P.2d at 825). The New Mexico Administrative Code defines a standard of conduct for licensed owners and trainers of racehorses relating to the presence of caffeine in a horse. See N.M. Admin. Code §§ 15.2.6.9(B)(2) & 15.2.6.9(L). Taken together, the New Mexico Administrative Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L) reflect a duty of licensed owners and trainers to take reasonable care to ensure that horses are free of caffeine concentrations at levels greater than 100 ng/ml in blood serum or plasma. See N.M. Admin. Code §§ 15.2.6.9(B)(2) & 15.2.6.9(L). See also N.M. Admin. Code §§ 15.2.6.9 ("Any threshold herein incorporated by reference by inclusion in one of the documents above shall not supersede any threshold or restriction adopted by the commission as specified by this section."). The Court takes judicial knowledge that caffeine concentrations in amounts of 100 ng/ml in blood serum or plasma approximately equal concentrations in amounts of 300 ng/ml in urine. See Budhraja, et al. at 87 ("[P]lasma caffeine concentrations of <100 ng/ml, [are] equivalent to ~300 ng/ml in urine."); Budhraja, et al. at 90 ("10 ng/ml in plasma . . . is equivalent to ~30 ng/ml in urine."). See also Greene, et al. at 59

("When injected [through IV], caffeine concentrations reached peak within 5 minutes after IV injection of the drug and then decreased slowly. The decreases of plasma and urinary concentrations were parallel, with urinary concentrations being consistently about 3-fold higher than plasma concentrations of the drug.").[32] Accordingly, the New Mexico Administrative Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L) reflect a duty of licensed owners and trainers to take reasonable care to ensure that horses are free of caffeine concentrations at levels greater than 300 ng/ml in urine. See Heath, 2008-NMSC-017, ¶ 7, 180 P.3d at 666 (concluding a regulation "prescribe[] certain actions or defines a standard of conduct, either explicitly or implicitly . . . .")(alteration added)(quoting Archibeque v. Homrich, 1975-NMSC-066, ¶ 15, 543 P.2d at 825).

The Plaintiffs rely on the two positive caffeine tests to demonstrate a breach of the standard of care that the administrative regulations impose. See Plaintiffs' Response at 17

_____

[32]Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). See Leon v. Fedex Ground Package Sys., Inc., 163 F. Supp. 3d 1050, 1066 (D.N.M. 2016)(Browning, J.). In determining whether to take judicial notice of a fact, the Court may consider medical and scientific reports and journals among the sources which the Court deems reliable. See Melong v. Micronesian Claims Comm'n, 643 F.2d at 12 ("Rule 201(b)(2) of the Federal Rules of Evidence . . . is designed to permit judicial recognition of material such as scientific data or historical fact that, although outside the common knowledge of the community, is nevertheless ascertainable with certainty without resort to cumbersome methods of proof."); United States v. Sauls, 981 F. Supp. at 920-21 ("In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable.")(emphasis added)(citation omitted); Bravos v. U.S. Bureau of Land Mgmt., 2011 WL 3924496, at *3 ("[T]he type of facts which a court will ordinarily take judicial notice are . . . established scientific facts . . . ."). See also McCormick on Evidence § 330, at 605-6 ("[T]he principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. . . . [T]he judge is free to consult any sources that he thinks are reliable . . . .").

("Defendants breached their duty when their horse had caffeine in its system, as was shown unequivocally by the two test samples."). A reasonable jury could not conclude by a preponderance of the evidence, however, that these two test results establish a breach of the standard of care. The Iowa Lab estimated that there were 125 ng/ml of caffeine in Stolis Winner's urine sample, see Mueller Letter at 1, and the LSU Lab confirmed the presence of caffeine in Stolis Winner's urine sample at an estimated concentration of 84.2 ng/ml, see Barker Letter at 1; Mueller Letter at 1. New Mexico administrative regulations reflect the Defendants' duty to prevent against the presence of caffeine in a racehorse at concentrations of 100 ng/ml in blood serum or plasma (approximately equal to 300 ng/ml in urine). The caffeine concentrations that the Iowa Lab and the LSU Lab estimated in Stolis Winner's urine sample are each less than that amount. Consequently, the positive tests for caffeine do not constitute sufficient evidence of breach to defeat the Defendants' motion for summary judgment.

Even if the Defendants breached the standard of care that New Mexico Administrative Code §§ 15.2.6.9(B)(2) and 15.2.6.9(L) reflect, the Plaintiffs have not adduced sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that the trace amount of caffeine found in Stolis Winner's urine caused the Plaintiffs' any injury. Under the doctrine of negligence per se, although a violation of a legal duty imposed by a statute or regulation is conclusive of duty and breach, it is not necessarily conclusive of causation. See Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d 1200, 1208 (D.N.M. 2009)(Browning, J.)("In negligence per se, violation of a separate legal duty is evidence of negligence, but not conclusive of negligence. . . . The violation of the traffic law -- running the red light -- is generally conclusive that the driver was negligent, although the violation is not conclusive of causation.")(alteration added)(citing Pack v. Read, 1966-NMSC-216, ¶ 9, 419 P.2d 453, 455).

See also Williams v. Neff, 1958-NMSC-071, ¶ 4, 326 P.2d 1073, 1074 ("We may assume for the moment, however, that he violated traffic regulations, but that alone did not discharge the burden resting upon appellant to prove that such negligence proximately contributed to cause the injury."). As to causation, the Plaintiffs argue that, but for the presence of caffeine in Stolis Winner, Jet Black Patriot would have won the 2008 All American Futurity. See Plaintiffs' Response at 19 ("There is, at minimum, a high probability that Plaintiffs' horse would have won the race. Plaintiffs' horse would have placed First but for Defendants' breach of duty."). The Plaintiffs proffer only the two positive test samples to prove that any putative breach by the Defendants' caused the Plaintiffs' injury. See Plaintiffs' Response at 16-17, 19. The amount of caffeine that the Iowa Lab and the LSU Lab estimated to be Stolis Winner's urine -- 125 ng/ml and 84.2 ng/ml, respectively -- approximately equaled the amount of caffeine that results in horse urine five days after that horse has eaten a handful of chocolate-covered peanuts containing an amount of caffeine less than that in one-tenth of one cup of weak coffee. Compare Barker Letter at 1, with Dyke at 114. The Plaintiffs build their case on that trace amount of caffeine, and they ask the Court to conclude that this measurement is sufficient evidence for a reasonable jury to reasonably find that, but for this amount of caffeine in Stolis Winner's system, Jet Black Patriot would have won the race. See Plaintiffs' Response at 19. The relevant scientific community does not associate, however, the amount of caffeine that the Iowa Lab and the LSU Lab estimated to be Stolis Winner's urine with any performance effect in a horse. See Budhraja, et al. at 89 ("If the concentration is <100 ng/ml in plasma or 300 ng/ml in urine, the finding is pharmacologically ineffective and of no forensic interest . . . ."); Budhraja, et al. at 92 ("Behavioral data suggests that performance effects require caffeine concentrations of >2000 ng/ml in plasma or 10,000 ng/ml in urine; lesser concentrations are unlikely to be

pharmacologically significant.").[33]  A reasonable jury could not conclude by a preponderance of the evidence that the two test results establish that the presence of caffeine in Stolis Winner's system caused Jet Black Patriot to not finish in first place at the 2008 All American Futurity.  Cf. Youst v. Longo, 729 P.2d at 730 ("It is a well-settled general tort principle that interference with the chance of winning a contest, such as the horserace at issue here, usually presents a situation too uncertain upon which to base tort liability.")(emphasis in original).

> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of

---

[33]In determining whether to take judicial notice of a fact, the Court may consider medical and scientific reports and journals among the sources which the Court deems reliable.  See Melong v. Micronesian Claims Comm'n, 643 F.2d at 12 ("Rule 201(b)(2) of the Federal Rules of Evidence . . . is designed to permit judicial recognition of material such as scientific data or historical fact that, although outside the common knowledge of the community, is nevertheless ascertainable with certainty without resort to cumbersome methods of proof."); United States v. Sauls, 981 F. Supp. at 920-21 ("In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable.")(emphasis added)(citation omitted); Bravos v. U.S. Bureau of Land Mgmt., 2011 WL 3924496, at *3 ("[T]he type of facts which a court will ordinarily take judicial notice are . . . established scientific facts . . . .").  See also McCormick on Evidence § 330, at 605-6 ("[T]he principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. . . . [T]he judge is free to consult any sources that he thinks are reliable . . . .").  Cf. Siegel v. Dynamic Cooking Sys., Inc., 501 F. App'x at 404 ((holding that "[t]aking notice of the relative pressure exerted by propane verses natural gas" is not an abuse of discretion because the judicial notice was of an "accepted scientific principle"); Helen of Troy, L.P. v. Zotos Corp., 235 F.R.D. at 640 (taking notice that urea was an acid having a very low pH in deciding a bottler seller's summary judgment motion in buyer's suit to recover for leaks of its hair care products, because the fact was not subject to reasonable dispute in that it was capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned); Rahman v. Taylor, 2011 WL 4386733, at *7 (taking "judicial notice that as many as ten weeks may be required to display a positive reaction to tuberculin skin testing after exposure and infection," because the court was able to verify that fact on a Center for Disease Control website).

> the plaintiff's position will be insufficient; there must be evidence on which the
> jury could reasonably find for the plaintiff.

Liberty Lobby, 477 U.S. at 252. There is no such evidence on this record. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Liberty Lobby, 477 U.S. at 249. The two positive caffeine tests showing that trace amounts of caffeine were present in Stolis Winner's urine -- amounts which the relevant scientific community and the New Mexico Racing Commission ascribe to environmental contamination, see N.M. Admin. Code § 15.2.6.9(L)(3)(c); Budhraja, et al. at 89, 92; Dyke at 114 -- are insufficient for a reasonable jury to return a verdict for the Plaintiffs. See Celotex, 322 U.S. at 323 ("[T]here can be 'no genuine issue of material fact,' [where] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.")(quoting Fed. R. Civ. P. 56(c)).

Furthermore, the Plaintiffs cannot ground their argument for causation on their contention that the Racing Commission should have reordered the purse in response to the positive caffeine tests. At the hearing, the Plaintiffs argued that they are entitled to summary judgment, because the positive caffeine samples violated the Racing Commission's rules "and that reordering of the purse was necessary." Tr. at 7:20 (Dunn). See N.M. Admin. Code § 15.2.6.9(B)(2)(recommending, for "the presence of a drug carrying a category B penalty," that a licensed owner suffer a penalty of "[d]isqualification [and] loss of purse")(alterations added). In response to the Court's inquiry regarding to which claim the Plaintiffs' direct their argument, the Plaintiffs suggested this argument supported their negligence claim. See Tr. at 8:1-12 (Court, Dunn). This argument does not convince the Court.

The Plaintiffs cannot establish that, because of the positive caffeine tests, the Racing Commission should have disqualified Stolis Winner and reordered the purse. The New Mexico

Administrative Code § 15.2.6.9(L)(3)(c) states that, with respect to caffeine, "[d]iscplinary action shall only be taken if test sample results exceed . . . 100 nanograms per milliliter of plasma or serum [the approximate equivalent of 300 ng/ml in urine]." N.M. Admin. Code § 15.2.6.9(L)(3)(c). See Budhraja, et al. at 87; Budhraja, et al. at 90; Green, et al. at 59. In light of this regulation, the Plaintiffs cannot demonstrate by a preponderance of the evidence that the test results in this case should have caused the Racing Commission to order a disqualification and reordering of the purse pursuant to New Mexico Administrative Code § 15.2.6.9(B)(2). Again, the Iowa Lab and the LSU Lab estimated the presence of caffeine in Stolis Winner's urine at concentrations of 125 ng/ml and 84.2 ng/ml, respectively. See Barker Letter at 1; Mueller Letter at 1. These amounts are less than the threshold for disciplinary action that the New Mexico Administrative Code § 15.2.6.9(L)(3)(c) provides. See N.M. Admin. Code § 15.2.6.9(L)(3)(c). Accordingly, with respect to Taylor, the Racing Commission did not impose a penalty based on the two positive caffeine test results. See Hearing Officer Panel Report at 21. The positive test results alone are insufficient evidence to establish either the breach or the causation element of the Plaintiffs' negligence claim, and, consequently, are insufficient evidence for a jury to "'properly proceed to find a verdict for the party producing it.'" Liberty Lobby, 477 U.S. at 252 (alteration in original)(quoting Schuylkill, 81 U.S. at 448). The Plaintiffs cannot properly defeat the Defendants' motion for summary judgment on the Plaintiffs' negligence claim, because the positive test samples, do not amount even to "a scintilla of evidence in support of the [Plaintiffs'] position." Liberty Lobby, 477 U.S. at 252.

Finally, the Plaintiffs' reliance on Johnson v. Board of Stewards of Charles Town Races, 693 S.E.2d 93 (W.V. 2010)("Johnson"), is unavailing. In that case, the appellants challenged the constitutionality of a West Virginia Racing Commission Rule providing that "'[n]o horse

participating in a race shall carry in its body *any drug substance*, its metabolites, or analog, which are foreign to the natural horse . . . .'" 693 S.E.2d at 94 (alterations added)(emphasis in original)(quoting W. Va. Code R. § 178-66-5 (2007)). The West Virginia Board of Stewards applied that rule to disqualify the appellants' horse after the horse tested positive for a miniscule amount of caffeine "alleged to be the equivalent to ingesting a teaspoon of caffeine." Johnson, 693 S.E.2d at 94. The appellants appealed the Board of Stewards' ruling, and the Supreme Court of Appeals of West Virginia, under rational basis review, affirmed the rule's constitutionality, because the rule is "rationally related to the reasonable regulation of horse racing" and "is a reasonable method of preventing horses from being raced when they have drugs in their system." Johnson, 693 S.E.2d at 98.

The Court observes that the Supreme Court of Appeals of West Virginia's application of rational basis review to a former[34] West Virginia Racing Commission rule is unimpeachable; it is also inapposite. Unlike the former West Virginia Racing Commission rule that the Supreme Court of Appeals of West Virginia reviewed in Johnson, 693 S.E.2d at 94-98, the New Mexico Racing Commission rules do not condition discipline on the presence of caffeine in a racehorse at any amount, see N.M. Admin. Code § 15.2.6.9(L)(3)(c). The New Mexico Administrative Code § 15.2.6.9(L)(3)(c) acknowledges that caffeine is an "environmental contaminant[] and [a] substance of human use," and provides that "[d]iscplinary action [for the presence of caffeine] shall only be taken if test sample results exceed . . . 100 nanograms per milliliter of plasma or

<hr>

[34]In West Virginia, West Virginia Code of State Rules § 178-1-49 now regulates the presence of medications and prohibited substances in race horses. The specific West Virginia regulation for caffeine provides: "Although caffeine may be found in a horse due to environmental contamination/inadvertent exposure, no sample or specimen shall exceed the level of 100 nanograms per milliliter of serum or plasma when tested post race." W. Va. Code R. § 178-1-49.10.b.

serum [the approximate equivalent of 300 ng/ml in urine]." N.M. Admin. Code §
15.2.6.9(L)(3)(c)(alterations added). The issue in this case is not the constitutionality of New
Mexico Administrative Code § 15.2.6.9(L)(3)(c), which the Court does not doubt, but whether
the tests results showing a amount of caffeine in Stolis Winner's urine less than the amount that
the Racing Commission ascribes to environmental contamination are sufficient to avoid
summary judgment in the Defendants' favor. Again, they are not. Accordingly, <u>Johnson</u>, 693
S.E.2d 93, does not help the Plaintiffs escape summary judgment in the Defendants' favor.

## V.     THE PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIMS.

The Court turns to the Plaintiffs' MSJ. <u>See</u> Plaintiffs' MSJ at 1-27. On this motion, the
Plaintiffs have the burden to demonstrate that "there is no genuine dispute as to any material fact
and the [Plaintiffs' are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The
movant must support "its motion with credible evidence -- using any of the materials specified in
Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." <u>Celotex</u>, 477
U.S. at 331. The Plaintiffs cannot satisfy even this initial burden.

In support of their claims for intentional interference with prospective contractual
relations, fraud, prima facie tort, and negligence, the Plaintiffs repeatedly and overwhelmingly
rely on the record evidence of the two positive results for caffeine in Stolis Winner's urine
sample. <u>See</u> Plaintiffs' MSJ ¶ 6, at 2; <u>id.</u> at 5-7, 23-27. The Plaintiffs assert that the positive
caffeine samples are "sufficient evidence to be granted summary judgment." Plaintiffs' MSJ at
23. They are not. As explained above, the relevant scientific community ascribes the
concentrations of caffeine observed in Stolis Winner's split urine samples to environmental
contamination and does not associate such low concentrations with any performance effects in a

horse.  See Budhraja et al. at 89, 92; Dyke at 114.[35]    As the Court has already discussed,

standing alone, the positive caffeine samples reflecting a minuscule concentration of caffeine in

Stolis Winner's urine are therefore insufficient to support a reasonable inference of liability on

any of the Plaintiffs' four tort claims.  First, the Plaintiffs are not entitled to summary judgment

on their intentional interference with prospective contractual relations claim, because a minuscule

quantum of caffeine observed in the urine samples cannot support a reasonable juror's inference

that the Defendants intentionally administered caffeine to Stolis Winner with a purpose to

interfere with the Plaintiffs' contractual relations.   Second, the Plaintiffs are not entitled to

summary judgment on their fraud claim, because the two test results cannot support a reasonable

inference that the Defendants knew that Stolis Winner had ingested any amount of caffeine when

they entered Stolis Winner into the race.   Third, the Plaintiffs are not entitled to summary

judgment on their prima facie tort claim, because the two test results cannot support a reasonable

---

[35]Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f).  See Leon v. Fedex Ground Package Sys., Inc., 163 F. Supp. 3d 1050, 1066 (D.N.M. 2016)(Browning, J.).  In determining whether to take judicial notice of a fact, the Court may consider medical and scientific reports and journals among the sources which the Court deems reliable.   See Melong v. Micronesian Claims Comm'n, 643 F.2d at 12 ("Rule 201(b)(2) of the Federal Rules of Evidence . . . is designed to permit judicial recognition of material such as scientific data or historical fact that, although outside the common knowledge of the community, is nevertheless ascertainable with certainty without resort to cumbersome methods of proof."); United States v. Sauls, 981 F. Supp. at 920-21 ("In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable.")(emphasis added)(citation omitted); Bravos v. U.S. Bureau of Land Mgmt., 2011 WL 3924496, at *3 ("[T]he type of facts which a court will ordinarily take judicial notice are . . . established scientific facts . . . .").  See also McCormick on Evidence § 330, at 605-6 ("[T]he principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. . . . [T]he judge is free to consult any sources that he thinks are reliable . . . .").

inference that the Defendants improperly trained Stolis Winner. Fourth, the Plaintiffs are not entitled to summary judgment on their negligence claim, because the two test results do not support a reasonable inference either of breach of the duty created by the relevant New Mexico Administrative Code provisions, see N.M. Admin. Code §§ 15.2.6.9(B)(2) & 15.2.6.9(L), or that the tiny quantum of caffeine in Stolis Winner's system caused the Plaintiffs' injury, see Youst v. Longo, 729 P.2d at 730.

Moreover, even if the Plaintiffs could meet their initial burden, the Plaintiffs are not entitled to summary judgment on their tort claims for a separate reason: the Defendants have adduced record evidence showing that they neither intentionally administered caffeine to Stolis Winner nor knew of that Stolis Winner had ingested any amount of caffeine. See, e.g., Defendants' Intentional Interference with Prospective Economic Advantage MSJ ¶¶ 10-12, at 2-3 (citing Taylor's First Answers, at 3; J. Windham's First Answers, at 3-4; P. Windham's First Answers, at 3); P. Windham Aff. ¶ 5, at 1. The Defendants' record evidence, viewed in the light most favorable to nonmoving party, creates a genuine issue that defeats the Plaintiffs' MSJ. "Summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. To support their summary judgment motion, the Plaintiffs have adduced no evidence that affirmatively negates the Defendants' record evidence, and the Plaintiffs therefore have proffered no evidence on which a reasonable jury could support an inference of the Defendants' tort liability. As the Court discusses in detail above, the two positive caffeine samples, standing alone, are insufficient. Accordingly, the Plaintiffs are not entitled to summary judgment on their claims for intentional interference with prospective economic relations, fraud, prima facie tort, or negligence.

## VI.  THE PLAINTIFFS CANNOT RECOVER ON AN IMPLIED PRIVATE CAUSE OF ACTION UNDER THE NEW MEXICO RACING COMMISSION RULES.

At the motion-to-dismiss stage of this litigation, the Defendants moved to dismiss the Plaintiffs' Complaint, arguing that "the 'Plaintiffs lack standing and have failed to state a claim, because the applicable statutes and regulations do not authorize a private right of action.'" Simon v. Taylor, 2013 WL 5934420, at *7 (quoting Defendants' MTD at 9).  The Court rejected the Defendants' argument.  See Simon v. Taylor, 2013 WL 5934420, at *27 ("The Court is not persuaded.").  The Court then explained its reasoning for declining to adopt the Defendants' motion to dismiss argument:

> It is the public policy of New Mexico to ensure that horse racing is conducted fairly and honestly, and to protect racing participants. The Court holds that the Supreme Court of New Mexico would likely find that pursuant to National Trust for Historical Preservation v. City of Albuquerque, 1994-NMCA-057, ¶¶ 6-10, 874 P.2d at 801, this public policy forms the predicate for an implied private right of action under the New Mexico Horse Racing Act. Furthermore, the Court believes that the Supreme Court of New Mexico would also likely hold that the legislative intent behind the Horse Racing Act supports an implied private right of action.

Simon v. Taylor, 2013 WL 5934420, at *27.  See id. at *47-*56.

The implied cause of action under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the administrative regulations that the Racing Commission promulgates, N.M. Admin. Code § 15.2.6, lurks as a vague spectre in this case.  In their Complaint, the Plaintiffs do not expressly plead an implied private cause of action arising under the New Mexico statute or regulation.  See Complaint ¶¶ 127-73, at 23-29 (asserting claims for (i) intentional interference with prospective economic advantage; (ii) fraud; (iii) prima facie tort; (iv) negligence; (v) violation of a procedural due process; and (vi) violation of substantive due process claim).  In the Complaint's fourth count, however, the Plaintiffs alternatively style their negligence claim as a "contract/common law" claim, Complaint ¶¶ 145-52, at 25-26, and assert

that the Defendants "owed a duty to Plaintiffs to comply with the standards of race horse owners and trainers," Complaint ¶ 148, at 25.  The Plaintiffs do not specify whether they believe this duty sounds in New Mexico tort law or in an implied private cause of action arising under New Mexico statute or regulation.  See Complaint ¶¶ 145-52, at 25-26.  Nor do the Plaintiffs specify how their negligence cause of action -- which travels under the theory of negligence per se, in light of the New Mexico Horse Racing Act and the Racing Commission's rules -- is legally or conceptually distinct from their implied private cause of action, which arises under the same statute and regulations.  See Complaint ¶¶ 145-52, at 25-26.  Nevertheless, throughout this case, the Court has given the Plaintiffs the benefit of the doubt and construed their Complaint as asserting an implied cause of action separate from their negligence claim.  See Simon v. Taylor, 2013 WL 5934420, at *47 ("[T]he Plaintiffs also bring claims under the New Mexico Horse Racing Act, and under the rules and regulations promulgated by the Commission pursuant to the Act."); id. at *56 (referring to "the Plaintiffs' claims arising under the New Mexico Horse Racing Act, and under its rules and regulations").

At the hearing, the Plaintiffs moved for summary judgment on their implied private cause of action under the Horse Racing Act and the Racing Commission rules.  See Tr. at 53:21-24 (Dunn).  The Court noticed that the Defendants' summary judgment motions did not address the Plaintiffs' implied contract claim.  See Tr. at 54:14-15 (Court).  Nevertheless, the Plaintiffs adverted to the Court's ruling on the Defendants' MTD, in which the Court held that "the New Mexico Supreme Court would see the New Mexico racing act . . . as having an implied common law cause of action that creates a duty that can be enforced in Court."  Tr. at 53:21-24 (Dunn).  The Plaintiffs stated: "So that's the whole issue that we think there is no fact issue on [and] that summary judgment can be granted on."  Tr. at 53:24-54:1 (Dunn).  Accordingly, the Court will

address the Plaintiffs' claim to relief under an implied private cause of action.

The Plaintiffs are not entitled to summary judgment on their implied cause of action under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the rules that the Racing Commission promulgated, N.M. Admin. Code § 15.2.6. The Plaintiffs rely on the two positive caffeine tests to argue that they are entitled to summary judgment on their implied cause of action. See Tr. at 53:24-54:1 (Dunn). See generally Plaintiffs' MSJ at 5-11. The Iowa Lab estimated that there were 125 ng/ml of caffeine in Stolis Winner's urine sample, see Mueller Letter at 1, and the LSU Lab confirmed the presence of caffeine in Stolis Winner's urine sample at an estimated concentration of 84.2 ng/ml, see Barker Letter at 1; Mueller Letter at 1. Although the Defendants do not dispute these positive caffeine tests, the test results do not establish that the Plaintiffs are entitled to judgment as a matter of law on their implied private cause of action under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's regulations, N.M. Admin. Code § 15.2.6.

The Court held in this case that, "[b]ased upon the holding of National Trust for Historical Preservation v. City of Albuquerque, . . . the Supreme Court of New Mexico would imply a private right of action under the Horse Racing Act and under the regulations promulgated pursuant to the Act." Simon v. Taylor, 2013 WL 5934420, at *51 (citing 1994-NMCA-057, ¶¶ 6-10, 874 P.2d at 801). As the Court has explained in ruling on the Defendants' MTD, in National Trust for Historical Preservation v. City of Albuquerque, 1994-NMCA-057, ¶¶ 6-10, 874 P.2d at 801,

> the Court of Appeals of New Mexico . . . recognized that it is New Mexico public policy "that when[ a] governing statute is silent regarding who may bring a statutorily recognized action to require a public agency to comply with state law, one who is 'injured' by the allegedly unlawful conduct ordinarily may bring suit."

Simon v. Taylor, 2013 WL 5934420, at *50 (quoting Nat'l Trust for Historical Preservation v.

City of Albuquerque, 1994-NMCA-057, ¶ 12, 874 P.2d at 802).  In ruling on the Defendants'

MTD, the Court concluded "that the Supreme Court of New Mexico would hold that the Horse

Racing Act and its regulations demonstrate what New Mexico's public policy is, and that that

public policy forms the predicate for a cause of action against the Defendants under the Horse

Racing Act and its regulations."  Simon v. Taylor, 2013 WL 5934420, at *51.  Accordingly, to

decide whether the two positive test results entitle the Plaintiffs to summary judgment on their

implied private cause of action arising under the New Mexico Horse Racing Act, N.M. Stat.

Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's regulations, N.M. Admin. Code

§ 15.2.6, the Court considers closely the specific statutes and regulations that "form[] the

predicate for a cause of action."  Simon v. Taylor, 2013 WL 5934420, at *51.

The New Mexico Administrative Code § 15.2.6.9 "incorporate[s] by reference" the

"classification guidelines contained within the 'uniform classification guidelines for foreign

substances and recommended penalties and model rule', April 8, 2016, version 12.0 . . . ."  N.M.

Admin. Code § 15.2.6.9.  Under the Uniform Classification Guidelines for Foreign Substances

and Recommended Penalties and Model Rule, caffeine is classified as a Drug Class 2 substance

and a Penalty Class B substance.  See Uniform Classification Guidelines for Foreign Substances

and Recommended Penalties and Model Rule at 2.  New Mexico Administrative Code

§ 15.2.6.9(B)(2) recommends penalties against a licensed owner and a licensed trainer "for

violations due to the presence of a drug carrying a category B penalty and for the presence of

more than one [non-steroidal anti-inflammatory drug] in a plasma or serum sample . . . ."  N.M.

Admin. Code § 15.2.6.9(B)(2).  For the first offense of a licensed trainer, New Mexico

Administrative Code § 15.2.6.9(B)(2) recommends "[a] minimum 15-day suspension absent

mitigating circumstances or the presence of aggravating factors could be used to impose a

maximum 60-day suspension [and a] minimum fine of $500 absent mitigating circumstances or the presence of aggravating factors . . . ."   N.M. Admin. Code § 15.2.6.9(B)(2)(alterations added).   For the first offense of a licensed owner, New Mexico Administrative Code § 15.2.6.9(B)(2) recommends "[d]isqualification, loss of purse (in the absence of mitigating circumstances), and [the] horse must pass a commission-approved examination before becoming eligible to be entered."  N.M. Admin. Code § 15.2.6.9(B)(2)(alterations added).

New Mexico Administrative Code § 15.2.6.9 also informs the predicate private cause of action arising under the Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the rules that the Racing Commission promulgated, N.M. Admin. Code § 15.2.6.   New Mexico Administrative Code § 15.2.6.9 includes provisions related to "environmental contaminants and substances of human use," N.M. Admin. Code § 15.2.6.9(L), and states that "[s]ubstances of human use and addiction . . . may be found in the horse due to its close association with humans," N.M. Admin. Code § 15.2.6.9(L)(2).   Subsection 15.2.6.9(L) lists caffeine as an environmental contaminant.   <u>See</u> N.M. Admin. Code § 15.2.6.9(L)(3)(c).   Subsection 15.2.6.9(L)(3)(c), in turn, states that "[d]isciplinary action shall only be taken if test sample results exceed the regulatory threshold," which, for caffeine, is "100 nanograms per milliliter of plasma or serum."  N.M. Admin. Code § 15.2.6.9(L)(3)(c).  The Court takes judicial knowledge that caffeine concentrations in amounts of 100 ng/ml in blood serum or plasma approximately equal concentrations in amounts of 300 ng/ml in urine.   <u>See</u> Budhraja, et al. at 87 ("[P]lasma caffeine concentrations of <100 ng/ml, [are] equivalent to ~300 ng/ml in urine."); Budhraja, et al. at 90 ("10 ng/ml in plasma . . . is equivalent to ~30 ng/ml in urine.").  <u>See also</u> Greene, et al. at 59 ("When injected [through IV], caffeine concentrations reached peak within 5 minutes after IV injection of the drug and then decreased slowly.   The decreases of plasma and urinary

concentrations were parallel, with urinary concentrations being consistently about 3-fold higher than plasma concentrations of the drug.").[36]   The Court concludes that, in light of these administrative regulations, the Supreme Court of New Mexico would recognize an implied private right of action for the presence of caffeine in a racehorse, but only for "test sample results exceed the regulatory threshold," which, for caffeine, is "100 nanograms per milliliter of plasma or serum [equivalent to ~300 ng/ml in urine]."  N.M. Admin. Code § 15.2.6.9(L)(3)(c)(alteration added).  Or, put another way, the Supreme Court of New Mexico would conclude that, to be successful, the implied cause of action for the presence of caffeine in a race horse must allege and establish not merely the presence of a substance covered by "the classification guidelines for foreign substances and recommended penalties and model rule," April 8, 2016, version 12.0, incorporated by New Mexico Administrative Code § 15.2.6.9, but, for those substances that the Racing Commission recognizes as "environmental contaminants and substances of human use,"

---

[36]Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f).  See Leon v. Fedex Ground Package Sys., Inc., 163 F. Supp. 3d 1050, 1066 (D.N.M. 2016)(Browning, J.).  In determining whether to take judicial notice of a fact, the Court may consider medical and scientific reports and journals among the sources which the Court deems reliable.  See Melong v. Micronesian Claims Comm'n, 643 F.2d at 12 ("Rule 201(b)(2) of the Federal Rules of Evidence . . . is designed to permit judicial recognition of material such as scientific data or historical fact that, although outside the common knowledge of the community, is nevertheless ascertainable with certainty without resort to cumbersome methods of proof."); United States v. Sauls, 981 F. Supp. at 920-21 ("In determining whether judicial notice should be taken, the Court may consider federal and state statutes and regulations, municipal ordinances, government reports, agency rules and regulations, Surgeon General's Reports, medical and scientific reports and journals as well as various other sources which the Court is of the opinion are reliable.")(emphasis added)(citation omitted); Bravos v. U.S. Bureau of Land Mgmt., 2011 WL 3924496, at *3 ("[T]he type of facts which a court will ordinarily take judicial notice are . . . established scientific facts . . . .").  See also McCormick on Evidence § 330, at 605-6 ("[T]he principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. . . . [T]he judge is free to consult any sources that he thinks are reliable . . . .").

the presence of a substance that exceeds the "regulatory thresholds" which New Mexico Administrative Code § 15.2.6.9(L) provides. The Court does not conclude that the Supreme Court of New Mexico would sustain an implied cause of action under the Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's rules, N.M. Admin. Code § 15.2.6, that ignored a Racing Commission regulation essential to that administrative body's review and disciplinary action. New Mexico Administrative Code § 15.2.6.9 states that "[a]ny threshold herein incorporated by reference by inclusion in one of the documents above shall not supersede any threshold or restriction adopted by the commission as specified by this section." N.M. Admin. Code § 15.2.6.9.

Because Stolis Winner's two test samples do not exceed the regulatory threshold of "100 nanograms per milliliter of plasma or serum [equivalent to ~300 ng/ml in urine]," the Court concludes that the Plaintiffs have not adduced sufficient evidence to demonstrate that they are entitled to judgment as a matter of law on their implied private right of action arising under the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the Racing Commission's rules, N.M. Admin. Code § 15.2.6. Without additional evidence that the Defendants violated the New Mexico Horse Racing Act, N.M. Stat. Ann. §§ 60-1A-1 to 60-1A-30, and the rules that the Racing Commission promulgated, N.M. Admin. Code § 15.2.6, the Plaintiffs are not entitled to recover on their implied private right of action. The Plaintiffs have adduced no such additional evidence of the Defendants' rule violation.

**IT IS ORDERED** that: (i) the Defendants' First Motion for Summary Judgment as to Claim for Intentional Interference with Prospective Economic Advantage and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 136), is granted; (ii) the Defendants' Second Motion for Summary Judgment as to Claim of Fraud and Memorandum in Support Thereof, filed

December 21, 2016 (Doc. 137), is granted; (iii) the Defendants' Third Motion for Summary Judgment as to Prima Facie Tort Claim and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 138), is granted; (iv) the Defendants' Fourth Motion for Summary Judgment as to Negligence Claim and Memorandum in Support Thereof, filed December 21, 2016 (Doc. 139), is granted; and (v) the Plaintiffs' Motion for Summary Judgment, filed December 22, 2016 (Doc. 140), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Robert H. Fritz, III
Fritz Law Firm
Houston, Texas

-- and --

Chad W. Dunn
Brazil & Dunn
Houston, Texas

       *Attorneys for the Plaintiffs*

Brian O'Toole
Brian O'Toole, P.C.
Austin, Texas

-- and --

Billy R. Blackburn
Blackburn Law Office
Albuquerque, New Mexico

       *Attorneys for Defendants Heath Taylor, Jerry Windham, and Pat Windham*

Nicholas Sydow
  Assistant Attorney General
Albuquerque, New Mexico

> *Attorneys for Defendants Marty L. Cope, Arnold J. Rael, B. Ray Willis, Thomas Fowler, Larry Delgado, and the New Mexico Racing Commission*